-IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREAT SOUTHERN WOOD          )
  PRESERVING, INC.,          )
                      )
      Plaintiff          )
                      )
v.          )          CV: 1:06 cv 708-CSC
                      )
AMERICAN HOME ASSURANCE CO.,          )
et al.,          )
                      )
      Defendants.          )

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff Great Southern Wood Preserving, Inc. ("Great Southern") submits this response to the Defendants' Motion for Summary Judgment. Great Southern moves this Honorable Court to deny the Defendants' Motion for Summary Judgment because genuine issues of material fact do exist and the Defendants are not entitled to a judgment as a matter of law. In support of this Response, Great Southern says the following:

### I.    STATEMENT OF FACTS

Great Southern is in the lumber treating business. It purchases raw, soft wood lumber, chemically treats the lumber at one of its treating facilities and then sells the treated wood product to various retail and independent business customers. Although Great Southern purchases most of its lumber domestically, it does purchase some lumber from South America and imports it to the United States. *See* relevant portions of Deposition of Marty Goff, which are attached as **Exhibit A**, page 11, lines 3-15; page 12, lines 9-15; page 15, lines 19-22; page 16, lines 4-12. The raw lumber that Great Southern imports is delivered by ship and discharged at various ports in the United States, including the Port of Gulfport, Mississippi. *See* Goff Depo.,

**Exhibit A**, page 17, lines 3-19. The lumber is discharged from the ships by requirement of the ports and placed into warehouse facilities at the ports. *See* Goff Depo., **Exhibit A**, page 28, lines 4-9; page 29, lines 3-13; page 36, lines 18-23; page 37, line 1-3. However, before Great Southern can send the raw lumber to one of its treatment facilities, or in rare occasions to external customers who purchase the raw lumber directly, the lumber must first be cleared by both the United States Customs Service ("Customs") and the United States Department of Agriculture ("USDA"). Release by USDA and Customs can take several days after the wood is physically discharged from the ship. *See* Goff Depo., **Exhibit A**, page 56, line 7 through page 60, line 3; page 101, line 12 through page 104, line 11; *see also* 19 U.S.C. §1448; 19 U.S.C. §1499; 7 C.F.R. 319.40-2.

The Port of Gulfport, Mississippi is small. *See* Goff Depo., **Exhibit A**, page 30, line 4; page 31, line 1; page 61, lines 13-14. As a result, the logistics of picking up a large load of discharged cargo can be quite difficult:

> A: At all other ports, we are given thirty days of free space which is, you know, the norm for our particular products."
> Q: Okay
> A: And we had a space agreement with the port of Gulfport because of inland logistics. It is much, much easier to get freight out of the ports from other facilities than it is from Gulfport. It is basically trucking lanes, inland logistics in the lanes of traffic.
> Q: All right. I don't want to put words in you mouth. So in Gulfport because of the – with the delays in getting the trucks lined up to get the lumber out of the port, is that – You tell me. I don't want to –
> A: Yes
> Q: – put words in your mouth.
> A: The thing that we found in the port of Gulfport was that due to the natural lanes, trucking lanes, we were always under pressure to get the amount of cargo we pick up out of that port, which is a small port. The port of Gulfport is a small port. So after talking with the port, they understood our need and they understood the need that we were asking for because I think they had been asked from other people as well.

Goff Depo., **Exhibit A**, page 29 line 3 through page 30, line 9.

The Port only has a limited number of trucking lanes. Thus, only a limited number of trucks can load cargo each day. The Mississippi State Port Authority ("MSPA"), furthermore, requires a 24-hour appointment to schedule the pick up of any cargo discharged at the Port of Gulfport. *See* Goff Depo., **Exhibit A**, page 29, line 7 though page 31, line 7; page 61, lines 8-20.

American Home Assurance Co. ("American Home") issued Marine Open Cargo Insurance Policy Number 88590C ("the Policy") to Great Southern effective June 2, 2005. *See* the Policy which is Bates stamped GSWP 3 through GSWP 26 and attached as **Exhibit B**; *see also* Complaint and Answer. The first statement in the Policy says that "[t]his Policy covers automatically on all shipments which would come within its scope." The Policy, **Exhibit B**, page GSWP 3 ¶ 1. It also expressly states that one of the risks covered while cargo is on shore is that resulting from hurricanes. *See* the Policy, **Exhibit B**, page GWSP 11, ¶ 16. The Policy, furthermore, contains a "warehouse to warehouse" provision which in pertinent part states,

> This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the Declaration and/or Certificate for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment, if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods herby insured from the overseas vessel is completed. Held covered at a premium to be agreed in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the ASSURED.

3

The Policy, **Exhibit B**, page GSWP 13, ¶ 19. The Policy remains effective provided that there is not any interruption or suspension in transit unless the interruption or suspension in transit is caused by circumstances beyond Great Southern's control. *See* the Policy, **Exhibit B**, page GSWP 14, ¶ 20 § VII.

Great Southern received two shipments of unfinished lumber from South America which are at issue in this case. The first shipment was aboard the *Kestrel Arrow*, Voyage 45 ("*Kestrel Arrow*") which arrived at the Port of Gulfport, Mississippi on August 3, 2005. *See* Goff Depo., **Exhibit A**, page 85, lines 14-15. This shipment was fully discharged from the *Kestrel Arrow* on August 6, 2005, and received full clearance from Customs and USDA on August 7, 2005. *See* Goff Depo., **Exhibit A**, page 85, line 14 through page 86, line 11. The *Kestrel Arrow* had 4,056 packs of lumber on it or approximately 90 tractor-trailer loads of lumber. Great Southern began picking up these loads and transporting them to its treatment facilities on August 8, 2005. *See* Goff Depo., **Exhibit A**, page 89, lines 20-23; *see also* Dr. Jack Taylor's Report, which is Exhibit 15 to Marty Goff's Deposition and is attached as **Exhibit C**, page 3, § IV, ¶ A.[1] Great Southern averaged picking up 173 packs of wood per day from the *Kestrel Arrow* shipment. Great Southern was on pace to have picked up this entire shipment and delivered it to its final destination by September 1, 2005. *See* Goff Depo., **Exhibit A**, page 90, lines 2-9; page 93, lines 15-22; *see also* Taylor Report, **Exhibit C**, page 3, § IV, ¶ A.

The other shipment of raw lumber was aboard the *Sanko Stream*, Voyage 19 ("*Sanko Stream*") and arrived at the Port of Gulfport, Mississippi on August 25, 2005. *See* Goff Depo., **Exhibit A**, page 84, lines 2-7. This shipment contained approximately 100 tractor-trailer loads of raw lumber. *See* Goff Depo., **Exhibit A**, page 31, lines 3-5; *see also* Taylor Report, **Exhibit**

---

[1] The page references to **Exhibit C** refer to the actual numbered pages of Dr. Taylor's report which actually start on the second page of **Exhibit C** because page one of Exhibit C is a cover letter.

**C**, page 3, § IV, ¶ A.  The wood on the *Sanko Stream* was fully discharged from the ship on

August 27, 2005, but was not cleared and released by USDA until October 4, 2005:

> Q:  And on the *Sanko Stream* voyage nineteen, the release
> from customs was when?
> A:  The *Sanko Stream* arrived on 8-25.  She completed the
> discharge on 8-27.  Hurricane Katrina hit Monday morning
> 8-29.  U.S. – We finally got U.S. customs to release on 10-
> 4.
> Q:  Okay.  Never got a chance.
> A:  No, sir.

Goff Depo., **Exhibit A**, page 86, lines 12-20.[2]

On the morning of August 29, 2005, Hurricane Katrina hit the Port of Gulfport,

Mississippi destroying the Mississippi State Port Authority Warehouse.  The entire shipment of

unfinished lumber from the *Sanko Stream* was destroyed.  In addition, the remaining 28 percent

or approximately 24 tractor-trailer loads from the *Kestrel Arrow* were also destroyed by the

hurricane.[3]  *See* Goff Depo., **Exhibit A**, page 86, line 16; page 89, line 20 through page 90, line

13; page 93, lines 14-22; *see also* Taylor Report, **Exhibit C**,  page 3, § IV, ¶ A.

Great Southern filed a claim for these losses under the Policy on August 31, 2005.

American Home asserts that it conducted an investigation of the claim.  *See* Declaration of

Selena Ho, Assistant Vice President and Regional Claims Manager with AI Marine Adjusters,

Inc., an adjusting entity for the AIG group of companies, which is attached as **Exhibit E**, page 1

¶¶ 1-3.  American Home, however, failed to discover that the shipment from the *Sanko Stream*

had not been cleared and released by USDA at the time of the hurricane.  *See* Goff Depo.,

**Exhibit A**, page 86, lines 12-20; page 121, lines 7-10; *see also* ABI Processing Status Report

7501, **Exhibit E**.  Nevertheless, American Home, denied Great Southern's Claims on July 7,

---

[2] It appears that clearance was give by USDA on October 5, 2005, rather than by U.S. Customs.  *See* ABI Processing Status Report 7501, which is Bates Stamped GSWP 105 and is attached as **Exhibit D**.
[3] On the date that Hurricane Katrina hit the Port of Gulfport, Mississippi, Great Southern had picked up 72 percent of the shipment from the *Kestrel Arrow* and transported it to its final destination.

2006, asserting that the loss from Hurricane Katrina occurred after the coverage under the Policy had ended. *See* Denial Letter which is Bates stamped GSWP 31 through GSWP 33 and attached as **Exhibit F**. As a result of this denial, Great Southern filed this lawsuit asserting claims of breach of contract and bad faith. *See* Goff Depo., **Exhibit A**, page 100, line 10 through page 104, line 11; page 119, line 10 through page 125, line 21; *see also* Complaint.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper under Rule 56(c) of the Federal Rules of Civil Procedure if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp., v. Catrett*, 477 U.S. 317, 322 (1986). Issues of fact are "genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Matsushita Electrical Industrial Co. v. Zenith*, 475 U.S. 574, 587 (1986). In deciding whether or not summary judgment is proper, "the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). The court's role, furthermore, "is not to weigh the evidence or to assess credibility, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251 (1986). If the reasonable trier of fact could "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933-34 (11th Cir. 1989) (citations omitted).

Under Rule 56(e) of the Federal Rules of Civil Procedure, the "party opposing summary judgment must show that there is a genuine issue of material fact that precludes summary judgment and warrants trial." *Loren v. Sasser*, 309 F.3d 1296, 1301 (11th Cir. 2002) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)). This burden does not force

the nonmoving party to "produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex*, 477 U.S. at 324. The nonmoving party simply must produce "enough of a showing that the jury could reasonably find for that party." *Loren*, 309 F.3d at 1302 (quoting *Walker*, 911 F.2d at 1577).

### III.    ARGUMENT

### A. BREACH OF CONTRACT

The Defendant correctly states that the Policy falls within the admiralty jurisdiction of the federal courts. The United States Supreme Court, however, has held that if a specific controlling rule of admiralty law does not exist then state law should be used to interpret a marine insurance contract. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 321 (1955); *see also All Underwriters v. Weisberg*, 222 F.3d 1309, 1313 (11th Cir. 2000); *Steelmet, Inc. v. Caribe Towing Corp.*, 779 F.2d 1485, 1244 (11th Cir. 1986); *Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir. 1985). The Eleventh Circuit Court of Appeals has noted that "admiralty courts will generally look to appropriate state law in determining questions involving a marine insurance contract." *Weisberg*, 222 F.3d at 1313 (quoting *Gulf Tampa Drydock*, 757 F.2d at 1174).

Under Alabama law, a plaintiff can prove a breach of contract claim by showing "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Hooper v. Columbus Regional Healthcare System, Inc.* 2006 WL 2988689 at * 3 (Ala. Oct. 20, 2006) (quoting *Jones v. Alfa Mut. Ins. Co.*, 875 So. 2d 1189, 1195) (Ala. 2003); *see also Employees' Benefit Ass'n v. Grissett*,

732 So. 2d 968, 975 (Ala. 1998). In the present case, Great Southern and American Home did

have a valid insurance contract. *See* the Policy, **Exhibit B**, pages GSWP 3 through GSWP 26;

*see also* Complaint and Answer. Great Southern has performed its part of the Policy and

American Home does not claim otherwise. American Home, however, did breach its part of the

contract by denying coverage for damages of the shipments from the *Kestrel Arrow* and the

*Sanko Stream* which were clearly within the scope of the Policy. As a result of this denial of

coverage, Great Southern has suffered damages for loss of the wood destroyed by Hurricane

Katrina.

A significant aspect of Alabama law related to insurance contracts is the effect of

ambiguities in the contract. The Eleventh Circuit Court of Appeals has held that "[a]n insurance

contract is deemed ambiguous if it is susceptible to two or more reasonable interpretations that

can fairly be made." *Continental Ins. Co. v. Roberts*, 410 F.3d 1331, 1333 (11th Cir. 2005)

(quoting *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1261 (11th Cir. 2000)). When this situation

occurs, "Alabama law instructs that ambiguities in insurance contracts are to be interpreted in

favor of the insured." *Twin City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co., Inc.*, 480 F.3d 1254,

1264 (11th Cir. 2007); *see also Hancock v. New York Life Ins. Co.*, 899 F.2d 1131, 1135 (11th

Cir. 1990) (citing *Aetna Life Ins. Co. v. Hare*, 256 So. 2d 904, 911 (Ala. 1972)).

Here, American Home relies on the "warehouse to warehouse" clause in the Policy to

assert that Great Southern's claim was properly denied because the lumber at issue was no longer

in transit and had reached its final destination. The "warehouse to warehouse" clause states in

pertinent part,

> the insurance continues whilst the goods are in transit and/or
> awaiting transit until delivered to *the final warehouse at the
> destination named in the policy* or until the expiry of 15 days (or

30 days, if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur.

The Policy, **Exhibit B**, page GSWP 13, ¶ 19 (emphasis added).

American Home claims that the "final destination" in the Policy is the Port of Gulfport, and it relies on the invoices from the ship line and bills of lading from the South American lumber companies which list Gulfport, Mississippi as the destination of the raw lumber product. *See* Shipping Invoices for the *Kestrel Arrow* which are bates stamped GSWP 47, GSWP 49, GSWP 50, GSWP 67, GSWP 68 and GSWP 857 and are attached as **Exhibit G**; Bills of Lading for the *Kestrel Arrow* which are bates stamped GSWP 235, GSWP 252 and GSWP 253 and are attached as **Exhibit H**; Shipping Invoices for the *Sanko Stream* which are bates stamped GSWP 259, GSWP 265, GSWP 267, GSWP 277, GSWP 279 and GSWP 283 and are attached as **Exhibit I**; Bills of Lading for the *Sanko Stream* which are bates stamped GSWP 260, GSWP 266, GSWP 274 and GSWP 275 and are attached as **Exhibit J**; *see also* Selena Ho Declaration, **Exhibit D**, page 3 ¶ 15; Denial Letter, **Exhibit F**, pages GSWP 32 – GSWP 33. As far as the shipping contracts are concerned, the Port of Gulfport is the final destination because neither the *Kestrel Arrow* nor the *Sanko Stream*, nor any other ship, can physically go beyond the water at the port. Moreover, these shipping invoices and bills of lading are contractual documents between Great Southern, the shipper (Gearbulk) and the sellers of the wood. These documents, which are attached as **Exhibits G**, **H**, **I** and **J**, have nothing to do with American Home or the insurance policy at issue in this case. Furthermore, American Home's attempts to use these shipping documents and sales contracts between Great Southern and the other companies to define the final destination under the Policy are without merit. American Home has no third party beneficiary rights in these contracts. *See e.g. Crayton v. Canseco Finance Corp.*, 237 F. Supp. 2d 1322, 1326 (M.D. Ala. 2002) (quoting *Weathers Auto Glass Inc. v. Alfa Mut. Ins. Co.*,

619 So. 2d 1328, 1329 (Ala. 1993) (holding that a "party claiming to be a third party beneficiary of a contract must establish that the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental, benefit upon the third party")).

Despite American Home's contentions, the Port of Gulfport, Mississippi is not the "final destination" under the Policy. In fact, no "final destination" is actually named anywhere in the Policy and this term is not defined in the Policy. The term "final destination," therefore, is ambiguous and any interpretation of this term should be resolved in favor of Great Southern, the insured. *See Twin City Fire Ins. Co.*, 480 F.3d at 1264. Great Southern asserts that the "final destination" is the treatment facility where the unfinished lumber is transported because Great Southern's typical business does not involve selling raw, untreated wood.

The argument that American Home ultimately makes regarding the denial of coverage under the "warehouse to warehouse" clause hinges on the issue of custody and control. In making the contention that Great Southern had custody and control of the shipments in question, American Home relies on the warehouse lease agreement between Great Southern and MSPA. *See* MSPA Lease which is Exhibit 11 to Marty Goff's Deposition and is attached here as **Exhibit K**. Great Southern has the lease for the temporary warehouse space simply because of the logistical constraints at the Port of Gulfport. The lease does state that Great Southern has sole responsibility for the custody and care of its cargo stored in the warehouse facility. *See* MSPA Lease, **Exhibit K**, page 2 ¶ F. This section of the MSPA lease, however, simply serves as a release of liability for MSPA. It does not have any bearing on the coverage or interpretation of the subject insurance policy between Great Southern and American Home. American Home, additionally, does not have any rights under the lease agreement between Great Southern and MSPA because, again, American Home is not a third-party beneficiary to the lease. *See* MSPA

Lease, **Exhibit K**, page 1 (stating that the lease is between MSPA and Great Southern); *see also Crayton*, 237 F. Supp. 2d at 1326; *Weathers Auto Glass Inc.*, 619 So. 2d at 1329.

Another argument that American Home makes regarding custody and control is that on occasion unfinished lumber from older shipments would remain in the warehouse facility at the Port of Gulfport for several months. While Great Southern does not deny this fact, this fact is immaterial because it has nothing to do with the cargo shipments from the *Kestrel Arrow* or the *Sanko Stream*. At the time Hurricane Katrina destroyed the Port of Gulfport, the remaining unfinished lumber discharged from the *Kestrel Arrow* had only been in the warehouse since August 6, 2005, or approximately 23 days, and the shipment discharged from the *Sanko Stream* had only been in the warehouse for two days. Both shipments clearly fall within the 30 day extension of the "warehouse to warehouse" clause of the policy.[4]

The remainder of the shipment from the *Kestrel Arrow* was awaiting transit to the "final destination" at the time of Hurricane Katrina. Although this lumber had been cleared and released by Customs and USDA and Great Southern did have access to remove this lumber, this lumber was still in the process of being transported to its final destination. If the hurricane had not hit, Great Southern would have had all of this raw lumber out of the temporary warehouse and to its final destination on or before September 1, 2005, within the 30 day period in the "warehouse to warehouse" provision in the Policy. Great Southern transported the raw lumber from the *Kestrel Arrow* in the manner that it did because of the limitations on removing cargo from the Port of Gulfport, Mississippi and the physical limitations of removing an entire ship load of lumber via tractor-trailers.

---

[4] The 30 day provision rather than the 15 day provision of the warehouse to warehouse clause applies here because Great Southern does not have treatment facilities within the limits of the Port of Gulfport.

The shipment from the *Sanko Stream*, on the other hand, was not only waiting transit to its "final destination" but also had not been cleared and released by USDA. The United States Code of Federal Regulations states in relevant part,

> Except for regulated articles exempted from this requirement by paragraph (c) of this section or Sec. 319.40-3, no regulated article may be imported unless a specific permit has been issued for importation of the regulated article in accordance with Sec. 319.40-4, and unless the regulated article meets all other applicable requirements of this subpart and any requirements specified by APHIS [Animal and Plant Health Inspection Service, United States Department of Agriculture] in the specific permit.

7 C.F.R. 319.40-2.

Until a shipment is cleared by USDA, Great Southern does not have custody and control of the goods. Here, the shipment from the *Sanko Steam* was not released by USDA until October 4, 2005. Because Great Southern had not exercised custody and control over the lumber from the *Sanko Stream* at the time of the loss, the lumber could not have reached its "final destination." Thus, this lumber was still in transit at the time of the loss and within the scope of the "warehouse to warehouse" clause of the Policy.

American Home, additionally, cites three cases to suggest that the extent of custody and control determines whether or not the "warehouse to warehouse" clause of a marine open cargo insurance policy applies. All three of these cases, however, can be distinguished from the current situation. Two cases from the Southern District of New York, *Jomark Textiles, Inc. v. International Fire and Marine Ins. Co., Ltd.*, 771 F. Supp. 577 (S.D.N.Y. 1989) and *New York Marine & General Ins. Co. v. Tradeline (L.L.C.)*, 2003 WL 548877 (S.D.N.Y. Feb. 25, 2003), both held that the "warehouse to warehouse" clause did not apply because the goods were not in transit.

12

In *Jomark Textiles,* the goods in question were textiles that had been shipped "from Korea to New York via the west coast of the United States in bond." 771 F.Supp. at 578. The textiles were removed by the insured from the port in New York and stored at a private warehouse in Seacaucus, New Jersey. The textiles then were sent to another private warehouse in Elizabeth, New Jersey, where the textiles "were to remain until Jomark determined their final destination." *Id.* While in storage at the warehouse in Elizabeth, New Jersey, the textiles were destroyed by fire. Coverage under the policy at issue in *Jomark Textiles* specifically terminated once the insured goods are delivered to a warehouse "(i) for storage other than in the ordinary course of transit or (ii) for allocation or distribution, ... ." *Id.* The policy of insurance did not contain a "warehouse to warehouse" provision extending coverage for a period of 15 to 30 days, as does the policy issued in this case by American Home. In *Jomark Textiles,* the court determined that the insured used the warehouse where the textiles were stored as a "staging place" and, therefore, since the warehouse was used for "allocation or distribution," coverage under the subject policy terminated. In this case, the wood imported by Great Southern remained at the Port of Gulfport, rather than being transported to a warehouse outside the limits of the port. Further, the policy at issue in this case does not contain the same provisions which excluded coverage in *Jomark Textiles.*

In *New York Marine & General Ins. Co. v. Tradeline (L.L.C.),* relevant portions of the marine cargo policy were the same as were found in the *Jomark Textiles* case. In *Tradeline,* the insured's shipment of fertilizer was stored in a silo at the port. The port was listed as the final destination in the policy of insurance. The insured then had the fertilizer bagged and distributed directly from the port. The court found that insurance coverage for the fertilizer had terminated since the fertilizer had (1) been delivered to the "final warehouse" listed in the policy and (2)

been delivered to a place of storage which the insured elected to use "for allocation or distribution." *Id.* at *3. Here, the policy issued to Great Southern by American Home did not name the Port of Gulfport, Mississippi as the "final warehouse," and coverage under the American Home policy was extended for a period of 15 to 30 days for shipment of the lumber in question to its final destination.

In *Lumber & Wood Products, Inc. v. New Hampshire Ins. Co.*, 807 F.2d 916 (11th Cir. 1987), the Eleventh Circuit Court of Appeals held that a shipment of lumber delivered to the dock of a third-party consignee was no longer in transit and had reached its final warehouse destination because the consignee had taken complete dominion and control over the lumber. *Id.* at 921. In that case, the consignee was in the business of purchasing raw lumber and then reselling it to customers directly from its dock. *Id.* at 917-18. The raw lumber was thus a finished product. Furthermore, the delivery of the lumber occurred at the private dock of the consignee which included the dock space, the berth and the warehouse facilities. *Id.* at 917. The destroyed lumber at issue in *Lumber & Wood Products* "had sat idly on Delta Hardwood's [the consignee] dock for thirty-two days after delivery." *Id.* at 919. The "warehouse to warehouse" clause in that case provided for coverage of the goods while in transit and awaiting transit to the final warehouse or at the end of 15 days after discharge.[5] *Id.*

Great Southern, on the other hand, is in the business of selling treated wood. The destroyed wood from both the *Kestrel Arrow* and the *Sanko Stream* had not been treated and thus was not a finished product for Great Southern. As such, neither shipment could be said to have arrived at its "final warehouse." While Great Southern occasionally sells raw lumber, nothing indicates that it was planning to do that with the two shipments at issue. Also, unlike the

---

[5] The clause does contain the same 30 day alternate provision like the one in the subject policy; however, in *Lumber & Wood Products*, the destination was not outside the limits of the port because the discharge of the lumber was at the private dock facilities of the consignee.

situation in *Lumber & Wood Products*, the time under the "warehouse to warehouse" provision

in the Defendant's Policy had not expired when the destruction occurred. Great Southern,

moreover, exercised no dominion and control over the shipment from the *Sanko Stream* because

at the time of the loss the shipment had not been cleared and released by USDA.

## B. BAD FAITH

The Eleventh Circuit Court of Appeals has noted that "[u]nder Alabama law, there are

two methods by which a party can establish a bad faith refusal to pay an insurance claim. An

insurance company may be liable for either 'normal' bad faith or 'abnormal' bad faith." *Mutual*

*Service Cas. Ins. Co. v. Henderson*, 368 F.3d 1309, 1314 (11th Cir. 2004) (citing *Grissett*, 732

So. 2d at 976 and *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 306 (Ala. 1999)).

Normal bad faith requires the plaintiff to prove "(1) a breach of the insurance contract; (2) an

intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or

arguable reason for that refusal; and (4) the insurer's actual knowledge of the absence of any

legitimate or arguable reason." *Henderson*, 368 F.3d at 1314 (citing *Grissett*, 732 So. 2d at 976);

*see also Nat'l Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 126-27 (Ala. 2002).

In the current case, American Home breached the insurance contract when it refused to

pay a valid claim covered by the terms of its policy. The denial letter issued by American Home

clearly establishes American Home's deliberate refusal to pay Great Southern's claim. None of

the reasons the Defendant gives, however, are reasonably legitimate or arguable. Neither the

cargo from the *Kestrel Arrow* nor the cargo from the *Sanko Stream* had reached the final

warehouse at the time the hurricane destroyed it. When Hurricane Katrina destroyed the

unfinished lumber at issue, all of this lumber was still awaiting transit to the "final destination."

Great Southern is in the business of selling treated lumber and does not have a treatment facility at the Port of Gulfport, Mississippi. As a result, all of the raw lumber at issue had to leave the Port of Gulfport to reach its final destination. The lumber from the *Sanko Steam*, furthermore, was clearly still in transit at the time of the hurricane because it had not yet received clearance from USDA, meaning Great Southern could exercise no dominion and control over it.

Even if Great Southern cannot prevail under a theory of normal bad faith, it can clearly prevail under a theory of abnormal bad faith. Again, in applying Alabama law, the Eleventh Circuit Court of Appeals has held,

> to recover under a theory of an abnormal case of bad faith failure to investigate an insurance claim, the insured must show (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim.

*Henderson*, 368 F.3d at 1315 (quoting *Simmons v. Congress Life Ins. Co.*, 791 So. 2d 371, 379 (Ala. 2000). As the Alabama Supreme Court has held, the insurer has the "responsibility to marshal all of the pertinent facts with regard to its insured's claim before it refuse[s] to pay." *Sockwell*, 829 So. 2d at 130; *see also Henderson*, 368 F.3d at 1315.

American Home failed to investigate Great Southern's claim properly. At the time of the claim, the lumber from the *Sanko Stream* had not yet been cleared and released by USDA. The release did not occur until October 4, 2005, more than a month after the August 29, 2005, date of loss. American Home did not actually deny the claim until July 6, 2006, when it stated that Great Southern had exercised dominion and control over this lumber. American Home, however, failed to discover or even to inquire whether at the time of the loss Great Southern had

exercised dominion or control over this wood from the *Sanko Stream*. Great Southern, in fact, had no control or dominion over the wood at the time of the loss.

Proper investigation also would have revealed that Great Southern was not using the warehouse at the Port of Gulfport as a staging area. Instead, as is typical at all ports, Great Southern used the warehouse space as temporary storage for the discharged lumber that was awaiting transport to its final destination. If American Home had properly investigated the claim before denying it, American Home would have realized that any delays in removing the cargo from the temporary warehouse space resulted from the limitation of the port itself and were not within the control of Great Southern.

The Alabama Supreme Court, additionally, has held that a claim for abnormal bad faith is proper in situations where "the insurer ...relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim." *Sockwell*, 829 So. 2d at 130-31. American Home asserts that its lawful basis in denying the claim is the language of the "warehouse to warehouse" clause of the Policy. This provision is ambiguous because it states that coverage continues until the delivery at the final warehouse at the destination named in the policy or for 30 days after discharge whichever occurs first. The policy does not actually name a destination. The term "final warehouse at the destination named in the policy," therefore, can have more than one interpretation. According to the Eleventh Circuit Court of Appeals, having more than one interpretation is the very definition of an ambiguity. *See Roberts*, 410 F.3d at 1333.

## IV.   CONCLUSION

Genuine issues of material fact exist in this case and the Defendants are not entitled to a judgment as a matter of law. Summary judgment, therefore, is not proper and the Defendants' Motion for Summary Judgment should be denied.

<u>s/Kenneth A. Dowdy</u>
Kenneth A. Dowdy (DOW015)
Attorney for Plaintiff
LUSK, LUSK, DOWDY &
CALDWELL, P.C.
2101 Highland Avenue, Suite 410
Birmingham, Alabama  35205
Telephone:  (205) 933-7090
Facsimile:    (205) 933-7099
E-mail: kad@lusklaw.com

## CERTIFICATE OF SERVICE

I herby certify that I have on this the 2nd day of July 2007, served the foregoing on counsel for the Defendants via the E-file system and a separate copy via United States Mail, postage prepaid and properly addressed to:

Blane H. Crutchfield, Esq.
Louis C. Norvell, Esq.
Hand Arendall, L.L.C.
P.O. Box 123
Mobile, Alabama 36601-0123

<u>s/Kenneth A. Dowdy</u>

EXHIBIT A

## FREEDOM COURT REPORTING

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4

5    GREAT SOUTHERN WOOD          )

6    PRESERVING, INC.,            )

7              Plaintiff,         )

8    vs.                          )  CASE NUMBER:

9    AMERICAN HOME ASSURANCE      )  1:06-CV-00708-CSC

10   CO., AIG, AMERICAN           )

11   INTERNATIONAL                )

12   UNDERWRITERS CORP.,          )

13   AMERICAN INTERNATIONAL       )

14   MARINE AGENCY,               )

15              Defendants.       )

16

17          DEPOSITION OF MARTY GOFF

18          In accordance with Rule 5(d) of

19   The Alabama Rules of Civil Procedure, as

20   Amended, effective May 15, 1988, I, Cindy

21   Weldon, am hereby delivering to Blane

22   Crutchfield, the original transcript of the

23   oral testimony taken on the 22nd day of May,

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 2

1    2007, along with exhibits.

2            Please be advised that this is the

3    same and not retained by the Court Reporter,

4    nor filed with the Court.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## FREEDOM COURT REPORTING

Page 3

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   EASTERN DIVISION

4

5    GREAT SOUTHERN WOOD            )

6    PRESERVING, INC.,             )

7          Plaintiff,              )

8    vs.                           ) CASE NUMBER:

9                                  ) 1:06-CV-00708-CSC

10   AMERICAN HOME ASSURANCE       )

11   CO., AIG, AMERICAN            )

12   INTERNATIONAL                 )

13   UNDERWRITERS CORP.,           )

14   AMERICAN INTERNATIONAL        )

15   MARINE AGENCY,                )

16          Defendants.            )

17

18          S T I P U L A T I O N

19          IT IS STIPULATED AND AGREED, by

20   and between the parties through their

21   respective counsel, that the deposition of

22   MARTY GOFF, may be taken before Cindy

23   Weldon, Certified Shorthand Reporter,

# FREEDOM COURT REPORTING

Page 4

1  Commissioner and Notary Public, at the

2  offices of Kaufman & Rothfeder, 2660

3  EastChase Center, Suite 300, Montgomery,

4  Alabama, on May the 22nd, 2007 at 10:00 a.m.

5         IT IS FURTHER STIPULATED AND

6  AGREED that the signature to and the reading

7  of the deposition by the witness is waived,

8  the deposition to have the same force and

9  effect as if full compliance had been had

10  with all laws and rules of Court relating to

11  the taking of depositions.

12         IT IS FURTHER STIPULATED AND

13  AGREED that it shall not be necessary for

14  any objections to be made by counsel to any

15  questions, except as to form or leading

16  questions, and that counsel for the parties

17  may make objections and assign grounds at

18  the time of trial, or at the time said

19  deposition is offered in evidence, or prior

20  thereto.

21         IT IS FURTHER STIPULATED AND

22  AGREED that notice of filing of the

23  deposition by the Commissioner is waived.

## FREEDOM COURT REPORTING

1              A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4            MR. KENNETH A. DOWDY

5            LUSK, LUSK, DOWDY & CALDWELL

6            SUITE 410, 2101 HIGHLAND AVENUE

7            BIRMINGHAM, ALABAMA   35205

8

9    FOR THE DEFENDANT:

10           MR. BLANE CRUTCHFIELD

11           HAND, ARENDALL

12           107 SAINT FRANCIS STREET

13           SUITE 3000

14           MOBILE, ALABAMA   36601

15

16

17

18

19

20

21

22

23

## FREEDOM COURT REPORTING

Page 7

1          MARTY GOFF,

2     after first being duly sworn, testified

3               as follows:

4    EXAMINATION BY MR. CRUTCHFIELD:

5          THE COURT REPORTER:  Usual

6    stipulations?

7          MR. DOWDY:  Please.

8          MR. CRUTCHFIELD:  That's fine.

9     Q.    Mr. Goff, my name is Blane

10   Crutchfield.  We've been introduced this

11   morning.  And I understand you're here as

12   the designated representative for Great

13   Southern for this 30(b)(6) deposition.

14          (Whereupon, Defendant's Exhibit

15   No. 1 was marked for identification and

16   attached to the original transcript.)

17    Q.    Mr. Goff, I'm going to ask you

18   some questions, as you probably know from

19   talking with Mr. Dowdy, that we had

20   designated some areas of inquiry and that

21   you're being put up as the representative

22   that has knowledge on those matters.

23          And I don't want to go through

## FREEDOM COURT REPORTING

Page 11

1   Great Southern does and generally how their

2   business operates.

3        A.   At Great Southern, we purchase

4   pine lumber, different species of pine, but

5   all soft wood lumbers.  We then bring it

6   into our facilities, we treat it, and then

7   sell it and distribute the product to

8   customers in the building industry, both

9   retail and independent --

10       Q.   All right.

11       A.   -- businesses.

12       Q.   Go ahead.

13       A.   And we -- For an example, we may

14  sell to Buddy's Hardware in Abbeville and we

15  also sell Home Depot.

16       Q.   And is there a particular brand

17  name that you sell under?

18       A.   Yes.  Yella Wood.  Yella Wood is

19  the trade name that belongs to Great

20  Southern.

21       Q.   And where does Great Southern have

22  -- Well, you said the corporate

23  headquarters is in Abbeville.  Where does it

# FREEDOM COURT REPORTING

Page 12

1   have facilities?

2       A.   We have facilities in Mobile

3   Alabama, of course, Abbeville, Alabama,

4   Muscle Shoals, Alabama, Conyers, Georgia,

5   Savannah, Georgia -- I'm sorry -- Jessup,

6   Georgia and Lake Panasofkee, Florida.  And

7   then we have satellite production centers as

8   well.  Those are our main facilities.

9       Q.   And when you say you import pine

10  lumber, do you also buy domestic lumber?

11      A.   Yes, sir.  We buy -- Approximately

12  eighty-five to ninety percent of our

13  purchases are domestic southern yellow pine

14  with the balance being imported subspecies

15  of pine.

16      Q.   And are you involved at all in the

17  domestic production?

18      A.   No, sir.  Not at this time.  In

19  prior jobs, yes.  But not now.

20      Q.   And as the import manager -- you

21  may have already touched on this -- but can

22  you kind of give me a description of what

23  you do on a daily basis?  It may change from

# FREEDOM COURT REPORTING

Page 15

1          A.    For Great Southern.

2          Q.    For Great Southern.

3          A.    Approximately one hundred and

4    fifty to two hundred million board feet per

5    year.

6          Q.    Do you have any idea what the

7    value of that lumber is?

8          A.    No.  I would be speculating

9    without crunching the numbers.

10         Q.    You said lumber that you import.

11   Do you act as a broker or any capacity for

12   other U.S. importers?

13         A.    No.

14         Q.    Okay.  I just wanted to make sure

15   when you said --

16         A.    Yes.  I --

17         Q.    -- what kind of volume do we

18   import, that there wasn't other --

19         A.    That is what I bring in.  Now, out

20   of that volume, I sell the volume to some

21   external customers who do not have an import

22   department.

23         Q.    You sell to those customers from

## FREEDOM COURT REPORTING

Page 16

1   lumber that you procured and then sell

2   before it comes to your facility?

3       A.    Correct.

4       Q.    Okay.  Is this lumber primarily

5   from South America that you import?

6       A.    Yes.

7       Q.    Are there other countries that you

8   import from?

9       A.    No.

10      Q.    Okay.  What countries do you

11  import from?

12      A.    Argentina, Chile and Brazil.

13      Q.    Are those different species or is

14  it just different suppliers of the same?

15      A.    Different suppliers.  They are all

16  teada or radita pine.

17            MR. DOWDY:  Could you spell that

18  for her.

19      A.    Radita, R-A-D-I-T-A.  Teada,

20  T-E-A-D-A.

21      Q.    And I would imagine that the bulk

22  of this imported product is brought in on

23  ocean going vessels from those foreign

## FREEDOM COURT REPORTING

Page 17

1    ports?

2        A.    Yes, sir.

3        Q.    During the last couple of years,

4    where has that -- where have those vessels

5    discharged the cargo?

6        A.    I discharge cargo in Houston,

7    Texas; Lake Charles, Louisiana; Gulfport

8    slash Pascagoula, Mississippi; Port Manatee,

9    Florida; Morehead City, North Carolina, and

10   Closter, New Jersey.

11       Q.    We can't get Mobile on that?

12       A.    Oh, yes.  Mobile, yes.  I'm sorry.

13       Q.    You do discharge some in Mobile?

14       A.    Yes.  I'm sorry.

15       Q.    And then you do discharge in

16   Mobile.  Is that at the State docks?

17       A.    Yes, sir.

18       Q.    There in Mobile?

19       A.    Yes.

20       Q.    I probably should ask you some

21   general questions about your background and

22   how you got to be trained in this particular

23   business and what education, if you can give

# FREEDOM COURT REPORTING

Page 28

1   point of origin or a port in a South

2   American country?

3        A.    Yes, sir.

4        Q.    In Port Manatee, do you have a

5   facility there where the -- or does anyone

6   have a facility there where the lumber is

7   stored prior to being -- prior to inland

8   transit?

9        A.    Yes.  All ports do.

10       Q.    All right.  And do you lease space

11  there in Port Manatee?

12       A.    No, sir.

13       Q.    In this case, we've been provided

14  with a lease for the warehouse space in

15  Gulfport.

16       A.    Uh-huh.

17       Q.    Are there any other ports where

18  you have a lease of a similar arrangement?

19       A.    No.

20       Q.    In those other ports, I take it

21  that whatever the terminal is there,

22  basically the cargo comes in and you have a

23  certain amount of free time and they --

## FREEDOM COURT REPORTING

Page 29

1    there's not a formal lease arrangement

2    entered into?

3        A.    At all other ports, we are given

4    thirty days of free space which is, you

5    know, the norm for our particular products.

6        Q.    Okay.

7        A.    And we had a space agreement with

8    the port of Gulfport because of inland

9    logistics.  It is much, much easier to get

10   freight out of the ports from other

11   facilities than it is from Gulfport.  It's

12   basically trucking lanes, inland logistics

13   in the lanes of traffic.

14       Q.    All right.  I don't want to put

15   words in your mouth.  So in Gulfport because

16   of the -- with the delays in getting the

17   trucks lined up to get the lumber out of the

18   port, is that -- You tell me.  I don't want

19   to --

20       A.    Yes.

21       Q.    -- put words in your mouth.

22       A.    The thing that we found in the

23   port of Gulfport was that due to the natural

## FREEDOM COURT REPORTING

Page 30

1  lanes, trucking lanes, we were always under

2  pressure to get the amount of cargo we pick

3  up out of that port, which is a small port.

4       The port of Gulfport is a small

5  port. So after talking with the port, they

6  understood our need and they understood the

7  -- they understood the need that we were

8  asking for because I think they had been

9  asked from other people as well.

10      Q.   In other words, because of the

11  trucking lanes and the delays that occurred

12  in terms of getting your product out, you

13  needed a place to put it essentially until

14  it could be trucked out?

15      A.   No, not really. I mean, the port

16  of Gulfport give us -- once we asked for it

17  -- a space agreement because the thirty day

18  free time which was typical at all other

19  ports did not work for us in the port of

20  Pascagoula -- I mean the port of Gulfport

21  due to the inland logistics that we were

22  just discussing as well as the nature of the

23  port.

## FREEDOM COURT REPORTING

Page 31

1    I mean, that was a small port.

2    And, you know, I would bring in -- for

3    example, on the Sanko Stream that had just

4    discharged, there were a hundred truck loads

5    on that.  So logistically for us, it was

6    tough to maintain a -- picking up a hundred

7    truck loads in three -- thirty days.

8        Q.    I've got you.

9        A.    And they understood that.  And I

10   think they worked well.  I was told they

11   worked similar space agreements with others

12   as well.

13       Q.    On the ocean carriage side of

14   things or really from the point at which you

15   purchased the product in South American

16   countries, who at Great Southern would have

17   been responsible for seeing to it that there

18   was insurance coverage placed to cover that

19   lumber?

20       A.    William Ray.

21       Q.    William Ray?

22       A.    Our CFO.

23       Q.    Can you -- You may not know

# FREEDOM COURT REPORTING

Page 36

1  forth?

2      A.    Correct.   They take -- They issue

3  an O S and D report, which is overage,

4  shortage or damage.   And they do -- they

5  reconcile the inventory that was discharged

6  versus what's showing on the bill of lading.

7      Q.    And then would they invoice you

8  for that or just send you a report and an

9  invoice on that?

10     A.    They do not send -- They send us a

11 report.   But they do not invoice for that

12 particular process.

13     Q.    Okay.  Do they invoice you for

14 anything forward?

15     A.    Wharfage.

16     Q.    For wharfage?

17     A.    Wharfage.

18     Q.    Okay.  And in the -- Is the cargo

19 typically in Gulfport immediately put in

20 warehouse or does it stay on the dock for a

21 particular time?  I'm just trying to get an

22 idea.

23     A.    It is discharged off the vessel

# FREEDOM COURT REPORTING

Page 37

1    and there is a person that does the

2    accounting as it comes off the vessel and

3    it's taken straight into the warehouse.

4         Q.    Who is the stevadore that handles

5    the cargo at Gulf Port?

6         A.    C.S.A.

7         Q.    I take it this lumber, if you can,

8    needs to be put inside and out of the rain?

9    You'd like it to be anyway?

10        A.    Yes, sir.

11        Q.    It's untreated?

12        A.    Correct.

13        Q.    Is that essentially the same

14   process that works at all your ports?  If I

15   understand, you don't have lease

16   arrangements with the other ports.  But is

17   that essentially --

18        A.    Yes, sir.

19        Q.    Okay.  Let's see if I can pull out

20   a set of documents just so we can -- What

21   I'd like to do is just go to sort of a

22   representative sample of the shipping

23   documents.

# FREEDOM COURT REPORTING

Page 56

1    A.    Yes, it is.

2    Q.    Tell me what -- And we can get

3  into some of these.  I almost hesitate to

4  because they are thick and look to be

5  involved.  But the delivery breakdown, the

6  import stock report.

7         But tell me generally speaking,

8  once cargo is discharged from the vessel at

9  Gulfport, what happens to it and where it

10  goes from there.

11    A.    Once the material is discharged,

12  in this case, the port of Gulfport, for

13  Great Southern, at that point in time, it is

14  still considered raw product.  I mean, it

15  has to come to our facilities to become a

16  finished good.

17         And once the material is

18  discharged and we get full U.S.D.A. release

19  and customs release, we then begin to

20  dispatch the cargo for pick up.

21         And that cargo is dispatched one

22  truckload at a time.  And it is then put

23  into our internal system and our

## FREEDOM COURT REPORTING

Page 57

1  transportation department begins to pick it

2  up and deliver it to the designated plant.

3      Q.    You mentioned U.S.D.A. release.

4  Is that another document that you would get

5  or a notification that you would get?

6      A.    U.S.D.A. does not do any paper

7  documents.  It is all on an online system.

8  Our customs broker makes all those entries

9  online.  I can revert back and see if

10  there's some possible documentation off that

11  web site.  But it is basically an online

12  entry system.

13     Q.    Okay.  And how -- In the timing of

14  things, when does that generally occur once

15  the cargo has been discharged?  How long

16  does it take to get the release from the

17  U.S.D.A.?

18     A.    That depends.  It could be as soon

19  as the material discharges.  It could be up

20  to -- I've seen it five, six, seven days

21  later depending on whether or not U.S.D.A.

22  wants to actually go out and inspect the

23  goods.

## FREEDOM COURT REPORTING

Page 58

1    Q.    And what about the customs

2    release?

3    A.    They operate in the same manner.

4    Q.    All right.  Is this document from

5    customs, does it reflect the release or is

6    that an online?  I'm referring now to

7    Exhibit 10.

8    A.    For sure online.  May I look at

9    that.

10    Q.    Sure.

11    A.    It definitely does online.  No.

12    This particular document only shows the

13    entry date in which it was put in the

14    system.

15    Q.    But at any rate, it's -- you were

16    saying it's brought to the warehouse, stays

17    there until you're ready to load it on a

18    truck and take it to whatever point it's

19    going to be taken to?

20    A.    Yes.

21    Q.    Who decides what lumber will go to

22    what --

23    A.    I do.

# FREEDOM COURT REPORTING

Page 59

1    Q.    -- treatment plant?

2    A.    I do and the people that work with

3    me do.  We decide -- We basically -- Also in

4    our day-to-day duties that I did not mention

5    earlier, we are inventory management as

6    well.

7          So we maintain the inventories in

8    our different facilities.  And depending on

9    that inventory level is where we would -- or

10   what dictates where we ship what to.

11   Q.    In other words, on a kind of like

12   needs basis when --

13   A.    Yes.

14   Q.    When your inventory level reaches

15   a certain point, you say we can take on

16   another hundred truck load or whatever it

17   may be?

18   A.    No.  I would not say -- I wouldn't

19   say that.  Ultimately all this cargo is

20   going to our plant.  So certainly in the

21   inventory position we consider that.

22         But ultimately this cargo is going

23   to the plants, whether it gives them thirty

## FREEDOM COURT REPORTING

Page 60

1    days worth of inventory or forty-five days

2    worth of inventory.  It's going to the

3    plants.

4        Q.    I see.  But in terms of deciding

5    what cargo and how much goes at a particular

6    time, it generally is based on your .

7    inventory needs at the plant?

8        A.    It is a consideration.  But it is

9    not the ultimate determine.

10       Q.    What are the other considerations?

11       A.    Well, the main -- what the plants

12   -- I'll give you an example.  If the plant

13   in Mobile has a thousand packs and the plant

14   in Abbeville has five hundred packs, the

15   material -- I will first determine that the

16   material needs to go to Abbeville.

17            And I will take care of their

18   inventory needs.  And once those needs are

19   taken care of, then the remaining balance

20   will go to Mobile.

21       Q.    Okay.  Timing-wise, how do you

22   make that determination, in other words, how

23   quickly you get any particular shipment out

# FREEDOM COURT REPORTING

Page 61

1  of the warehouse and on to the facility?

2      A.    I would say it -- In our system,

3  we have means in which we can mark cargo

4  ready for pick up.  And once that cargo is

5  ready for pick up, we then start the pick up

6  process.

7          And it is -- Now, the timing

8  depends on a couple of things.  Inland

9  logistics, you know, can we get these trucks

10 positioned in that location or that area.

11 And also it depends on the port and how busy

12 they are.

13          Because again, the port of

14 Gulfport was a small port.  And they were

15 limited to the amount of trucks they could

16 load per day.  And so, you know, they

17 require a twenty-four hour appointment.

18          And depending on whether we could

19 get an appointment, you know, we could pick

20 up more or less.

21      Q.    Okay.  But given those factors,

22 then it's -- typically it was Great

23 Southern's determination of when the cargo

# FREEDOM COURT REPORTING

Page 84

1  the Kestrel Arrow -- well, let me just say,

2  the Sanko Stream voyage nineteen was August

3  the 25th of '05?

4      A.    It arrived on the 25th.

5      Q.    All right.

6      A.    And discharge was complete on the

7  27th, which was I think a Saturday.

8      Q.    Okay.  Now, how do you -- How did

9  you determine when the discharge was

10  complete?

11      A.    I'd get a notice from the ship

12  lines and then also in the document that we

13  talked -- discussed earlier that I have not

14  provided Ken nor you with from the ship line

15  which basically said when it started and

16  when it was complete.

17      Q.    Okay.  I was just looking at Ken's

18  letter which had said delivery four days

19  before Katrina on the Sanko Stream and then

20  twenty-four days before Katrina on the

21  Kestrel Arrow.

22          But what you're telling me is that

23  what you understand was that there was an

# FREEDOM COURT REPORTING

Page 85

1    arrival date and then it took whatever it

2    took, two days to complete the discharge?

3         A.    Yes, sir.

4         Q.    On the --

5         A.    On the Sanko.

6         Q.    And so what they're doing is

7    taking the -- I'm sorry.  I didn't mean to

8    interrupt.

9         A.    No.  It's okay.

10        Q.    So what they're doing is they're

11   discharging on the dock and then with

12   forklifts, taking the product as it comes

13   off the ship to the warehouse?

14        A.    Yes, sir.  On the Kestrel, she

15   arrived on 8-3.  She completed discharge on

16   8-6.  And U.S.D.A -- When she was completely

17   discharged, U.S.D.A. had it on inspection

18   hold.

19        Q.    All right.

20        A.    U.S.D.A. released it from

21   inspection hold for our pick up on 8-7.

22        Q.    Okay.  Now, I have 8-5 and the

23   complaint says 8-5 for arrival on the

## FREEDOM COURT REPORTING

Page 86

1  Kestrel Arrow.  But you --

2      A.   Yes.  And we were basing that on

3  the shipping schedule that the ship line

4  provides us with.  So during the -- I guess

5  the discovery or production, we then defined

6  that from the ship line the exact date of

7  arrival and the exact date of departure.

8      Q.   So that was --

9      A.   So that has changed.

10     Q.   8-3 to 8-6?

11     A.   Yes, sir.  That's on the Kestrel.

12     Q.   And on the Sanko Stream voyage

13  nineteen, the release from customs was when?

14     A.   The Sanko Stream arrived on 8-25.

15  She completed the discharge on 8-27.

16  Hurricane Katrina hit Monday morning 8-29.

17  U.S. -- We finally got U.S. customs to

18  release on 10-4.

19     Q.   Okay.  Never got a chance.

20     A.   No, sir.

21     Q.   All right.  And on the very -- Do

22  I understand that there is no claim on the

23  Penguin Arrow?  That's not part of the

## FREEDOM COURT REPORTING

Page 89

1    to the inland freight issues we talked about

2    earlier.  It gets back to scheduling times

3    with the port.  So I'm still a little --

4        Q.    Well, just -- I mean, just by

5    example.  You don't have to accept these

6    figures.  This is sort of what I've got by

7    example.

8              Looks like, for instance, on the

9    Penguin Arrow, which was -- which I have as

10   discharge or arrival on July the 6th, that

11   as of the day of the hurricane, there was

12   still five hundred and fifty-five bundles

13   there.

14       A.    Yes.  I don't want to speak to the

15   Penguin Arrow per se because I need -- I'm

16   familiar with it.  But that's -- I'm not as

17   familiar with the details as I am these two

18   vessels that we've been speaking of.

19             So, you know, I will give you an

20   example as far as the Kestrel.  The Kestrel,

21   once we got cargo clearance on 8-8, we

22   picked up -- there was four thousand and

23   fifty-six packs discharged on the Kestrel.

# FREEDOM COURT REPORTING

Page 90

On 8-29, Hurricane Katrina hit. We had picked up seventy-two percent of that cargo. And that's basically an average of a hundred and seventy-three packs per day.

Based on that average per day of pickup, we would have had that vessel completely moved out and to its final destination, our plants, by 9-1, well within the space agreement we had with the port.

Q.   Would that be complete, all the bundles from that ship?

A.   Yes, sir.  And on 8-29, we had moved seventy-two percent of cargo.

Q.   And I'm not trying to pin you down to any particular time, but in looking at the various cargos that came in, it does appear that there were a number of shipments where lumber stayed in the warehouse up to three months and in some cases four months?

A.   And that's true.  You know, I think you can also go back and see where it's the polar opposite as well where everything was picked up well within the

## FREEDOM COURT REPORTING

Page 93

1     A.   Yes.

2     Q.   All right.  And tell me again how

3  you communicated that to them.  Was that an

4  e-mail or a fax?

5     A.   It should be a fax.  And that's

6  our common practice with all ports.

7     Q.   And in terms of the warehouse

8  arrangement that you had, you mentioned a

9  little while ago in response to one of my

10  questions that you were timing-wise within

11  the agreement that you had with the port.

12  What did you mean there?  Within the space

13  agreement or --

14     A.   Yes.  I was speaking of the

15  Kestrel Arrow, that based on she discharged

16  on 8-8.  And on 8-29 when Hurricane Katrina

17  hit, we had picked up seventy-two percent of

18  the cargo, which based on that hundred and

19  seventy-three unit per day pickup average,

20  we would have had all the cargo out well

21  within the forty-five days within the space

22  agreement that we had with the port.

23     Q.   And that's what I was getting at.

## FREEDOM COURT REPORTING

Page 100

1          (Whereupon, Defendant's Exhibit

2     No. 15 was marked for identification and

3     attached to the original transcript.)

4          Q.    All right.  Let me show you -- it

5     actually has Ken's cover letter on it -- but

6     Exhibit 15 which is the report of Jack

7     Taylor.  Have you read that and are you

8     familiar with it?  You may not have.

9          A.    No, sir.

10          Q.    Okay.  Well, maybe I should just

11     handle it this way.  Obviously in this

12     lawsuit, Great Southern makes contention

13     that there was coverage for this cargo and

14     they make the assertion that it is covered

15     under a clause known as the warehouse to

16     warehouse clause?

17          A.    Yes, sir.

18          Q.    And you may have looked at that

19     language in there and so forth.  Can you

20     tell me what the basis is that that clause,

21     that warehouse to warehouse clause covers

22     this particular cargo?

23          MR. DOWDY:  I'm going to object to

## FREEDOM COURT REPORTING

Page 101

1  the form.  Calls for a legal conclusion.

2  You can answer it to the extent --

3         THE WITNESS:  I'm sorry?

4         MR. DOWDY:  I said you can answer

5  it to the extent you understand.

6     Q.   Let me ask you a better question.

7  See if I can do that.  Do you know what

8  facts support that contention?

9     A.   I can only speak to my perception

10  of that clause.

11     Q.   Okay.

12     A.   And that is our products, one

13  hundred percent of the products that went in

14  port are in our opinion raw products.  Our

15  customers do not consume these products in

16  the form in which we bring them in.

17         So our final destination or place

18  of rest is our plants because that is when

19  we have a finished good that's sold.  And so

20  because it is our plants are in off the port

21  facilities, I concluded it meant thirty days

22  beyond the discharge date.

23     Q.   Your plant facilities, you're

## FREEDOM COURT REPORTING

Page 102

1  talking about the treatment plants we've

2  been talking about?

3      A.   Yes.

4      Q.   I take it from what you're saying,

5  that being an off -- outside the port

6  destination, that you've got either the

7  thirty days or when it reached that

8  destination, whichever first occurred I

9  think is how the policy reads?

10     A.   I personally perceive that it's

11  saying that because it's not a finished

12  good, that I have to move it outside the

13  port gate, outside the port facility, which

14  means that my marine cargo insurance covered

15  me an additional fifty days for a total of

16  thirty days once the cargo had been

17  discharged.

18     Q.   Do you know whether Great Southern

19  ever advised AIG or its broker or anybody

20  else in the insurance end of things that --

21  as to where the destinations were for any

22  particular cargo?

23     A.   William Ray would be able to

## FREEDOM COURT REPORTING

Page 103

1    answer that question.  I don't know.  I did

2    not have any direct dealings with the

3    insurance company or broker.

4        Q.    Do you contend in the lawsuit that

5    -- well, let me ask it this way.  Do you

6    contend that the product had not reached its

7    destination at the time of the loss, its

8    final destination?

9        A.    Yes, sir, that's our contention.

10       Q.    And that being the facilities,

11   your treatment facilities?

12       A.    Yes.

13       Q.    Do you know whether Great Southern

14   procured insurance for the inland transit of

15   that cargo from Gulfport to the treatment

16   plant?

17            MR. DOWDY:  You mean on the

18   trucks?

19            MR. CRUTCHFIELD:  Yes.

20       A.    I don't know.  I'd have to refer

21   that to William Ray.

22       Q.    You mentioned a while ago that

23   your feeling was that the cargo was not --

## FREEDOM COURT REPORTING

Page 104

1    had not reached its ultimate destination.  I

2    think you testified earlier, though, that on

3    some occasions you sell it as a raw material

4    directly from Gulfport?

5        A.   I sell it as a raw material to

6    other treating plants, yes.

7        Q.   And are you -- Do you contend that

8    that product is covered until it reaches

9    those other treatment plants?

10            MR. DOWDY:   Object to the form.

11       A.   Yes.

12            MR. DOWDY:   I'm just objecting.

13   You can answer.

14       Q.   Those destinations you would agree

15   wouldn't be known -- maybe not known to

16   Great Southern, but certainly an unknown to

17   an insurance company until the sale had

18   occurred?

19       A.   True.

20       Q.   Okay.  I probably forgot to ask

21   this.  But in terms of those sales to other

22   treatment plants, what were the terms of

23   those sales, in other words, were they FOB

## FREEDOM COURT REPORTING

Page 119

1 a through bill of lading, it would -- this

2 blank would be filled in to show the

3 carrier, meaning the inland carrier, where

4 the ultimate place of delivery was?

5      A.   I mean, I've never had experience

6 with one.  But yes, I can see where that is

7 a place.  I'm not familiar with this.

8      Q.   All right.  This probably is more

9 of a lawyer question than anything, but I

10 need to ask you.  In this lawsuit, Great

11 Southern alleges that AIG or the other

12 defendants in this case denied coverage and

13 acted in bad faith when they did so, which

14 is a legal term.

15           And I'm not asking you to be a

16 lawyer.  Do you know or do you have a

17 position on -- or does Great Southern have a

18 position on what facts support that

19 allegation?

20      A.   Yes.  It's our contention that as

21 described in the marine cargo policy that we

22 talked about earlier, that because the final

23 destination of our product was outside the

## FREEDOM COURT REPORTING

Page 120

1   port facility, that we had fifteen

2   additional days of thirty days of coverage

3   under our contract.  That was our

4   perception.  We also --

5        Q.    Go ahead.

6        A.    We also contest that the Sanko

7   Stream, which was the vessel that discharged

8   on the 25th or began on the 25th, finished

9   on the 27th, we allege that that vessel was

10  covered because we never had customs

11  clearance on that vessel.

12            We never even had a chance to go

13  in and pick up anything.  We finally got

14  customs clearance on October -- I think it

15  was the 4th.  And the only reason we got it

16  then is customs told us that they were

17  cleaning up old documents.

18       Q.    Okay.

19       A.    So we allege that that vessel was

20  never even cleared, but yet it was denied.

21       Q.    You would agree, though, that you

22  still had -- the cargo, you couldn't remove

23  it from the warehouse, but it was still

## FREEDOM COURT REPORTING

Page 121

1  within your custody and control.  Is that a

2  fair statement?

3      A.   And there again, this get into

4  legal conversation.  I can tell you what my

5  opinion is.

6      Q.   All right.

7      A.   My opinion is that the cargo is

8  not in our custody or our control unless

9  there's full clearance given to us via the

10 U.S.D.A. and customs.

11     Q.   As between you and the Mississippi

12 Port Authority, though, you agreed that when

13 that cargo was in their warehouse, it was in

14 your custody, care and control.  Is that a

15 fair statement?

16     A.   Yes.  But I cannot pick it up

17 until I'm given clearance.

18     Q.   I understand that.  But it wasn't

19 in anybody's elses control?

20     A.   Yes.  I agree.

21     Q.   All right.

22     A.   I couldn't pick it up nor could

23 anyone else.

# FREEDOM COURT REPORTING

Page 122

1    Q.    You couldn't take it from the

2    warehouse?

3    A.    Right.

4    Q.    You could go look at it?

5    A.    Right.

6    Q.    And move it around the warehouse

7    if you wanted?

8    A.    Yes, sir.

9    Q.    Okay.  And you mentioned that --

10   all right.  Anything else that you believe

11   that was an act of bad faith on the part of

12   the insurance company?

13   A.    No.  That's our main contention.

14   Q.    Let me ask you this.  You may not

15   agree with how the insurance company

16   interprets the policy.  Do you at least

17   admit that they have an arguable basis for

18   denying coverage?

19   A.    No, sir, I can't agree with that.

20   Q.    And that's based on how you

21   interpret the policy?

22   A.    Yes, sir.

23   Q.    And you disagree with how they

# FREEDOM COURT REPORTING

Page 123

1  interpret the language of the clause in the

2  policy?

3      A.   Yes, sir.

4      Q.   All right.  You mentioned that you

5  thought you had thirty days because the

6  policy -- because you believe the final

7  destination was the treatment plants outside

8  the port?

9      A.   Yes, sir.

10     Q.   And I know you don't have a copy

11  -- you don't have a copy of this in hand,

12  but I'm reading the policy to say,

13  thereafter the insurance continues whilst

14  the goods are in transit or awaiting transit

15  until delivered to the final warehouse at

16  the destination named in the policy.

17          And then it says or until the

18  expiration of fifteen days or thirty days of

19  the destination to which the goods are

20  insured is outside the limits of the port,

21  whichever shall first occur.

22          So would you agree with me that if

23  they reached their final destination before

## FREEDOM COURT REPORTING

Page 124

1  the expiration, that occurs first and that's

2  when the policy period begins, coverage

3  ends?

4       A.   No, sir.  We contest that the

5  final destination is our plant.  And it is

6  still in route.  It is still in transit even

7  though it's been discharged and sitting

8  there, there's nothing we can do with that

9  product there.  And so for us, it's still in

10  transit to our facilities.

11       Q.   Let me put it this way.  You're

12  not saying that had it reached what you

13  consider to be its final destination, that

14  you would keep having -- and it made it

15  there in five days -- that you would have

16  more time of coverage under these time

17  limits?

18            In other words, once it reaches

19  the destination, that's when you understand

20  is when the coverage terminates?

21       A.   Once it reaches our destination

22  outside the port facilities.

23       Q.   Right.  Whether you have fifteen

## FREEDOM COURT REPORTING

Page 125

1  days or thirty days or fifty days, that ends

2  -- as I read the language here, it says as

3  it -- when it's delivered to the final

4  warehouse at the destination or until the

5  expiration of fifteen days, whichever first

6  occurs.  Do you agree that that's how that

7  works, that it ends at the destination?

8       A.   I've read that numerous, numerous

9  times.  And no, sir, I can't agree with

10  that.

11      Q.   But once it reached its final

12  destination as you consider it to be final,

13  it was no longer in transit?

14           MR. DOWDY:  I think he's saying,

15  for example, if within fifteen days, five

16  days, the same day it was discharged, you

17  picked it up and delivered it just say to

18  the Abbeville or Mobile plant, that that

19  coverage ends when it's reached the plant.

20      A.   Yes.  Yes, sir.  I'm sorry.  Yes,

21  sir.

22           MR. DOWDY:  I don't want to -- I

23  just thought of an example.

EXHIBIT B

# MARINE OPEN CARGO POLICY NO. 88590C

### of the

## AMERICAN HOME ASSURANCE COMPANY

### (A CAPITAL STOCK INSURANCE COMPANY)
### 70 PINE STREET, NEW YORK, N. Y. 10270

### ISSUED TO
### GREAT SOUTHERN WOOD PRESERVING, INC., ET AL
### U.S. HIGHWAY 431 NORTH
### ABBEVILLE, ALABAMA 36310

### NOTICE - PLEASE READ YOUR ENTIRE POLICY.

1. This Policy covers automatically on all shipments which come within its scope. It is important that all such shipments be reported as soon as known and the valuation thereof declared as soon as ascertained.

2. Your attention is called to the basis of insured value as set forth in the Valuation Clause, (Clause number 10). The insured value should always be in accordance with the basis specified therein unless otherwise agreed with the Company prior to shipment.

3. Any damage to the goods should be noted on the receipt given to the carrier if possible; and in any event as soon as it is known that the shipment has sustained loss or damage, written claim should be filed with the carrier. Such steps may be necessary to preserve your rights and the Company's rights of subrogation against the carrier.

4. In the event of any known or reported loss or damage you should promptly notify the Company, or the office of the American International Marine Agency that issued this policy, to protect the interests of all concerned. If no such party is available, then prompt notice should be given to the nearest Correspondent of the American Institute of Marine Underwriters or to the nearest accredited representative of Lloyd's, London.

Rev. 03/02

Endorsement No. _____1_____

Name of Assured _____Great Southern Wood Preserving, Inc., et al_____

Attached to and forming part of Marine Open Cargo Policy
No. _____88590C_____ of the__American Home Assurance Company_____

## ANNUAL MARINE MINIMUM & DEPOSIT PREMIUM

In consideration of the issuance of this policy from June 2, 2005 through July 31, 2005, an Annual Marine Minimum & Deposit Premium of $26,250.00 ($22,167.00 Marine, $4,083.00 War) shall be payable on June 2, 2005.

The Assured agrees to report all shipments covered under this policy on an annual basis and the Assurer to calculate premium thereon at the rates indicated in the rate schedule. When the premium so earned exceeds the minimum premium charged any additional premium shall be due and payable to these Assurers.

No portion of the above premium is refundable in the event of cancellation, either by the Assured or the Assurer.

All other terms and conditions remaining unchanged.

Dated: June 6, 2005

By:_____
Authorized Representative
American International Marine Agency

GSWP 4

Endorsement No. _____2_____

Name of Assured _____Great Southern Wood Preserving, Inc., et al_____

Attached to and forming part of Marine Open Cargo Policy
No. ____88590C_____ of the _American Home Assurance Company_____

Effective June 2, 2005, it is hereby understood and agreed the following is added to this policy:

**AIMU**
**EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE WITH U.S.A. ENDORSEMENT**
**(March 1, 2003)**

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

1.    In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from:

    1.1    ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel.

    1.2    the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof.

    1.3    any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

    1.4    the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

**RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE (U.S.A. ENDORSEMENT)**

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that:

    if fire is an insured peril

    and

    where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions

    and

    a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance (reinsurance), be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

All other terms and conditions remaining unchanged.

Dated: June 6, 2005                                    By:_____

                                          Authorized Representative
                         American International Marine Agency

Endorsement No. _____3_____

Name of Assured _____Great Southern Wood Preserving, Inc., et al_____

Attached to and forming part of Marine Open Cargo Policy
No. _____88590C_____of the _American Home Assurance Company_____

Effective June 2, 2005, it is hereby understood and agreed the following is added to this policy:

**AIMU**
**CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, AND ELECTROMAGNETIC EXCLUSION**
**CLAUSE**
**(March 1, 2003)**

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

**AIMU U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE**

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

All other terms and conditions remaining unchanged.

Dated: June 6, 2005                          By:_____George J. Potts_____

                                                    Authorized Representative
                                            American International Marine Agency

# MARINE OPEN CARGO POLICY INDEX

| Clause | Page # |
|---|---|
| ACCUMULATION (12) | 5 |
| ADDITIONAL TERMS & CONDITIONS, IF ANY (18) | 7 |
| ASSIGNMENT VOID (48) | 15 |
| ASSURED (1) | 3 |
| ATTACHMENT AND CANCELLATION (2) | 3 |
| AVERAGE TERMS AND CONDITIONS (17) | 6 |
| BILL OF LADING, ETC. (25) | 10 |
| BOTH TO BLAME CLAUSE (24) | 10 |
| BROKER AS AGENT FOR ASSURED (40) | 13 |
| CARRIER CLAUSE (9) | 4 |
| CERTIFICATE AUTHORITY (38) | 12 |
| CONSTRUCTIVE TOTAL LOSS CLAUSE (35) | 12 |
| CONVEYANCES (7) | 4 |
| CRAFT CLAUSE (8) | 4 |
| DECLARATIONS (37) | 12 |
| DELAY CLAUSE (52c) | 17 |
| DELIBERATE DAMAGE/POLLUTION HAZARD CLAUSE (30) | 11 |
| DEVIATION CLAUSE (6) | 4 |
| ERRORS AND OMISSIONS (39) | 13 |
| EXPLOSION CLAUSE (29) | 11 |
| FREE OF CAPTURE AND SEIZURE WARRANTY (F.C.& S.) (52a) | 16 |
| FREE OF PARTICULAR AVERAGE (15) | 6 |
| GENERAL AVERAGE CLAUSE (33) | 11 |
| GENERAL AVERAGE CONTRIBUTORY CLAUSE (34) | 11 |
| GEOGRAPHIC LIMITS (5) | 4 |
| GOODS INSURED (3) | 3 |
| GOVERNING LAW (53) | 17 |
| GROUNDING CLAUSE (31) | 11 |
| ILLICIT TRADE (4) | 4 |
| IMPORT DUTY (51) | 15 |
| INCHMAREE CLAUSE (32) | 11 |
| LABELS CLAUSE (28) | 10 |
| LANDING, WAREHOUSING & | |

| Clause | Page # |
|---|---|
| FORWARDING CHARGES (22) | 9 |
| LIMIT OF LIABILITY (11) | 5 |
| LOADING OF GRAIN, PETROLEUM AND HEAVY CARGOES (26) | 10 |
| MACHINERY CLAUSE (27) | 10 |
| MARINE EXTENSION CLAUSE (20) | 8 |
| NORMAL LOSS (43) | 13 |
| NOTICE OF LOSS (41) | 13 |
| NUCLEAR EXCLUSION CLAUSE - CARGO - (4/1/91) (52d) | 17 |
| OTHER INSURANCE (50) | 15 |
| PARAMOUNT WARRANTIES (52) | 16 |
| PARTIAL LOSS (44) | 14 |
| PAYMENT OF LOSS (45) | 14 |
| PERILS WATERBORNE (14) | 6 |
| PREMIUM PAYMENTS (36) | 12 |
| PROOFS OF LOSS (42) | 13 |
| PROVISIONS REQUIRED BY LAW TO BE STATED IN THIS POLICY (54) | 17 |
| RETURNED SHIPMENTS (23) | 9 |
| SCHEDULE OF RATES | 18 |
| SHORE CLAUSE (16) | 6 |
| SOUTH AMERICAN CLAUSE (21) | 9 |
| STRIKES, RIOTS & CIVIL COMMOTIONS ENDORSEMENT - (02/21/03) TRIA FORM | 19 |
| STRIKES. RIOTS AND CIVIL COMMOTIONS WARRANTY (S.R. & C.C.) (52b) | 16 |
| SUBROGATION AND IMPAIRMENT OF SUBROGATION (49) | 15 |
| SUE AND LABOR CLAUSE (46) | 14 |
| TIME FOR SUIT (47) | 14 |
| VALUATION (10) | 5 |
| VALUE AT RISK (13) | 5 |
| WAR RISK ONLY OPEN POLICY (CARGO) - (12/2/93) | 20 |
| WAREHOUSE TO WAREHOUSE (19) | 8 |

Rev. 03/02

GSWP  7

### 1) ASSURED

THE AMERICAN HOME ASSURANCE COMPANY (hereinafter referred to as the Company or as the ASSURERS) in consideration of premiums to be paid at the rates set forth herein, or as may be endorsed hereon, does insure GREAT SOUTHERN WOOD PRESERVING, INC., ET AL, U.S. HIGHWAY 431 NORTH, ABBEVILLE, ALABAMA 36310 (hereinafter referred to as the ASSURED) subject to all the terms, conditions, exceptions and warranties hereinafter set forth.

### 2) ATTACHMENT AND CANCELLATION

This Policy and the coverage granted hereunder to be deemed continuous and to attach and cover in respect of all insured goods and/or merchandise shipped on and after JUNE 2, 2005 and will continue in force until cancelled by either party giving the other, or its agent, thirty (30) days written notice, or unless otherwise mutually agreed upon or otherwise provided for herein, or unless otherwise voided by reason of breach of warranty, misrepresentation or concealment.

Notwithstanding anything herein to the contrary, the Company may effect immediate cancellation of this Policy by giving written notice thereof at any time when any premium has been due and unpaid for a period of thirty (30) days.

However, such cancellation(s), shall not affect any risks which are in due course of transit and which have attached prior to such notice of cancellation.

### 3) GOODS INSURED

Upon lawful goods and/or merchandise suitably packed for export, consisting principally of UNFURNISHED LUMBER and similar merchandise usual and incidental to the business of the ASSURED, shipped under deck and/or on deck by the ASSURED, (a) being the property of the ASSURED, or that of others in which the ASSURED may have an insurable interest, or for which the ASSURED may hold or receive instructions to effect insurance, provided such instructions be given in writing prior to shipment, and before any known or reported loss or accident; and/or (b) consigned to the ASSURED, or to others for the account or control of the ASSURED, being the property of the ASSURED or that of others in which the ASSURED may have an insurable interest or for which the ASSURED may hold or receive instructions to effect insurance, provided such instructions be given in writing prior to shipment, and before any known or reported loss or accident; but excluding shipments sold by the ASSURED on F.O.B., F.A.S., Cost and Freight, or similar terms whereby the ASSURED is not obligated to furnish marine insurance and also excluding such shipments as are bought by the ASSURED on C.I.F. terms, or other terms which include marine insurance.

Page 3

GSWP  8

## 4) ILLICIT TRADE

Warranted free from any charge, expense, damage or loss which may arise in consequence of a seizure or detention, for, or on account of any illicit or prohibited trade, or any trade in articles contraband of war, or in the violation of any port rule or regulation.

## 5) GEOGRAPHIC LIMITS

At and from ports and/or places in **THE WORLD** to ports and/or places in **THE WORLD** direct or via other ports and/or places, with privilege of transshipment by land and/or water, but excluding shipments to or from Nigeria, Cuba, Iraq and North Korea (and/or to or from those countries which the Government of the United States currently forbids trade, if different from the above), also excluding Inland Transit worldwide.

## 6) DEVIATION CLAUSE

This insurance shall not be vitiated by any unintentional error in description of vessel, voyage or interest, or by deviation, overcarriage, change of voyage, transshipment or any other interruption of the ordinary course of transit, from causes beyond the control of the ASSURED. It is agreed however, that any such error, deviation or other occurrence mentioned above shall be reported to this Company as soon as known to the ASSURED, and additional premium paid if required.

## 7) CONVEYANCES

(a) Per Iron and/or Steel Steamer or Steamers and/or Iron and/or Steel Vessel or Vessels propelled by power (excluding sailing vessels, with or without auxiliary power, except as connecting conveyances) and connecting conveyances;
(b) By aircraft and connecting conveyances;
(c) By approved iron and/or steel barge, other than as a connecting conveyance;
(d) By truck, trailer or rail car, other than as connecting conveyances.

## 8) CRAFT CLAUSE

This insurance also to cover during any special or supplementary lighterage provided written notice be given the ASSURERS in all such cases when such facts are known to the ASSURED and additional premium to be paid if and as required, with each craft and/or lighter to be deemed a separate insurance. This insurance shall not be prejudiced by any agreement exempting lightermen from liability.

## 9) CARRIER CLAUSE

Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.

## 10)  VALUATION

Valued at amount of invoice, including all charges included in the invoice and including prepaid or advance freight and/or freight payable "vessel lost or not lost", not included in the charges included in the invoice, plus **10 %**. Foreign currency is to be converted into United States currency at Banker's sight rate of exchange on the date of issuance of each invoice and/or credit and/or draft.

## 11)  LIMIT OF LIABILITY

This insurance shall not attach or cover and these Assurers shall not be liable for more than **$2,500,000.** by any one conveyance or, in any one place or, at any one time or, in any one disaster or accident or; as specified in the following sub-limits, or unless otherwise specified elsewhere herein.

(a) **$250,000.** for On Deck shipments, when subject to an On Deck Bill of Lading;
(b) **$Not Covered** by any one aircraft (except when used as a connecting conveyance) ;
(c) **$Not Covered** by any one truck, trailer or rail car (except when used as a connecting conveyance);
(d) **$Not Covered** by any one approved iron and/or steel barge (except when used as a connecting conveyance), nor for more than **$Not Covered** in any one tow.
(e) **$   5,000.** for any one package shipped by mail or parcel post.

## 12)  ACCUMULATION

Should there be an accumulation of shipments in respect of which the insured value exceeds the limits expressed in this Policy by reason of an interruption of transit, or by reason of a casualty, or at a transshipping point, or on a connecting conveyance, the ASSURERS shall hold covered such excess amount and shall be liable for the full amount at risk (but in no event for more then double the applicable limit of liability) provided such accumulation is beyond the control of the Assured and provided written notice be given to the ASSURERS in all such cases as soon as the fact becomes known to the ASSURED.

## 13)  VALUE AT RISK

In the event that the total value at risk exceeds the applicable Limit of Liability set forth herein, these Assurers shall nevertheless be entitled to receive premium on the full value at risk. The acceptance of such premiums by the Assurer shall in no way alter or increase the applicable Limits of Liability, but the Assurer shall be liable for the full amount of loss up to, but not exceeding such Limit of Liability. In the event of loss which exceeds the applicable Limit of Liability, any deductible will be subtracted from the applicable Limit of Liability and not from the full amount of loss.

**14)  PERILS WATERBORNE**

Touching the adventures and perils which the ASSURERS are contented to bear and take upon themselves while the goods and/or merchandise are waterborne (notwithstanding any extension of coverage provided under this Policy, unless otherwise specifically agreed) they are of the Seas, Fires, Assailing Thieves, Jettisons, Barratry of the Master and Mariners, and all other like perils losses and misfortunes that have or shall come to the hurt, detriment or damage of the said goods or any part thereof, except as may be otherwise specifically provided for herein or endorsed hereon.

NOTE: For perils insured against while the goods are on docks, wharves or elsewhere on shore and/or during land transportation within the coverage of this Policy, see Clause 16.

**15)  FREE OF PARTICULAR AVERAGE**

Warranted free from Particular Average unless the Vessel or craft be stranded, sunk, or burnt, but notwithstanding this warranty these ASSURERS are to pay any loss of or damage to the interest insured which may reasonably be attributed to fire, collision or contact of the vessel and/or craft and/or conveyance with any external substance (ice included) other than water, or to discharge of cargo at port of distress. The foregoing warranty, however, shall not apply where broader terms of Average are provided for hereon or in the certificate or policy to which these clauses are attached.

**16)  SHORE CLAUSE**

Unless broader terms and conditions have been provided for in Clause 17 or elsewhere herein; where this insurance by its terms covers while on docks, wharves, or elsewhere on shore, and/or during land transportation, it shall include the risks of collision, derailment, overturning or other accident to the conveyance, fire, lightning, sprinkler leakage, cyclones, hurricanes, earthquakes, floods (meaning the rising of navigable waters) and/or collapse or subsidence of docks or wharves, even though the insurance be otherwise Free of Particular Average.

**17)  AVERAGE TERMS AND CONDITIONS**

**(a) SHIPMENTS UNDER DECK.** Except while on deck of the ocean vessel and subject to an On Deck Bill of Lading, shipments of **UNFURNISHED LUMBER**, suitably packed for export, are insured, against All Risks of physical loss or damage from any external cause, irrespective of percentage, but excluding those risks excepted by the Free of Capture and Seizure Warranty and the Strikes, Riots, and Civil Commotions Warranty contained herein, unless such risks are specifically assumed hereunder by endorsement.

**(b) SHIPMENTS ON DECK.**   Shipments of **UNFURNISHED LUMBER**, suitably packed for export, which are shipped on deck subject to an On Deck Bill of Lading are insured, Warranted free from Particular Average unless caused by the stranding, sinking, burning and/or collision of the vessel: but to pay the insured value of any merchandise and/or goods jettisoned and/or washed overboard, irrespective of percentage. Notwithstanding the foregoing, merchandise and/or goods shipped on deck subject to an Under Deck bill of lading, without the knowledge and consent of the Assured, shall be treated as under deck cargo and insured as per Clause 17 (a) above.

GSWP  11

Notwithstanding the above, all insured goods shipped in fully enclosed containers which are stowed on deck, are insured subject to the provisions of this policy applying to under deck shipments, provided such goods are subject to an Under Deck or an optional Under Deck/On Deck Bill of Lading.

**(c) SHIPMENTS BY AIRCRAFT.** Shipments of **NOT COVERED** by aircraft, suitably packed for export, are insured against All Risks of physical loss or damage from any external cause, irrespective of percentage, but excluding those risks excepted by the Free of Capture and Seizure Warranty and the Strikes, Riots, and Civil Commotions Warranty contained herein, unless such risks are specifically assumed hereunder by endorsement. Also warranted free of claim for loss or damage due to changes in atmospheric pressure and/or temperature. Whenever the words "ship", "vessel", "seaworthiness", "ship owner", or "vessel owner" appear in this Policy (except in Clause 7 "Conveyance" and Clause 11 "Limit of Liability"), they are deemed to include also the words "aircraft", "air worthiness" or "aircraft owner".

**(d) SHIPMENTS BY BARGE.** Shipments of **NOT COVERED** via approved iron and/or steel Barge (other than as a connecting conveyance), suitably packed for export, are insured Warranted free from Particular Average unless caused by the vessel and/or interest insured being stranded sunk, burnt, on fire or in collision with another ship or vessel or with ice or with any substance other than water, but liable for jettison and/or washing overboard irrespective of percentage.

**(e) SHIPMENTS BY MAIL.** Shipments of **UNFURNISHED LUMBER** by mail or parcel post, suitably packed for export, while in the custody of postal authorities, are insured against All Risks of physical loss or damage from any external cause, irrespective of percentage, but excluding those risks excepted by the Free of Capture and Seizure Warranty and the Strikes, Riots, and Civil Commotions Warranty contained herein, unless such risks are specifically assumed hereunder by endorsement.

It is understood and agreed that a certificate of mailing will be secured from the Postal Authorities for each package shipped by ordinary mail or parcel post if possible. Shipments are to be made in accordance with United States Postal Service rules or regulations, or in accordance with the rules and regulations of the postal authorities of the country where mailed, if such mailing occurs outside the United States. When permitted, mail shipments are to be sent by Government insured parcel post or, if this is not possible, by registered parcel post if permissible. The ASSURED agrees that each package shipped by Government insured parcel post will be insured with the Government for the maximum amount of insurance allowed by the Government.

**18)    ADDITIONAL TERMS & CONDITIONS, IF ANY**
**DEDUCTIBLE:**
**EACH CLAIM SHALL BE SUBJECT TO A DEDUCTIBLE OF $10,000.00 ANY ONE ACCIDENT OR OCCURRENCE EXCLUDING GENERAL AVERAGE AND SALVAGE CHARGES.**

Page 7

## 19) WAREHOUSE TO WAREHOUSE

This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the Declaration and/or Certificate for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment, if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be agreed in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the ASSURED.

It is necessary for the ASSURED to give prompt notice to these ASSURERS when they become aware of an event for which they are "held covered" under this Policy and the right to such cover is dependent on the compliance with this obligation.

## 20) MARINE EXTENSION CLAUSE

I. This insurance attaches from the time the goods leave the Warehouse at the place named in the Policy, Certificate or Declaration for the commencement of the transit and continues until the goods are delivered to the final Warehouse at the destination named in the Policy, Certificate or Declaration, or a substituted destination as provided in Clause III hereunder.

II. This insurance specially to cover the goods during deviation, delay, forced discharge, re-shipment, transshipment and any other variation of the adventure arising from the exercise of a liberty granted to the shipowner or charterer under the contract of affreightment

III. In the event of the exercise of any liberty granted to the shipowner or charterer under the contract of affreightment whereby such contract is terminated at a port or place other than the original insured destination, the insurance continues until the goods are sold and delivered at such port or place; or, if the goods be not sold but are forwarded to the original insured destination or to any other destination this insurance continues until the goods have arrived at final warehouse as provided in Clause I.

IV. If while this insurance is still in force and before the expiry of 15 days from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel at the final port of discharge is completed, the goods are re-sold (not being a sale within the terms of Clause III) and are to be forwarded to a destination other than that covered by this insurance, the goods are covered hereunder while deposited at such port of discharge until again in transit or until the expiry of the aforementioned 15 days whichever shall first occur. If a sale is effected after the expiry of the aforementioned 15 days while this insurance is still in force the protection afforded hereunder shall cease as from the time of the sale.

V. Held covered at a premium to be arranged in case of change of voyage or of any omission or error in the description of the interest, vessel or voyage.

VI. This insurance shall in no case be deemed to extend to cover loss damage or expense proximately caused by delay or inherent vice or nature of the subject matter insured.

VII. It is a condition of this insurance that there shall be no interruption or suspension of transit unless due to circumstances beyond the control of the ASSURED.

None of the foregoing subdivisions of this Clause 20 shall be construed as in any way enlarging any of the other terms and conditions of this Policy (except in so far as any of the provisions of Clause 19. of this Policy are inconsistent herewith), it being particularly understood and agreed that the F.C.& S. Warranty remains in full force and effect and that nothing in the foregoing shall be construed as extending this insurance to cover any risks of war or consequences of hostilities.

## 21)  SOUTH AMERICAN CLAUSE

Notwithstanding anything contained elsewhere herein to the contrary (particularly the Marine Extension Clause and the Warehouse to Warehouse Clause) the insurance provided hereunder for all shipments to South America shall continue to cover for sixty (60) days [ninety (90) days on shipments via the Magdalena River] after completion of discharge of the overseas vessel at port of destination or until the goods are delivered to the final Warehouse at destination, whichever may first occur, and shall then terminate.

The time limit above to be reckoned from midnight of the day on which the discharge of the insured goods from the overseas vessel is completed.

## 22)  LANDING, WAREHOUSING & FORWARDING CHARGES

Notwithstanding any Average warranty contained herein, these ASSURERS agree to pay any landing, warehousing, forwarding or special charges when they are incurred by reason of a peril insured against. Also to pay the insured value of any package or packages which may be totally lost in loading, transshipment or discharge.

## 23)  RETURNED SHIPMENTS

In the event of refusal or inability of the ASSURED, or the consignee at the destination named in the policy, certificate or declaration, to accept delivery of goods and/or merchandise which have been insured by this Policy, then this Policy is extended to cover such goods and/or merchandise when reshipped in its original packing to the original point of origin. It being understood and agreed that notice must be given to the ASSURER by the ASSURED as soon as refusal of acceptance is known to them, and prior to any further movement of the said goods and/or merchandise to any destination other than that named in the policy, certificate or declaration. Such goods and/or merchandise being held covered at rates, terms and conditions to be agreed.

### 24)   BOTH TO BLAME CLAUSE

Where goods are shipped under a Bill of Lading containing the so-called "Both to Blame Collision" Clause, these ASSURERS agree as to all losses covered by this insurance, to indemnify the ASSURED for this Policy's proportion of any amount (not exceeding the amount insured) which the ASSURED may be legally bound to pay to the shipowners under such clause. In the event that such liability is asserted, the ASSURED agrees to notify these ASSURERS who shall have the right at their own cost and expense to defend the ASSURED against such claim.

### 25)   BILL OF LADING ETC., CLAUSE

The ASSURED is not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the Bill of Lading and/or Charter Party. The seaworthiness of the vessel as between the ASSURED and these ASSURERS is hereby admitted and the wrongful act or misconduct of the shipowner or his servants causing a loss is not to defeat the recovery by an innocent ASSURED if the loss in the absence of such wrongful act or misconduct would have been a loss recoverable on the Policy. With leave to sail with or without pilots, and to tow and assist vessels or craft in all situations, and to be towed.

### 26)   LOADING OF GRAIN, PETROLEUM AND HEAVY CARGOES

Warranted by the ASSURED that vessels to be loaded with Grain, Petroleum and/or heavy cargoes shall be loaded under the inspection of a surveyor appointed or approved by the Company for that purpose and his certificate as to proper loading and seaworthiness must be obtained before the sailing of such vessels or the insurance under this Policy in respect of such cargo to be void.

### 27)   MACHINERY CLAUSE

When the property insured under this Policy includes a machine, article, interest or set consisting when complete for sale or use of several parts, then in case of loss or damage covered by this insurance to any part of such machine, article, interest or set, these ASSURERS shall be liable only for the proportion of the insured value of the part lost or damaged, or at the ASSURED'S option, for the cost and expense, including labor and forwarding charges, of replacing or repairing the lost or damaged part; but in no event shall these ASSURERS be liable for more than the insured value of the complete machine, article, interest or set.

### 28)   LABELS CLAUSE

In case of damage affecting labels, capsules or wrappers, these ASSURERS, if liable therefor under the terms of this Policy, shall not be liable for more than an amount sufficient to pay the cost of new labels, capsules or wrappers, and the cost of reconditioning the goods, but in no event shall these ASSURERS be liable for more than the insured value of the damaged merchandise.

GSWP   15

Rev. 03/02

**29)  EXPLOSION CLAUSE**

Including the risk of explosion, howsoever or wheresoever occurring during the currency of this insurance unless excluded by the F.C. & S. Warranty or the S.R. & C.C. Warranty set forth herein or unless proximately caused by the inherent vice or nature of the subject matter insured or by the personal negligence or act of the ASSURED.

**30)  DELIBERATE DAMAGE/POLLUTION HAZARD CLAUSE**

This Policy is extended to cover, but only while the property insured is on board a waterborne conveyance, loss of or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under this Policy (subject to all its terms, conditions and warranties) if the property insured would have sustained physical loss or damage as a direct result of such accident or occurrence. This agreement shall not increase the Limits of Liability provided for in this Policy.

**31)  GROUNDING CLAUSE**

Grounding in canals, harbors, or tidal rivers not to be deemed a stranding within the meaning of this Policy or any amendment thereof; but the ASSURERS to pay for any loss or damage to the goods or merchandise which may be proved to have resulted directly therefrom and which would be recoverable under the terms of this Policy if caused by stranding.

**32)  INCHMAREE CLAUSE**

This insurance is also specially to cover any loss of or damage to the interest insured hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the master, mariners, mates, engineers or pilots.

**33)  GENERAL AVERAGE CLAUSE**

General Average and Salvage Charges payable according to United States laws and usage and/or as per Foreign Statements and/or as per York-Antwerp Rules (as prescribed in whole or in part) if in accordance with the Contract of Affreightment.

**34)  GENERAL AVERAGE CONTRIBUTORY CLAUSE**

The Company shall be liable for only such proportion of General Average and Salvage Charges as the sum hereby insured (less Particular Average for which this Company is liable hereunder, if any) bears to the contributory value of the goods or merchandise insured hereunder.

GSWP   16

## 35)   CONSTRUCTIVE TOTAL LOSS CLAUSE

No recovery for a Constructive Total Loss shall be had hereunder unless the property insured is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it cannot be preserved from actual total loss without an expenditure which would exceed its insured value when the expenditure had been incurred.

## 36)   PREMIUM PAYMENTS

Premiums at the rates specified in the schedule attached hereto or as otherwise agreed shall be paid in cash and due immediately upon attachment of the risk; and the Company shall be entitled to premium on all shipments covered by the Policy, whether reported or not.

## 37)   DECLARATIONS

The ASSURED by the acceptance of this Policy warrants and agrees to report all shipments in respect of which insurance is provided hereunder to the Company, or the office of the American International Marine Agency which issued this policy as soon as known to the ASSURED, or as soon thereafter as may be practicable. Should the ASSURED willfully fail to report shipments covered by this Policy, then the Policy as to all subsequent shipments shall at the Company's option become null and void. The Company or its agents shall be permitted to examine the books, accounts and records of the ASSURED for the purpose of tabulating and verifying all shipments in respect of which insurance is provided hereunder.

## 38)   CERTIFICATE AUTHORITY

Authority is hereby granted the ASSURED to countersign and issue the form of Certificate of Insurance or Special Marine Policy furnished by the ASSURERS for any or all shipments in respect of which insurance is provided hereunder and in consideration thereof the ASSURED warrants that no Certificate or Special Marine Policy will be issued with terms thereon varying from the conditions of this Policy and/or any written instructions that are or may be given by the ASSURERS and/or the office of the American International Marine Agency that issued this policy.

The ASSURED further warrants and agrees to mail or deliver a full and complete copy of each Certificate or Special Marine Policy issued, on the day of issuance of the Certificate or Special Marine Policy or as soon thereafter as may be practicable, to the Company, or to the office of the American International Marine Agency that issued this policy. If the ASSURED issues a Certificate of Insurance or Special Marine Policy without incorporating the applicable deductible set forth in the policy, if any, the ASSURED agrees to reimburse this Company, for the full amount of any loss that this Company pays under such Certificate of Insurance or Special Marine Policy, including all loss adjustment expenses up to the amount of the deductible. If the ASSURED issues a Certificate of Insurance or Special Marine Policy with terms varying from the conditions of this Policy and/or any written instructions given by the ASSURER or their agents, the ASSURED agrees to reimburse the Company for the full amount of the loss that the Company pays, including loss adjustment expenses caused by such variation under such Certificate of Insurance or Special Marine Policy. The Assured further agrees that all such reimbursements shall be due and payable to the Company, within 60 days of presentation to the Assured.

## 39)  ERRORS AND OMISSIONS

It is agreed that this insurance shall not be prejudiced by any unintentional delay or inadvertent omission in reporting hereunder, or any unintentional error in the description of the interest, vessel or voyage, if prompt notice be given the ASSURERS in all such cases as soon as said delay and/or omission and/or error becomes known to the ASSURED and adjustment of premium be made if and as required.

## 40)  BROKER AS AGENT FOR ASSURED

If the laws of the state in which this policy is issued permit, it is agreed that the Assured's Broker **HILB ROGAL & HOBBS, 425 NORTH MARTINGALE ROAD, SUITE 1100, SCHAUMBURG, ILLINOIS 60173,** who caused this insurance to be written, or any substituted broker, shall be deemed to be and continue to be the Agent of the ASSURED for all purposes in connection with this insurance, including but not limited to, receiving notice of cancellation or for accepting or rejecting any proposed modification or alteration in the terms of this Policy. Any such notice given to the said Agent of any such cancellation, modification or alteration agreed to by the said Agent shall have the same effect as if given to, or agreed to by, the ASSURED. This agency shall continue until written notice of revocation by the ASSURED shall have been received by the ASSURERS, or by the office of the American International Marine Agency that issued this policy.

If the laws of the state in which this policy is issued do not recognize the Broker as Agent for the Assured, then all such notices of cancellation, modification or alteration shall be mailed by the Assurers directly to the last known mailing address of the Assured with copies to the Agent of record.

## 41)  NOTICE OF LOSS

Warranted by the ASSURED that all claims for loss of, or damage to, the goods and/or merchandise insured hereunder shall be promptly reported to the Company or to the office of the American International Marine Agency that issued this policy.

## 42)  PROOFS OF LOSS

Proofs of loss and all bills for expenses must be approved by the Settling Agent of this Company, if there be one at or near the place where the loss occurs or the expenses are incurred or, if there be none in the vicinity, by the Correspondent of the American Institute of Marine Underwriters, or the nearest accredited representative of Lloyd's, London, and such agent or correspondent must be represented on all surveys.

## 43)  NORMAL LOSS

In the event of claim under this insurance for loss of and/or damage to merchandise and/or goods upon which there is a normal or usual loss, it is hereby mutually agreed that the claim shall be adjusted and the insured value of the part or parts lost or damaged shall be arrived at in the adjustment of the claim on the basis of expected outturn, whether or not the deduction of normal loss be provided in this insurance or be a trade custom.

Page 13

## 44)  PARTIAL LOSS

In all cases of partial loss or damage caused by perils insured against, the loss shall be determined by a separation of the damaged portion of the insured property from the sound portion, and the amount of loss determined by;

a) an agreed estimate (by survey) of the percentage of damage of such damaged portion, in which event the ASSURED will receive such percentage of the insured value of the damaged merchandise; or, if such agreement is not practicable,

b) then such damaged portion shall be sold either at public auction or by private sale (whichever the Company shall deem most advisable) for the account of the owner of the property, in which event the amount of the loss shall be the difference between the net amount so realized by the auction or sale and the insured value of the portion so sold.

## 45)  PAYMENT OF LOSS

In case of loss or other claim, such loss or claim to be paid in funds current in the United States to the ASSURED or order, or to bank, or bankers as their interests may appear, within thirty (30) days after submission to the Company or to its agent of proper proof of loss and proper proof of interest in the goods or merchandise so involved (the amount of premium, if unpaid, and all other indebtedness due the Company by the ASSURED being first deducted). In the event that payment is required in other than United States currency, the rate of exchange shall be that in effect on the date the claim is settled.

## 46)  SUE AND LABOR CLAUSE

In case of any loss or misfortune, it shall be lawful and necessary for the ASSURED, his or their factors, servants and assigns to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods and merchandise insured hereunder, or any part thereof, without prejudice to this insurance, to the charges whereof this Company will contribute according to the rate and quantity of the sum hereby insured; nor shall the acts of the ASSURED or this Company in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of an abandonment.

## 47)  TIME FOR SUIT

It is a condition precedent to any action, suit or proceeding for the recovery of any claim upon, under, or by virtue of this Policy that such action, suit or proceeding shall be commenced within twelve (12) months next after the date of the accident, disaster or event causing loss of, or damage to, the insured goods or giving rise to a claim for sue and labor expenses or, in case of a claim for General Average contribution, salvage and/or special charges, next after the date of actual payment thereof by the ASSURED. Provided however, that if by the laws of the State or other place within which this Policy or any certificate thereunder is issued or where the action, suit or proceeding is instituted, such limitation is invalid, then any such claim shall become barred and void unless such action, suit or proceeding shall be commenced within the shortest limit of time permitted by the laws of such State or place to be fixed herein for the bringing of such suit, action or proceeding.

Page 14

## 48)  ASSIGNMENT VOID

Warranted by the ASSURED that the assignment of this Policy or any insurable interest therein or the subrogation of any rights thereunder, if any, to any party without the consent of the Company shall render the insurance affected by such assignment or subrogation void.

## 49)   SUBROGATION AND IMPAIRMENT OF SUBROGATION

It is agreed that upon payment of any loss, the ASSURED shall assign and subrogate to this Company all their rights against carriers, bailees and other third parties to the extent of such payments and shall permit suit to be brought in the ASSURED'S name (but at this Company's expense), and the ASSURED further agrees to render all reasonable assistance in the prosecution of said suit or suits.

It is further a condition of this insurance that if the ASSURED or their assigns have entered or shall enter into any agreement whereby any carrier, bailee or other third party is released from its liability for any loss, and/or waive, compromise, settle or otherwise impair any right of claim against such third party, to which this Company would be subrogated upon payment of a loss; then this Company shall be free from liability with respect to such loss, but premium shall not be affected.

## 50)   OTHER INSURANCE

a) If an interest insured hereunder is covered by other insurance, which attached prior to the coverage provided by this Policy, then this Company shall be liable only for the amount in excess of such prior insurance; and this Company shall return the premium upon so much of the sum by it insured as it shall be exonerated from by such prior insurance.

b) If an interest insured hereunder is covered by other insurance which attached subsequent to the coverage provided by this Policy, then this Company shall nevertheless be liable for the full amount of the insurance, without right to claim contribution from such subsequent insurers, and shall accordingly be entitled to retain the premium it received in the same manner as if no such subsequent insurance had been made.

c) Other insurance upon the property with the same attachment date as the coverage's provided by this Policy, shall be deemed simultaneous, and this Company will be liable only for a ratable contribution to the loss or damage, in proportion to the amount for which this Company would otherwise be liable under this Policy, and will return to the ASSURED an amount of premium proportionate to such reduction of liability.

## 51)   IMPORT DUTY

This insurance also covers subject to policy terms of Average, the risk of partial loss by reason of perils insured against on the duties imposed on goods imported into the United States and/or Canada and insured hereunder, it being understood and agreed, however, that when the risk upon the goods continues beyond the time of landing from the overseas vessel, the increased value, consequent upon the payment of such duties, shall attach as an additional insurance upon the goods from the time such duty is paid or becomes due, to the extent of the amount thereof actually paid or payable.
Any limit of liability expressed in this policy shall be applied separately to such increased value.
The ASSURED warrants that on all risks insured hereunder a separate amount shall be reported

Page 15

sufficient to cover the said duty, upon which the rate of premium shall be an agreed percentage of the merchandise rate.

The ASSURED will, in all cases use reasonable efforts to obtain an abatement or refund of duties paid or claimed in respect of goods lost damaged or destroyed. It is further agreed that the ASSURED shall, when this Company elects, surrender the merchandise to the customs authorities and recover duties thereon as provided by law, in which event the claim under this policy shall be only for a total loss of the merchandise so surrendered and expenses.

This insurance on duty and/or increased value shall terminate at the end of the import movement covered under this policy (including the Warehouse to Warehouse and Marine Extension Clause if incorporated therein), but nothing contained in these clauses shall alter or affect any coverage granted elsewhere in the policy during the storage or transit subsequent thereto.

## 52) PARAMOUNT WARRANTIES

The following Warranties set forth in Clause 52(a - d) shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon unless such other provision refers specifically to the risks excluded by such Warranties and expressly assumes the said risks.

### 52 (a) FREE OF CAPTURE AND SEIZURE WARRANTY (F.C.& S.)

Notwithstanding anything herein contained to the contrary, this insurance is warranted free from capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise; also warranted free, whether in time of peace or war, from all loss, damage or expense caused by any weapon of war employing atomic or nuclear fission and/or fusion or other reaction or radioactive force or matter or by any mine or torpedo, also warranted free from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, rockets or similar missiles or with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather, fire or explosion unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein is performing) by a hostile act by or against a belligerent power; and for the purposes of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power.

Further warranted free from the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or from the consequences of the imposition of martial law, military or usurped power, or piracy.

### 52 (b) STRIKES, RIOTS AND CIVIL COMMOTIONS WARRANTY (S.R. & C.C.)

Notwithstanding anything herein contained to the contrary, this insurance is warranted free from loss, damage or expense caused by or resulting from:

(1) strikes, lockouts labor disturbances, riots, civil commotions, or the acts of any person or persons taking part in any such occurrences or disorders,

Page 16

(2) vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional.

## 52 (c) DELAY CLAUSE

Warranted free of claim for loss of market or for loss, damage or deterioration arising from delay, whether caused by a peril insured against or otherwise, unless expressly assumed in writing hereon.

## 52 (d) NUCLEAR EXCLUSION CLAUSE - CARGO (AIMU, APRIL 1, 1991)

Notwithstanding anything to the contrary herein, it is hereby understood and agreed that this Policy shall not apply to any loss, damage or expense due to or arising out of, directly or indirectly, nuclear reaction, radiation or radioactive contamination, regardless of how it was caused. However, subject to all provisions of this Policy, if this Policy insures against fire, then direct physical damage to the property insured located within the United States, or any territory of the United States or Puerto Rico by fire directly caused by the above excluded perils, is insured, provided that the nuclear reaction, radiation, or radioactive contamination was not caused, whether directly or indirectly, by any of the perils excluded by the F.C. & S. Warranty of this Policy (Clause 52 (a) above).

Nothing in this Clause shall be construed to cover any loss, damage, liability or expense caused by nuclear reaction, radiation or radioactive contamination arising directly or indirectly from the fire mentioned above.

## 53)   GOVERNING LAW

All questions of liability arising under this Policy are to be governed by the law and customs of England, except in the United States and its territories and possessions, where the law and customs of the United States will prevail.

## 54)   PROVISIONS REQUIRED BY LAW TO BE STATED IN THIS POLICY:

This Policy is in a capital stock corporation.

**IN WITNESS WHEREOF,** this Insurance Company has executed and attested these presents; but this Policy shall not be valid unless countersigned by a duly authorized representative of the Company.

Secretary

Countersigned at **CHICAGO, ILLINOIS**
this **6TH** day of **JUNE, 2005**

President

By:

Authorized Representative

Page 17

GSWP   22

Rev. 03/02

## SCHEDULE OF RATES

Attached to and forming part of Policy No. **88590C** of the AMERICAN HOME ASSURANCE COMPANY
Dated: **JUNE 2, 2005**, issued to **GREAT SOUTHERN WOOD PRESERVING, INC., ET AL**

(1) The following are the present rates of premium of this Company applying to Under Deck shipments on metal-hulled, self-propelled vessels which are not over 20 years of age nor less than 1000 net registered tons and which are classed A1 American Record or equivalent by a Member of the International Association of Classification Societies; or

(2) Vessels over 20 years of age which are approved by this Company, and which are not less than 1000 net registered tons and classed as in (1) above, but only while operating in their regular trades;

but in either case excluding vessels built:
(a) for service on the Great Lakes;
(b) solely for military or naval service; or
(c) for the carriage of dry bulk or liquid bulk cargoes, and which are more than 15 years of age,
    unless specifically approved by this Company.

Rates to be fixed by this Company at the time of declaration of risk for shipments not specified herein in respect of which insurance is provided under the policy. Transshipments at rates to be agreed.

The rates below are subject to change on thirty (30) days notice.

VESSEL - STEAMER SHIPMENTS PER ABOVE, UNDER DECK - DIRECT.
AIRCRAFT - VIA CERTIFICATED AIRCRAFT

RATES FOR UNFURNISHED LUMBER,   SUITABLY PACKED FOR EXPORT, PER POLICY TERMS
AND CONDITIONS.

RATES FROM PORTS AND OR PLACES AS BELOW TO PORTS AND OR PLACES AS BELOW;

| AT/FROM: | TO: | MARINE: |
|---|---|---|
| THE WORLD | THE WORLD | 0.09 PER $100.00 OF ANNUAL VALUES SHIPPED |

WAR AND S.R. & C.C. RATES (EXCEPT FOR AREAS OF THE WORLD "ON APPLICATION") ARE
INCLUDED IN THE MARINE RATE.

DUTY, NOT COVERED.

All other terms and conditions remaining unchanged.

Dated: **JUNE 6, 2005**

By: *George J Keech*
Authorized Representative

Page 18

American Institute (AIMU)

Endorsement for Open Policies (Cargo)

**STRIKES, RIOTS & CIVIL COMMOTIONS (MARCH 1, 2002)**

...be attached to and form a part of Policy No. 88590C of the AMERICAN HOME ASSURANCE COMPANY insuring GREAT SOUTHERN WOOD PRESERVING, INC., ET AL

S.R. & C. C. Endorsement (Form No. 11)

THIS INSURANCE ALSO COVERS:

(1) Physical loss of or damage to property insured directly caused by strikers, locked-out workmen, or persons taking part in labor disturbances or riots or civil commotions;

(2) Physical loss of or damage to the property insured directly caused by vandalism, sabotage or malicious acts; and,

(3) Physical loss of or damage to the property insured directly caused by the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; PROVIDED that any claim to be recoverable under this subsection (3) be not excluded by the F.C. & S. Warranty in the Policy to which this endorsement is attached. Notwithstanding the foregoing, coverage under this subsection (3) is conditional upon the property insured being in the ordinary course of transit and, in any event, shall terminate:

*(a)* As per the Warehouse to Warehouse Clause, Marine Extension Clause, 60 Day South American Clause and any other clauses relating to duration of transit contained in or endorsed onto the Policy; or,

*(b)* on delivery to the consignee's or other final warehouse or place of storage at the destination named herein; or,

*(c)* on delivery to any warehouse or place of storage, whether prior to or at the destination named herein, which the Assured elects to use either for storage other than in the ordinary course of transit or for allocation or distribution; or,

*(d)* in respect of marine transits, on the expiry of 60 days after completion of discharge overside of the property insured from the vessel at the port of discharge; or,

*(e)* in respect of air transits, on the expiry of 30 days after unloading the property insured from the aircraft at the place of discharge;

whichever shall first occur.

...ile the property insured is at risk under the terms and conditions of this insurance within the United States of America, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and Canada, this insurance is extended to cover physical loss of or damage to the property insured directly caused by acts committed by an agent of any government, party or faction engaged in war, hostilities or other warlike operations, provided such agent is acting secretly and not in connection with any operation of military or naval armed forces in the country where the described property is situated.

Nothing in this endorsement shall be construed to cover any loss, damage or expense directly or indirectly arising from, contributed to or caused by any of the following, whether due to a peril insured against or otherwise:

(a) change in temperature or humidity;

(b) the absence, shortage, or withholding of power, fuel, or labor of any description whatsoever during any strike, lockout, labor disturbance, riot or civil commotion;

(c) loss of market or loss, damage or deterioration arising from delay;

(d) hostilities, warlike operations, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, except to the limited extent that the acts of certain agents acting secretly have been expressly covered above; or,

(e) nuclear reaction, radiation or radioactive contamination.

The Assured agrees to report all shipments attaching under this cover and to pay premiums therefore at the rates established by the Assurer from time to time.

This endorsement may be canceled by either party upon forty-eight hours written, telegraphic or telefaxed notice to the other party, but such cancellation shall not affect any risks which have already attached hereunder.

Effective with respect to shipments made on or after JUNE 2, 2005

All other terms and conditions remaining unchanged.

Dated: JUNE 6, 2005

By: *[signature] George J Kust*

Authorized Representative

Rev. 03/02

Page 19

American Institute (AIMU)
**WAR RISK OPEN POLICY (CARGO)**
**(DECEMBER 2, 1993)**

**AMERICAN HOME ASSURANCE COMPANY**
NEW YORK, NEW YORK  A CAPITAL STOCK COMPANY FOUNDED 1853

THIS POLICY OF INSURANCE WITNESSETH, that in consideration of premiums as agreed to be paid, the Assurer does make insurance and cause **GREAT SOUTHERN WOOD PRESERVING, INC., ET AL** to be insured, lost or not lost, for account of whom it may concern, against War Risks only, in accordance with the terms and conditions hereinafter set forth.

To apply to shipments made on or after JUNE 2, 2005,
This Company shall not be liable hereunder for more than $2,500,000. by any one vessel.

In cases where the total value(s) at risk on any one vessel exceed(s) the limit of liability as set forth in this Policy, the Assured agrees, nevertheless, to report to the Assurer full value(s) at risk and to pay premium thereon at the agreed rates. The Assured further agrees that acceptance of such reports and premium by the Assurer shall not serve to revoke or to overrule the limit of liability set forth in this Policy; however, subject to the limit of liability, the Assurer in accepting these reports does agree to pay partial losses covered by this Policy without reduction by reason of any coinsurance which otherwise may have existed in the absence of this special agreement.

Subject to the provisions of Clause 4 of this Policy, should there be an accumulation of interests exceeding the above limit of liability by reason of any interruption of transit beyond the control of the Assured or by reason of any casualty, and/or after the interests have been discharged from the incoming overseas Vessel at an intermediate port or place for on-carriage from that or any other port or place by another overseas Vessel, and/or on the on-carrying overseas Vessel, this Policy shall attach for the full amount at risk (but in no event for more than twice the Policy limit which would be applicable to any one Vessel) provided written notice be given to this Assurer as soon as known to the Assured.

This Policy shall cover only those shipments which are insured against marine risks under Policy No. **88590C** of this Company, it being agreed that the description of such shipments, the valuations thereof, the voyage, the designation of the overseas Vessel (which shall be construed to include aircraft if included under the marine policy) on which the goods are to be carried and the ports and/or places of loading and discharge, as reported under the said Policy against marine risks, shall be deemed incorporated herein. Notwithstanding the foregoing, this policy shall not cover purely domestic shipments by air between points in the United States of America (excluding Alaska and Hawaii).

Any loss payable hereunder shall be payable in funds current in the United States, to the order of Assured or Order thirty days after full proofs of loss and proofs of interest have been filed with the Assurer.

1.(a) This insurance is only against the risks of capture, seizure, destruction or damage by men-of-war, piracy, takings at sea, arrests, restraints, detainments and other warlike operations and acts of kings, princes and peoples in prosecution of hostilities or in the application of sanctions under international agreements, whether before or after declaration of war and whether by a belligerent or otherwise, including factions engaged in civil war, revolution, rebellion or insurrection, or civil strife arising therefrom; the imposition of martial law, military or usurped power, and including the risks of aerial bombardment, floating or stationary mines and stray or derelict torpedoes. Warranted not to abandon (on any ground other than physical damage to ship or cargo) until after condemnation of the property insured.

(b) This insurance also covers, but only while the property insured is on board a waterborne conveyance, loss of or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under this Policy (subject to all of its terms, conditions and warranties) if the property insured would have sustained physical loss or damage as a direct result of such accident or occurrence.

2. Warranted free from any claim based upon loss of, or frustration of, the insured voyage or adventure caused by arrests, restraints or detainments.

3. This insurance does not cover any loss, damage or expense directly or indirectly arising from, contributed to, or caused by any of the following, whether due to a peril insured against or otherwise:

(a) Commandeering, preemption, requisition or nationalization by the government (defacto or otherwise) of the country to or from which the goods are insured.

(b) Seizure or destruction under quarantine, environmental or customs regulations.

(c) Delay, deterioration and/or loss of market.

(d) Nuclear reaction, radiation or radioactive contamination, regardless of how it was caused.

4.(a) The insurance against the risks enumerated in Clause 1, except the risks of floating or stationary mines and stray or derelict torpedoes, floating or submerged referred to in (b) below, shall not attach to the interest hereby insured or to any part thereof:

(i) prior to being on board an overseas Vessel (For the purpose of this Clause 4 an overseas Vessel shall be deemed to mean a Vessel carrying the interest from one port or place to another where such voyage involves a sea passage by that Vessel);

(ii) after being discharged overside from an overseas Vessel at the intended port or place of discharge,
or
after the expiry of 15 days from midnight of the day of arrival of the overseas Vessel at the intended port or place of discharge, whichever shall first occur;

(iii) after expiry of 15 days from midnight of the day of arrival of the overseas Vessel at an intermediate port or place to discharge the interest for on-carriage from that or any other port or place by another overseas Vessel, but shall reattach as the interest is loaded on the on-carrying overseas Vessel. During the said period of 15 days the insurance remains in force whether the interest is awaiting transit or in transit between the overseas Vessels.

(iv) For the purposes of this Clause 4 arrival at the intended port or place of discharge shall be deemed to mean that time when the overseas Vessel first

berths, anchors, moors or is secured in an area subject to regulation by the authorities of such port or place.

(b) The insurance against the risks of float   or stationary mines and stray or derelict torpedoes, float   submerged, attaches as the interest hereby insured is first loaded on a lighter, craft or vessel after leaving the warehouse at point of shipment in transit for the destination declared hereunder, and ceases to attach as the interest is finally landed from the vessel, craft or lighter prior to delivery to warehouse at such destination.

(c) If the contract of affreightment is terminated at a port or place other than the destination named therein such port or place shall be deemed the intended port or place of discharge for the purpose of this Clause 4.

(d) Shipments by mail, if covered by this Policy, are insured continuously from the time of leaving the sender's premises until delivered to the place of address.

(e) Shipments by air (other than by air mail), if covered by this Policy are insured subject to the same terms and conditions as shipments by overseas Vessel.

(f) It is a condition of this insurance that the Assured shall act with reasonable dispatch in all circumstances within their control.

(g) If anything contained in this Policy shall be inconsistent with this Clause 4 it shall to the extent of such inconsistency be null and void.

5. This insurance shall not be vitiated by deviation, overcarriage, change of voyage, or by any error or unintentional omission in the description of interest, vessel or voyage, provided the same be communicated to the Assurer as soon as known to the Assured and an additional premium paid if required.

6. And in case of any loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said goods, and merchandises, or any part thereof, without prejudice to this insurance; nor shall the acts of the Assured or Assurers, in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of an abandonment; and to the charges whereof, the said Assurers will contribute according to the rate and quantity of the sum hereby insured.

7. General Average and Salvage Charges payable according to United States laws and usage and/or as per Foreign Statement and/or as per York-Antwerp Rules (as prescribed in whole or in part) if in accordance with the Contract of Affreightment.

8. It is agreed that the reports of shipments made under the Policy against marine risks mentioned above shall be deemed to be reports under this Policy also, and the Assured agrees to pay premiums on all shipments insured under this Policy at the war risk rates of the Assurer as fixed from time to time.

9. No claim shall be payable hereunder which arises from collision, contact with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather or fire unless caused directly (and independently of the nature of the voyage or service which the Vessel concerned or, in the case of a collision, any other Vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purpose of this paragraph "power" includes any authority maintaining naval, military or air forces in association with a power.

10. No recovery for a Constructive Total Loss shall be had hereunder unless the property insured is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it cannot be preserved from actual total loss without an expenditure which would exceed its value if the expenditure had been incurred.

11. It is agreed that this Policy is a separate and wholly independent contract and is not subject to any terms or conditions of the Policy against marine risks above mentioned (whether physically attached thereto or not) except as such terms or conditions shall have been expressly incorporated herein by reference.

12. This insurance may be cancelled by either party upon forty-eight hours written, telegraphic or telefaxed notice to the other party, but such cancellation shall not affect any shipment on which this insurance has attached under the terms of Clause 4 hereof prior to the effective date of such notice. Shipments on which this insurance has not so attached but for which, prior to the effective date of such notice, bills of lading have been issued and (in the case of exports) Certificates or special policies have been issued and negotiated, shall be covered from the time of loading on the overseas Vessel, as provided in Clause 4, at the rates of the Assurer, provided that, prior to said effective date, such shipments were at the risk of the Assured and were covered under the said Policy against marine risks.

In the event of loss which may give rise to a claim under this Policy, prompt notice shall be given to this Company.

This Policy shall not be valid unless countersigned by a duly authorized representative of the Company.

*Elizabeth M. Tuck*

Secretary

Countersigned at CHICAGO, ILLINOIS
This 6TH day of JUNE, 2005

By:

President

Authorized Representative

GSWP   26

EXHIBIT C



LUSK, LUSK,
DOWDY & CALDWELL, P.C.
ATTORNEYS AND COUNSELORS AT LAW

DONALD D. LUSK (1943-2006)
KENNETH A. DOWDY
PAYTON C. LUSK
LESLIE A. CALDWELL*
DAVID L. DEAN

*also admitted to Georgia Bar

March 30, 2007
Via e-mail

2101 HIGHLAND AVENUE
SUITE 410
BIRMINGHAM, ALABAMA 35205
(205) 933-7090
FAX: (205) 933-7099

EMP. ID: 63-1171807

Blane Crutchfield, Esquire
HAND ARENDALL, L.L.C.
P. O. Box 123
Mobile, AL 36601

Re:    Great Southern v. American Home Assurance Co., Inc.
       Our File: 7039-068

Dear Blane:

In keeping with the Court's Uniform Scheduling Order, the plaintiff hereby discloses the identity of Mr. Jack Taylor, who may be used at trial to present expert testimony. Mr. Taylor's report is attached hereto. Please call should you have any questions or concerns.

With warm personal regards I remain,

Yours very truly,

Kenneth A. Dowdy

KAD;ls

Attachment

DEFENDANT'S
EXHIBIT

15

## JACK A. TAYLOR
### BIRMINGHAM, ALABAMA 35242-6210

HOME OFFICE: (205) 702-4151
BSC OFFICE:   (205) 226-4822

FAX: (205) 702-4194
E-MAIL:  JTAYLOR@BSC.EDU

March 29, 2007

Mr. Kenneth A. Dowdy, Esq.
Lusk, Lusk, Dowdy & Caldwell, P.C.
2101 Highland Ave.
Suite 410
Birmingham, AL 35205

RE: *Great Southern Wood Preserving, Inc. v. American Home Assurance Company, et al.*

Dear Mr. Dowdy:

You asked me to review the transactions related to the claims by Great Southern Wood Preserving Inc. under the Marine Open Cargo Policy issued by American Home Assurance Company.  Following is my report with respect to these transactions.

## I.  QUALIFICATIONS

I am the Joseph S. Bruno Professor of Retailing at Birmingham-Southern College in Birmingham, Alabama.  I have a Ph.D. and teach marketing, legal environment of business, and related courses at Birmingham-Southern.  I teach in both the undergraduate and graduate programs.  I have a JD degree and I am licensed to practice law in the state of Alabama.  I also teach insurance law at Birmingham School of Law.  I have attached a copy of my curriculum vitae to this report.

I have been involved in the insurance industry since 1974.  I have professional insurance designations including a CLU (Chartered Life Underwriter), CPCU (Chartered Property Casualty Underwriter), an RHU (Registered Health Underwriter), and an F.L.M.I. (Fellow, Life Management Institute).  I have served as a consultant and testified as an expert on many insurance cases.  I have qualified as an insurance expert and have provided testimony in state and federal courts.  I have testified for both the plaintiff and the defendant.  I have attached a list of the cases in which I have given testimony either in deposition or at trial during the past four years.

I am familiar with the customs and practices of the insurance industry, including those related to the matters on which I am offering opinions in this case.  Each of my opinions is expressed to a reasonable degree of professional certainty and is based on the material I have reviewed, the information available to me as of this date, and my education, training and experience in the insurance industry.

1

It is my understanding that discovery has not been completed and that additional information may become available. My opinions may change, or supplemental opinions may be added if additional information becomes available through discovery, deposition or otherwise. In this event, I will provide a supplemental report.

I am being compensated at a rate of $225.00 per hour plus expenses for my services in this case.

## II.  MATERIAL REVIEWED

Complaint,
Answer of American Home Assurance Company et al.,
Marine Open Cargo Policy No. 88590C,
Letter dated July 7, 2006 from Selena K. Ho to Kenneth A. Dowdy, and
Documents bates stamped AIG00001 to AIG01657.

## III.  GENERAL INFORMATION

### A.  Ocean Marine Insurance

Ocean Marine Insurance is designed to cover various hazards related to the movement of goods. The first and obvious protection that can be provided is for the goods themselves. Risks are unavoidable in the shipment of goods. Goods are generally handled many times during shipment, and Marine Insurance is designed to provide coverage throughout this process.

Goods are first loaded at the origination point onto a land vehicle (truck or train, for instance). They may then be held in a port before being loaded onto the ship. Upon arrival at the destination port, the goods must be inspected or cleared before they are released to the buyer. This may require that the goods be temporarily held or stored until they are inspected and cleared for release to the buyer. Once released, the buyer has dominion and control of the goods and is free to transfer the goods to the buyer's premises.

### B.  Marine Cargo Open Policy

A marine cargo open policy is a continuous contract of insurance between an insurance company and the assured. It automatically covers all of the assured's goods in transit as long as the policy remains in force.

The policy specifies:
- The general description of the goods.
- The countries or places to or from which the goods will be insured.
- The maximum value payable under the policy.
- How the goods will be valued.
- The conditions of insurance.
- The assured agrees to declare details of all shipments that fall within the scope of the policy, and the insurance company agrees to insure such shipments according to the terms and conditions of the policy.

2

## IV. FACTS AND BACKGROUND OF THE CASE

### A. The American Home Assurance Company Marine Open Cargo Policy

American Home Assurance Company (American Home) issued Marine Open Cargo Policy No. 88590C to Great Southern Wood Preserving, Inc. (Great Southern). The Policy had an effective date of June 2, 2005.

On or about August 27 or 28, 2005, a shipment of unfinished lumber arrived at the Port of Gulfport in Gulfport, Mississippi. The shipment consisted of 100 tractor-trailer loads of lumber[1]. The lumber was temporarily placed in the Mississippi State Port Authority Warehouse in Gulfport waiting inspection and release by the appropriate government authority. Inspection and release of the lumber was required before Great Southern could move it to its processing plant.

A shipment of 90 tractor-trailer loads of lumber was received 24 days before the storm of which 24 loads remained in the warehouse on August 29, 2005. Another 16.5 tractor-trailer loads of lumber remained in the warehouse from a shipment received on or about July 6, 2005.

On August 29, 2005, before the inspection and release of the August 27/28 shipment to Great Southern, Hurricane Katrina destroyed the Mississippi State Port Authority Warehouse. This resulted in the loss of all of the unfinished lumber, including the just arrived shipment. Great Southern subsequently made claims for the lost lumber under Marine Open Cargo Policy No. 88590C.

### B. American Home's Denial

Great Southern was notified by a letter dated July 7, 2006 that American Home was denying coverage under Policy No. 88590C for the losses claimed.[2] The letter states in part the following:

> The losses presented in these claim occurred on August 29, 2006, when the Mississippi State Port Authority Warehouse in Gulfport, Mississippi where the lumber products were stored was destroyed by Hurricane Katrina. Given that these losses did not occur during the ocean voyage, but during a period of storage after discharge of the vessels, we direct your attention to the following provisions of the Policy:
>
> 19) WAREHOUSE TO WAREHOUSE
>
> This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the Declaration and/or Certificate for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment, if any, until the goods are discharged over side from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit

---

[1] See letter dated July 21, 2006 to Selena Ho.
[2] The letter was sent by Certified Mail to Plaintiff's attorney, Kenneth A. Dowdy, Lusk, Lusk, Dowdy & Caldwell, P.C.

until delivered to the final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge over side of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be agreed in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the ASSURED.

It is necessary for the ASSURED to give prompt notice to these ASSURERS when they become aware of an event for which they are 'held covered' under this Policy and the right to such cover is dependent on the compliance with this obligation.

We note that the Policy is a Marine Open Cargo Policy and does not provide separate warehouse coverage, nor was such coverage ever requested.

I have reviewed Policy No. 88590C and found that the "final warehouse at the destination named in the policy" is not named in the Policy. It is clear that the lumber delivered on or about August 27 or 28, 2005, was destroyed before ". . . the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur" and before being inspected and released to the control of Great Southern. Further, the evidence is that on August 29, 2005 at least part of the remaining unfinished lumber fell within the extended time period. Finally, the last sentence of the first paragraph clearly contemplates and allows for coverage arising from circumstances beyond the control of the assured (Great Southern).

## IV. OPINIONS, BASIS, AND SUPPORTING FACTS

My opinions are expressed to a reasonable degree of professional certainty and are based on the material I reviewed, the information available to me as of this date, and my education, training and experience in the insurance industry. For convenience, the basis and supporting facts discussed above are incorporated in my opinions as applicable.

1.  Based on the material and evidence I reviewed, it is my opinion that the lumber received on or about August 27 or 28, 2005, had not reached its final warehouse destination and was covered under Policy No.88590C at the time of loss.

2.  Based on the material and evidence I reviewed, it is my opinion that the lumber received prior to August 27 or 28, 2005 and still in temporary storage in the Gulfport Warehouse on August 29, 2005, had not reached its final warehouse destination and was covered under Policy No.88590C. Coverage for this category of lumber would be covered under Policy provision 19) WAREHOUSE TO WAREHOUSE:
    ". . . whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur."

4

3. Based on the material and evidence I reviewed, it is my opinion that American Home's denial of Great Sothern's claims as discussed above was improper and the claims are payable under the terms of Policy No.88590C.

Sincerely,

Jack A. Taylor, Ph.D.

5

Jack A. Taylor
6300 Timberwolf Trail
Birmingham, Alabama 35242

Birmingham-Southern College
P.O. Box 549023
Birmingham, Alabama 35254

BSC:     (205) 226-4822
Home:    (205) 702-4151
FAX:     (205) 702-4194
E-Mail   jtaylor@bsc.edu

EDUCATION:      Ph.D. 1992 (Administration-Health Services; Specialization in Marketing) - University of Alabama at Birmingham.

J.D. 1985 - Birmingham School of Law.  Summa Cum Laude & Valedictorian.

Post Graduate Studies 1980 (Marketing) - University of Memphis.

M.B.A. 1976 (Management) - Illinois State University.

B.S.B.A. 1973 (Marketing) - University of Central Florida.

A.A. 1971 - Freed-Hardeman University.

PROFESSIONAL
DESIGNATIONS:     CPCU (Chartered Property Casualty Underwriter) 2004 - AICPCU.

PCM (Professional Certified Marketer) 2001 - American Marketing Association.

CLU (Chartered Life Underwriter) 1982 - The American College.

RHU (Registered Health Underwriter) 1982 - National Association of Health Underwriters.

FLMI (Fellow, Life Management Institute) 1979 - Life Office Management Association.

Principles of Health Insurance I & II, 1976 - Health Insurance Association of America.

EXPERIENCE:

ACADEMIC
1995 - Present    Birmingham School of Law - Birmingham, Alabama.
                  PROFESSOR OF INSURANCE LAW.

1988 - Present    Birmingham-Southern College - Birmingham, Alabama.
                  JOSEPH S. BRUNO PROFESSOR OF RETAILING, Division of Graduate and Business Programs - Endowed professorship.  Teach undergraduate and graduate courses in Marketing and related areas. Previously taught courses in Insurance.  Discipline Coordinator for Business Administration Program (Marketing, Management, and Finance).

1979 - 1980       Freed-Hardeman University - Henderson, Tennessee.
                  INSTRUCTOR, DEPARTMENT OF BUSINESS - Taught courses in Business Law, Economics, Finance, Insurance, Management, and Marketing.

1989 - 1992       Faulkner University - Birmingham, Alabama.
                  ADJUNCT PROFESSOR - Executive B.B.A. program.  Taught courses in Business Law, Ethics, Management, Marketing, and General Business.

1981 - 1982
and
1987 - 1988       Birmingham-Southern College - Birmingham, Alabama.
                  ADJUNCT PROFESSOR - Taught courses in Insurance, Marketing and related areas.

1

**BUSINESS**

1982 - 1987    Protective Life Insurance Company - Birmingham, Alabama.
DIRECTOR, AGENCY ADMINISTRATION - Administrator of the home office agency department. Responsible for approving agent appointments and financing; production and contract validation; budget variance analysis.  Coordinator on legal matters involving company representatives. Responsible for negotiating and drafting contracts, agreements and other documents, and for monitoring and collecting agent balances.  Departmental liaison with corporate management and operational departments. Assisted in managing and coordinating corporate wide marketing activities.

American Foundation Life Insurance Company - Birmingham, Alabama.
VICE PRESIDENT, MARKETING SERVICES - Responsible for advanced sales support, marketing and sales support activities including development of sales material, field communication, procedure manuals, and recruiting material.  Developed and conducted sales and product seminars. (Company bought by Protective Life in 1983).

1980 - 1982    Vulcan Life Insurance Company - Birmingham, Alabama.
and    VICE PRESIDENT AGENCY ADMINISTRATION - Administrator of the home office agency
1977 - 1979    department.  Coordinated all marketing activities.  Designed and developed sales, marketing and recruiting material.  Wrote and implemented numerous procedure manuals and reorganization programs.  Worked with outside consultants in the areas of marketing, research, administration, contract drafting and collecting agent balances.  Developed and implemented long and short-range marketing plans.  Manager, Policyholder Service Department.  Liaison between agency force and home office operational departments.

1974 - 1976    State Farm Insurance Companies - Bloomington, Illinois.
SENIOR UNDERWRITER, HEALTH INSURANCE - Responsible for underwriting (risk evaluation) medical and disability insurance.

**LEGAL**

1987 - 1988    Bradley, Arant, Rose & White - Birmingham, Alabama.
ATTORNEY - Property abstract examination and writing title opinions.

**OTHER ACTIVITIES:**    Board of Directors, Alabama Retail Association.

Consulting on insurance company operations, agency management, administration, sales and marketing, and work flow.  Areas of emphasis include life, medical, disability, liability, and property and casualty insurance.  Projects for insurance and other organizations include market analysis, marketing research, development and implementation of management and marketing plans and strategies, design of sales and marketing material, and development of documents and forms. Consulting and speaking on customer service.

**BOOK REVIEWS & CONTRIBUTING EDITOR:**    Life and Health Insurance Marketing, 1998.  Life Office Management Association.  Second Edition.

Agency Administration Course Manual, 1996.  Life Office Management Association.
New text for LOMA's Associate, Insurance Administration Program.

Risk Management and Insurance, 1996.  West Publishing Company.  Seventh Edition.

Intro to Managed Care, 1995.  Life Office Management Association.  New textbook.

Law for Business, 1991.  West Publishing Company.  Second Edition.

**DISSERTATION:**    An Examination of External Sources of Information Used By Primary Care Physicians in the Selection of a Referral Specialist.  University of Alabama at Birmingham.  1992.

2

**PUBLICATIONS:**   Sources of Referral Information: A Marketing Analysis of Physician Behavior. Health Care Management Review, (coauthor), Summer 1998.

Injuries and loss of earnings.  The Alabama Lawyer, (coauthor), May 1996.

The Beginning and the Essence of Insurance.  Business to Business Inc., Winter 95 - 96.

So You Have an Unhappy Customer, Now What Do You Do?  Business to Business Inc., October 1995.

Managing Customer Expectations: The Key To Satisfaction. Business to Business Inc., August 1995.

Service Excellence: Take The Customer By Surprise.  Business to Business Inc., June 1995.

How to Run Your Customer Off By Really Trying.  Business to Business Inc., April 1995.

Influencing Physician Referrals.  Journal of Health Care Marketing, (coauthor), Fall 1994.

Product Line Management in Hospitals: An Exploratory Study of Management Change. Hospital & Health Services Administration, (coauthor), Fall 1990.

Life Insurance for You and Your Clients.  The Practical Lawyer, July 1988.

Life Insurance for You and Your Clients.  The Audio Lawyer, August 1, 1988.

The Simple Rules of Self-Motivation.  Insurance Sales, March 1982.

The Realities of the Brokerage Market.  Insurance Sales, October 1981.

**PROFESSIONAL LICENSES:**

MEMBER:
Alabama State Bar
Birmingham Bar Association

LICENSED TO PRACTICE LAW:
State of Alabama
United States District Court for the Northern District of Alabama
United States Court of Appeals for the Eleventh Circuit

**AWARDS:**

BIRMINGHAM SCHOOL OF LAW
Valedictorian
Governor's Award - Outstanding Senior Scholar for Four Years
Sanders Award - Top Student in All Real Property and Title Courses
Outstanding Senior
Outstanding Sophomore
Outstanding Freshman

**PERSONAL:**   Married; two children.

**REFERENCES:**   Furnished upon request.

February 2006

3

Dr. JACK A. TAYLOR
CASE LISTING

March 29, 2007

The following is a list of cases in which I have testified as an expert at trial or by deposition in the past four years.

2003

| | | |
|---|---|---|
| Case: | Diana Dean Martin Liverman et al. v. J. C. Penney Life Insurance Company et al. |
| Firm: | Starnes & Atchison, LLP |
| For: | Defendant |
| Activity: | Deposition |
| Court: | Circuit Court of Green County, Alabama |
| Case No. | CV – 1999 - 000146 |

| | |
|---|---|
| Case: | Marlon R. Wade v. Nationwide Mutual Fire Insurance Company |
| Firm: | Hare, Clement & Duck, P.C. |
| For: | Defendant |
| Activity: | Deposition |
| Court: | United States District Court for the Southern District of Alabama, Southern Division |
| Case No. | 1:01 - CV - 000804 - WS - C |

| | |
|---|---|
| Case: | Mae Clark v. Blue Cross and Blue Shield of Alabama |
| Firm: | Balch & Bingham LLP |
| For: | Defendant |
| Activity: | Deposition |
| Court: | Circuit Court of Etowah County, Alabama |
| Case No. | CV - 1997 - 000210 |

| | |
|---|---|
| Case: | Paula F. Chancey v. Fidelity & Guaranty Life Insurance Company |
| Firm: | Starnes & Atchison LLP |
| For: | Defendant |
| Activity: | Deposition |
| Court: | U.S. District Court for the Middle District of Alabama, Southern Division |
| Case No. | 1:02 - CV - 00914 - WHA - VPM |

| | |
|---|---|
| Case: | Sandra Pabon v. Nationwide Mutual Fire Insurance Company |
| Firm: | Hare, Clement & Duct, P.C. |
| For: | Defendant |
| Activity: | Testified at trial |
| Court: | Circuit Court of Jefferson County, Alabama |
| Case No. | CV - 1997 - 004687 |

| | |
|---|---|
| Case: | Sarah and Allen Cooper v. State Farm Fire and Casualty Co. et al. |
| Firm: | Yearout and Traylor, P.C. |
| For: | Plaintiff |
| Activity: | Deposition |
| Court: | Circuit Court of Jefferson County, Alabama |
| Case No. | CV - 2001 - 007529 |

1

| | |
|---|---|
| Case: | Burlington Insurance Company v. Morris Concrete |
| Firm: | Porterfield, Harper & Mills |
| For: | Plaintiff/Counter-Defendant (Burlington Ins. Co. Declaratory Judgment) |
| Activity: | Deposition |
| Court: | United States District Court for the Southern District of Alabama, Southern Division |
| Case No. | 1:02 - CV - 00686 - WS - C |

| | |
|---|---|
| Case: | Clayton Shelburn et al. v. Keith Linhart, et al. |
| Firm: | Sandberg, Phoenix & von Gontrad, P.C. |
| For: | Defendant |
| Activity: | Deposition |
| Court: | Missouri Circuit Court Twenty-Second Judicial Circuit City of St. Louis |
| Case No. | 22002 – 07356 |

| | |
|---|---|
| Case: | Joy Hall v. UNUM Life Insurance Company of America |
| Firm: | Bunch & James |
| For: | Plaintiff |
| Activity: | Deposition |
| Court: | United States District Court for the Northern District of Alabama, Northwestern Division |
| Case No. | 3:02 - CV - 01749 - RDP |

| | |
|---|---|
| Case: | Jay Food Corporation v. Nationwide Property and Casualty Insurance Company |
| Firm: | Hare, Clement & Duck |
| For: | Defendant |
| Activity: | Testified at trial |
| Court: | The Circuit Court of the First Judicial District of Hind County, Mississippi |
| Case No. | 2510056 |

| | |
|---|---|
| Case: | John L. Pack et al. v. Provident American Life & Health Insurance Co. |
| Firm: | Steptoe & Johnson |
| For: | Defendant |
| Activity: | Deposition |
| Court: | The United States District Court for the Southern District of West Virginia at Bluefield |
| Case No. | 1:02 - CV - 00023 |

2004

| | |
|---|---|
| Case: | James Robert Smith, IV v. SAFECO |
| Firm: | Don F. Wiginton |
| For: | Plaintiff |
| Activity: | Deposition |
| Court: | The Circuit Court for the Tenth Judicial Circuit in and for Jefferson County, Alabama |
| Case No. | CV - 2002 - 000785 |

| | |
|---|---|
| Case: | Linda Womack v. Continental General Insurance Company |
| Firm: | McKinney & Stringer |
| For: | Defendant |
| Activity: | Deposition |
| Court: | The United States District Court for the Western District of Oklahoma |
| Case No. | 5:03 - CV - 00111 - HE |

Case:      Infinity National Insurance Company v. Bethany Terrell
Firm:      Roberts & Fish
For:       Defendant/ Plaintiff (For Declaratory Relief)
Activity:  Deposition
Court:     The Circuit Court of Tuscaloosa County, Alabama
Case No.   CV - 2001 - 001674

Case:      Howard Half v. Metropolitan Life Insurance Company
Firm:      Thorp, Reed & Armstrong
For:       Defendant
Activity:  Testified at trial
Court:     The Court of Common Pleas of Allegheny County, Pennsylvania
Case No.   GD951763

Case:      Mary T. Lasko v. Metropolitan Life Insurance Company
Firm:      Thorp, Reed & Armstrong
For:       Defendant
Activity:  Testified at trial
Court:     The Court of Common Pleas of Allegheny County, Pennsylvania
Case No.   GD9515438

Case:      Decorator Warehouse, LLC v. Pritchett-Moore, Inc. & Walter Gary
Firm:      Owens and Millsaps, LLP
For:       Plaintiff
Activity:  Deposition
Court:     The Circuit Court of Tuscaloosa County, Alabama
Case No.   CV - 2003 - 000429

Case:      Rosenfeld, LLC, et al. v. Nationwide Mutual Fire Insurance Co. et al.
Firm:      Hare, Clement & Duck, P.C.
For:       Defendant
Activity:  Deposition
Court:     The Circuit Court of Tuscaloosa County, Alabama
Case No.   CV - 2003 - 000007

Case:      Lowery Printing, Inc. v. The Ohio Casualty Company, et al.
Firm:      Friedman, Leak & Bloom
For:       Defendant
Activity:  Deposition
Court:     The Circuit Court for the Tenth Judicial Circuit of Alabama
Case No.   CV - 2002 - 001250

Case:      Karen Leidholt Ketchum, as Personal Representative for the Estate of Marguerite Leindholt
           Deceased, and the Leidholt Family Trust v. Conseco Life Insurance Co.
Firm:      Burr & Forman
For:       Defendant
Activity:  Deposition
Court:     United States District Court Northern District of Alabama
Case No.   CV - 2003 - 002793

3

2005    Case:        Cathy L. Brockelsby and Bruce Brockelsby v. Continental General Insurance Company and
                     Harold Hulett
        Firm:        Hinshaw & Culbertson, LLP
        For:         Defendant
        Activity:    Deposition
        Court:       The Circuit Court for the Seventh Judicial Circuit Sangamon County, Illinois
        Case No.     2002 - L3 - 70

        Case:        Christopher P. Crotty v. General American Life Insurance Company,
                     Ernest R. Reeves v. General American Life Insurance Company
        Firm:        Armstrong Teasdale, LLP
        For:         Defendant
        Activity:    Deposition (One deposition for both cases)
        Court:       The Circuit Court for St. Louis, State of Missouri
        Case No.     22032 - 00202

        Case:        Charlotte Palmer, surviving spouse of Jimmy Palmer, deceased v.
                     Mutual of Omaha Insurance Company, Kent Houck and Budo D. Perry
        Firm:        McKinney & Stringer
        For:         Defendant
        Activity:    Deposition
        Court:       The United States District Court for the Eastern District of Oklahoma
        Case No.     6:04 - CV - 00361-RAW

        Case:        Jerry Wise, et al. v. Kansas City Life Insurance Company
        Firm:        Daniel Coker Horton & Bell, P.A.
        For:         Defendant
        Activity:    Deposition
        Court:       The United States District Court for the Northern District of Mississippi Western Division
        Case No.     3:03 CV - 107 - D - A

        Case:        Jerry Wise, et al. v. Kansas City Life Insurance Company
        Firm:        Daniel Coker Horton & Bell, P.A.
        For:         Defendant
        Activity:    Testified at trial
        Court:       The United States District Court for the Northern District of Mississippi Western Division
        Case No.     3:03 CV - 107 - D - A

        Case:        Edward Beliunas and Paulette Beliunas v. Metropolitan Life Insurance Company
        Firm:        McCarter & English
        For:         Defendant
        Activity:    Testified at trial
        Court:       The Court of Common Pleas of Allegheny County, Pennsylvania
        Case No.     GD - 95 - 012297

2006    Case:        Charles T. Easterly and Marjorie E. Easterly v. Metropolitan Life Insurance Co. et al.
        Firm:        Frost Brown Todd, L.L.C.
        For:         Defendant
        Activity:    Deposition
        Court:       Commonwealth of Kentucky Fayette Circuit Court Fourth Division
        Case No.     CV - 99 - CIV - 3811

| | |
|---|---|
| Case: | Charles T. Easterly and Marjorie E. Easterly v. Metropolitan Life Insurance Co. et al. |
| Firm: | Frost Brown Todd, L.L.C. |
| For: | Defendant |
| Activity: | Testified at trial |
| Court: | Commonwealth of Kentucky Fayette Circuit Court Fourth Division |
| Case No. | CV - 99 - CIV - 3811 |

| | |
|---|---|
| Case: | Northport Health Services, Inc. and Northport Health Services of Florida, LLC v. Acordia Southeast, Inc., at al. |
| Firm: | Burr & Forman LLP |
| For: | Plaintiff |
| Activity: | Deposition |
| Court | Circuit Court of Tuscaloosa County, Alabama |
| Case No. | CV – 2004 - 000343 |

| | |
|---|---|
| Case: | Insurance Products Marketing, Inc. and Donald Feldman v. Conseco Life Insurance Co. et al. |
| Firm: | Burr & Forman LLP |
| For: | Defendant |
| Activity: | Deposition |
| Court | United States District Court of South Carolina Beaufort Division |
| Case No. | 9:04 - 22261 - 23 |

| | |
|---|---|
| Case: | James Hall v. Guideone Insurance Co. et al. |
| Firm: | Philip W. Thomas, P.A. |
| For: | Defendant |
| Activity: | Deposition |
| Court | The Circuit Court of Union County Mississippi |
| Case No. | 2006 - 072 |

| | |
|---|---|
| Case: | Kenneth R. Guifoyle and Masako Hikida v. Blue Cross and Blue Shield of South Carolina |
| Firm: | Montgomery, Patterson, Potts & Willard |
| For: | Defendant |
| Activity: | Deposition |
| Court | The Court of Common Pleas; State of South Carolina, County of Richland |
| Case No. | 2005 - CP - 40 – 2427 |

| | |
|---|---|
| Case: | Ted Forwood, et al, v American General Life Insurance Co., et al. |
| Firm: | Maynard, Cooper & Gayle, P.C. |
| For: | Defendant |
| Activity: | Deposition |
| Court | The Circuit Court of Mobile County, Alabama |
| Case No. | CV - 04 – 797 |

| | |
|---|---|
| Case: | Fireman's Fund Insurance Co. v Christian Cheerleaders Association |
| Firm: | Sirote & Permutt, P.C. |
| For: | Defendant |
| Activity: | Deposition |
| Court | The Circuit Court of St. Clair County, Alabama Southern Judicial Division at Pell City |
| Case No. | |

| Case: | Beatrice Thompson v Columbus Life Insurance Company, et al. |
|---|---|
| Firm: | Thorndal, Armstrong, Delk, Balkenbush & Eisinger |
| For: | Defendant |
| Activity: | Deposition |
| Court | United States District Court District of Nevada |
| Case No. | CV – S – 05 – 0630 – KJD - LRL |

| Case: | James Hall v. Guideone Insurance Co. et al. |
|---|---|
| Firm: | Philip W. Thomas, P.A. |
| For: | Defendant |
| Activity: | Testified at trial |
| Court | The Circuit Court of Union County Mississippi |
| Case No. | 2006 - 072 |

| Case: | Reginald Martin Agency, Inc. et al, v. Conseco Medical Insurance Co. et al. |
|---|---|
| Firm: | Burr & Forman LLP |
| For: | Defendant |
| Activity: | Deposition |
| Court | United States District Court Southern District of Indiana Indianapolis Division |
| Case No. | 1:04-CV-1587-TAB-RLY |

| Case: | Patrick D. Roberson d/b/a Southeastern v. American Resources Insurance Co. , Inc. et al. |
|---|---|
| Firm: | Hare, Clement & Duck |
| For: | Plaintiff, counterclaim |
| Activity: | Deposition |
| Court | The Circuit Court of Jefferson County, Bessemer Division |
| Case No. | CV-04-1382 |

2007

| Case: | Jimmy L. Hobbs v. Walters Industries, Inc. et al. |
|---|---|
| Firm: | A.W. Bolt |
| For: | Plaintiff |
| Activity: | Deposition |
| Court | The Arbitration Tribunal of the American Arbitration Association |
| Case No. | 30-160-238-06 |

EXHIBIT D

10/05/2006
02:07:13 PM

Richard Murray & Co., Inc.
ABI PROCESSING STATUS REPORT - 7501

Page: 1
MAC

| File No. | Entry No. | Status | | Employee | Date | Time |
|---|---|---|---|---|---|---|
| 3839-05 | 990-0899774-6 | LINK - 7501 Prepare Messages | Passed And Certified | DEEDEE | 08/25/2005 | 08:46:23 AM |
| | | ABI - 7501 ABI Results | Paperless - Filer Retain Records | DEEDEE | 08/25/2005 | 09:46:38 AM |
| | | | Passed - Cert-Release Certified Via Summary | DEEDEE | 08/25/2005 | 09:46:38 AM |
| | | ABI - Cargo Release Processing Results | Certified | DEEDEE | 08/25/2005 | 09:46:38 AM |
| | | | Entry Documents Required | DEEDEE | 08/25/2005 | 09:46:44 AM |
| | | | Manifest Hold Agriculture | DEEDEE | 08/25/2005 | 09:46:44 AM |
| | | | Entry Documents Required | DEEDEE | 08/25/2005 | 09:44:24 AM |
| | | | Manifest Hold Agriculture | DEEDEE | 08/26/2005 | 09:44:24 AM |
| | | | Conditional Release Specific Document Review | DEEDEE | 08/26/2005 | 11:48:40 AM |
| | | | Manifest Hold Agriculture | DEEDEE | 08/26/2005 | 11:48:40 AM |
| | | LINK - Stmt Date-Modify (Auto) | Passed - Filer Order Stmt/Pay: 09/14/2005 | JAN | 08/26/2005 | 02:29:48 PM |
| | | ABI - Stmt Date-Modify | Accepted - Stmt/Pay: 09/14/2005 Stmt No: 1905251028 | JAN | 09/08/2005 | 02:36:14 PM |
| | | LINK - Stmt Date-Modify (Auto) | Passed - Filer Order Stmt/Pay: 09/26/2005 | JAN | 09/14/2005 | 10:32:27 AM |
| | | | Accepted - Stmt/Pay: 09/23/2005 | JAN | 09/14/2005 | 10:37:21 AM |
| | | ABI - Stmt Date-Modify | Accepted - Stmt/Pay: 09/23/2005 Stmt No: 1905257009 | DEEDEE | 09/14/2005 | 10:42:39 AM |
| | | LINK - 7501 Prepare Messages | Replace And Passed | MAC | 09/19/2005 | 01:38:36 PM |
| | | | Replace And Passed | MAC | 09/19/2005 | 01:49:51 PM |
| | | ABI - 7501 ABI Results | Passed | DEEDEE | 09/19/2005 | 02:38:38 PM |
| | | | Paperless - Filer Retain Records | DEEDEE | 09/19/2005 | 02:38:38 PM |
| | | | Paperless - Filer Retain Records | DEEDEE | 09/19/2005 | 02:51:40 PM |
| | | | Passed | DEEDEE | 09/19/2005 | 02:51:40 PM |
| | | ABI - Cargo Release Processing Results | Conditional Release Specific Document Review | DEEDEE | 10/04/2005 | 10:52:26 AM |
| | | | Agriculture Manifest Hold Removed | DEEDEE | 10/04/2005 | 10:52:26 AM |
| | | | Release Date Update - 10/04/2005 | DEEDEE | 10/04/2005 | 10:52:26 AM |
| | | ABI - Liquidation | No Change | DEEDEE | 08/11/2006 | 08:24:07 AM |

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| GREAT SOUTHERN WOOD PRESERVING, INC., | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 1:06-cv-00708-CSC |
| | * | |
| AMERICAN HOME ASSURANCE CO., AIG, AMERICAN INTERNATIONAL UNDERWRITERS CORP., AMERICAN INTERNATIONAL MARINE AGENCY, | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |

## SELENA HO DECLARATION

STATE OF ILLINOIS    )
COUNTY OF COOK    )

1.    My name is Selena Ho. I am an Assistant Vice President and Regional Claims Manager with AI Marine Adjusters, Inc., an adjusting entity for the AIG group of companies ("AIG"). I have personal knowledge of the matters stated herein.

2.    On August 31, 2005, Great Southern reported a loss of lumber as a result of Hurricane Katrina. Although the lumber had reportedly been shipped from various ports of origin in South America, all of the lumber included in the claim was stored in a warehouse in Gulfport, Mississippi.

3.    American Home conducted an investigation of the claim based on customary and prudent practices in the insurance industry.

4.    Following receipt of notice of the claim, American Home retained SGS North American/Marine Services, an independent marine surveyor, to investigate the claim. SGS North American/Marine Services inspected the site of the loss and assisted in obtaining shipping documents and other relevant information.

5.    American Home also corresponded directly with Great Southern, its lawyers and insurance brokers in its effort to investigate the claim.

6.      As a result of the investigation, American Home determined that in addition to the four (4) shipments at issue in this case, Great Southern submitted claims for eight (8) separate shipments which had been shipped from ports of origin before the June 2, 2005 effective date of the policy. By letter dated May 24, 2006, the claims for these pre-policy shipments were denied. The May 24, 2006 denial letter is attached hereto as Exhibit 1.

7.      Great Southern reported that all of the lumber had been stored in warehouse space leased to Great Southern by the Mississippi State Port Authority. The Gulfport, Mississippi warehouse lease is attached hereto as Exhibit 2.

8.      Under the warehouse lease, Great Southern assumed all responsibility for the care, custody, control and protection of the lumber. See Lease Agree., § F.

9.      Great Southern reported that the warehouse was used to store lumber while awaiting distribution by Great Southern. Great Southern's practice was to remove the lumber from the Gulfport warehouse and direct it to Great Southern treatment plants, depending on its inventory needs and the availability of trucks, or to sell the lumber to outside customers and ship the lumber directly from the Gulfport warehouse. Broker Dan Morton's June 28, 2006 email noting direct sales from Gulfport, and discretionary dispatch of lumber by Great Southern, is attached hereto as Exhibit 3.

10.     Great Southern provided documents showing the length of storage time for lumber which was the subject of the claim as well as prior shipments. These documents reflected that the duration of storage time varied with some lumber remaining in the warehouse for several months prior to being shipped by Great Southern to its treatment plants or being sold to third parties.

11.     The shipping documents provided by Great Southern reflected that the lumber was shipped from South American ports for delivery at the port of Gulfport, Mississippi. The ocean carrier's freight invoices submitted by Great Southern also showed the destination as Gulfport, Mississippi with no on-carriage charges or destination. The commercial invoices for the lumber also show Gulfport, Mississippi as the "destination."

12.     The documents and information provided by Great Southern revealed that the lumber which was subject of the claim had been received into the custody and control of Great Southern at its final destination and was no longer in the ordinary course of transit at the time of the loss.

13.     On May 23, 2006 American Home issued a letter to Great Southern reserving its rights with respect to coverage under the policy.

2

14.    On July 7, 2006, American Home issued a letter declining coverage for the shipments at issue in this case under the policy. The July 7, 2006 letter is attached hereto as Exhibit 4.

15.    The July 7, 2006 denial letter explained:

The information submitted establishes that Great Southern used the warehouse at the pier as a storage facility for its lumber after vessel discharge, and the lumber was removed by Great Southern from the warehouse as it was needed at Great Southern's various processing facilities.

We have also been advised that occasionally the material was sold and shipped to customers directly from the Gulfport warehouse. The spreadsheets we received indicate that it typically takes Great Southern 90 days or longer to remove the lumber delivered by a particular vessel completely from the Gulfport warehouse. The contract between Great Southern and the Mississippi State Port Authority establishes that Great Southern had contracted for assigned space at the warehouse in Gulfport, and Great Southern assumed all responsibility for the care, custody, control and protection of the cargo. SSA is the designated stevedore, cargo handler and terminal operator on behalf of Great Southern. In addition, all of the bills of lading show that the place of delivery is the Port of Gulfport, and the space designated for "Place of delivery by on carrier" is blank. The Commercial invoices for each shipment show the "destination" as Gulfport.

These facts establish that Great Southern exercised full dominion and control over the lumber once it was discharged from the vessels and placed into the warehouse in Gulfport. Therefore, the ordinary course of transit had ceased, and the lumber had been delivered to its final destination warehouse within the meaning of the Policy.

We conclude there is no coverage for these losses under the Policy because the losses occurred after coverage under the Policy had ceased.

(July 7, 2006 Den. Let.).

16.    Following the denial, Great Southern's broker advised that Great Southern had obtained replacement coverage with Lloyds of London. Under the new coverage, Great Southern obtained additional coverage for goods after delivery to its port warehouse facility. In advising American Home of the new policy, Great Southern's broker noted: "No gaps in coverage in case another hurricane type loss." See Broker Georgia DeHart's July 20, 2006 email acknowledging the gaps in coverage is attached hereto as Exhibit 5.

I declare under penalty of perjury under the laws of the United States of America that to the best of my knowledge the foregoing is true and correct.

Executed on this 30th day of May, 2007.

SELENA HO

EXHIBIT F



**AI Marine Adjusters, Inc.**
300 South Riverside Plaza, Suite 2100
Chicago, IL  60606-6613
312.930.6955
312.930.5388 fax

July 7, 2006

Kenneth A. Dowdy, Esq.
LUSK, LUSK, DOWDY & CALDWELL, P.C.
2101 Highland Ave.
Suite 410
Birmingham, AL  35205

<u>**VIA CERTIFIED MAIL**</u>
**7001 2510 0005 2927 5204**

Re:  Policy No.:           88590C

Policy Inception Date: 06/2/05

Claim Nos.:           0061343 (Sanko Stream, V. 19)
                      0061346 (Sanko Stream, V. 19)
                      0068147 (Penguin Arrow, V. 53)
                      0068148 (Kestel Arrow, V. 45)

Date of Loss:        08/29/05

Dear Mr. Dowdy:

Our office has been investigating the above claims, including the documents most recently submitted by you on behalf of your client, Great Southern Wood Preserving, Inc. ("Great Southern") on March 30, 2006, and by the Assured's broker, Mr. Morton, on June 28, 2006. This is to notify you that American Home Assurance Company ("American Home") hereby denies coverage under Policy No. 88590C for the above-referenced claims.

From the bills of lading and other materials which were provided to us, we identified the following shipments as having commenced on or after the June 2, 2005, inception date of the policy:

| VESSEL | B/L No. | B/L Date | Arrival Date |
|---|---|---|---|
| PENGUIN ARROW (V. 53) | PEN053CMP104 | 6/8/05 | 7/6/05 |
| PENGUIN ARROW (V. 53) | GBULPEN053PGA29B | 6/15/05 | 7/6/05 |
| KESTEL ARROW (V. 45) | GBULKEA045PGA32B | 7/12/05 | 8/5/05 |
| KESTEL ARROW (V. 45) | GBULKEA045PGA33B | 7/12/05 | 8/5/05 |
| SANKO STREAM (V. 19) | SSR019CMP106 | 7/27/05 | 8/25/05 |
| SANKO STREAM (V. 19) | GBULSSR019PGA20B | 8/5/05 | 8/25/05 |

GSWP   31

Services Provided by Members of
American International Group, Inc.

The losses presented in these claim occurred on August 29, 2006, when the Mississippi State Port Authority Warehouse in Gulfport, Mississippi where the lumber products were stored was destroyed by Hurricane Katrina. Given that these losses did not occur during the ocean voyage, but during a period of storage after discharge of the vessels, we direct your attention to the following provisions of the Policy:

      19)    WAREHOUSE TO WAREHOUSE

      This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the Declaration and/or Certificate for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment, if any, until the goods are discharged over side from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge over side of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be agreed in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the ASSURED.

      It is necessary for the ASSURED to give prompt notice to these ASSURERS when they become aware of an event for which they are 'held covered' under this Policy and the right to such cover is dependent on the compliance with this obligation.

We note that the Policy is a Marine Open Cargo Policy and does not provide separate warehouse coverage, nor was such coverage ever requested.

The information submitted establishes that Great Southern used the warehouse at the pier as a storage facility for its lumber after vessel discharge, and the lumber was removed by Great Southern from the warehouse as it was needed at Great Southern's various processing facilities. We have also been advised that occasionally the material was sold and shipped to customers directly from the Gulfport warehouse. The spreadsheets we received indicate that it typically takes Great Southern 90 days or longer to remove the lumber delivered by a particular vessel completely from the Gulfport warehouse. The contract between Great Southern and the Mississippi State Port Authority establishes that Great Southern had contracted for assigned space at the warehouse in Gulfport, and Great Southern assumed all responsibility for the care, custody, control and protection of the cargo. SSA is the designated stevedore, cargo handler and terminal operator on behalf of Great Southern. In addition, all of the bills of lading show that the place of delivery is the Port of Gulfport, and the space designated for "Place of delivery by on

2

carrier" is blank. The Commercial invoices for each shipment show the "destination" as Gulfport.

These facts establish that Great Southern exercised full dominion and control over the lumber once it was discharged from the vessels and placed into the warehouse in Gulfport. Therefore, the ordinary course of transit had ceased, and the lumber had been delivered to its final destination warehouse within the meaning of the Policy.

We conclude there is no coverage for these losses under the Policy because the losses occurred after coverage under the Policy had ceased.

Please be advised that no past, present or future action of American Home or its agents in investigating or considering these claims for coverage can or should be deemed as a waiver or modification of this Denial of Coverage, or of any policy terms, warranties and conditions and any rights it has under the applicable law, and American Home shall not be estopped from asserting any such rights, policy terms, warranties and conditions. However, we invite you to provide any information which you believe may be relevant to American Home's consideration of these claims, and we will respond in due course.

Very truly yours,
AI MARINE ADJUSTERS, INC.

Selena K. Ho
Assistant Vice President
Regional Claims Manager

cc:    Susan W. Farrell
       Hilb Rogal & Hobbs
       425 N. Martingdale Road
       Suite 1100
       Schaumburg, IL  60173

       AIMA – Underwriting

       Rob Sciachetano – AI Marine Agency of Illinois, Inc.

3

EXHIBIT G

# ⊖ GEARBULK AG.

C/O TREFORMA AG.
ZUGERSTRASSE 50
6340 BAAR
Tel: 00-41-41-768 11 11
Fax: 00-41-41-768 11 12

GREAT SOUTHERN WOOD PRESERVING,
P. BOX 610
ABBEVILLE – ALABAMA
36310 - USA

Attn.: Mr. MARTY GOFF

| | |
|---|---|
| OUR REF.1: | **KESTREL ARROW V.045** |
| OUR REF.2: | **SMUS 28/05** |
| DATE: | **14-Jul-05** |
| INVOICE NO.: | **SMUS 2144/05** |

**MV KESTREL ARROW V.045**
**PARANAGUA**

| | | | | | |
|---|---|---|---|---|---|
| Compl. loading | 12-Jul-05 | | | | |
| Sailed | 12-Jul-05 | | | | |
| Total loaded: | 3,238.320 | CBM of | Lumber | | |
| Freight Basis: | Port of rest | | | | |

| DESTINATION | B/L | | | | | |
|---|---|---|---|---|---|---|
| GULFP | 32B | 2476.395 | CBM | x | US$42.50 / CBM | US$105,246.79 |
| GULFP | 33B | 761.925 | CBM | x | US$42.50 / CBM | US$32,381.81 |
| Wharfage | | 1,619.160 | MT | x | US$2.04 / MT | US$3,303.09 |
| Handling | | 3,238.320 | CBM | x | US$2.50 / CBM | US$8,095.80 |
| Surcharge Security | | 1,619.160 | MT | x | US$0.11 / MT | US$178.11 |
| Bunker Surcharge (USD1.00/cbm) | | 3,238.320 | CBM | x | US$1.00 / CBM | US$3,238.32 |

**TOTAL DUE TO GEARBULK**                    **US$152,443.91**

VALUE DATE:           21-Jul-05



PAYMENT INSTRUCTIONS:

*[handwritten: 33B 10088.4 B11037 - whauf - 819.07 / hand - 1904.81 / 2723.88]*

| | |
|---|---|
| Correspondent: | The Bank of New York, New York |
| | CHIPS ABA: 001 |
| | Fedwire ABA: 021000018 |
| | SWIFT code: IRVT US 3N |

*[handwritten: 32B 10083 B11036 - whauf - 2662.12 / hand - 6190.99 / 8853.11]*

| | |
|---|---|
| | DEN NORSKE BANK |
| | TORGALM 2 |
| Beneficiary Bank: | 5020 BERGEN - NORWAY |
| | Account name: GEARBULK AG |
| | International Bank Account Number  NO78 5205 0491 285 |
| | SWIFT: DNBANOBB |
| | Reference: M/V KESTREL ARROW V.045 / GREAT SOUTHERN |

or alternatively please mail payment to:

**Gearbulk Pool Ltd.**
C/O Gearbulk, Inc.
Attn.: Elvira Gregorio
3000 Bayport Drive
Suite 450
Tampa, FL 33607
tel/fax  813 830-6000/6001

GSWP   47

# BRASILMAD COM. EXP. LTDA.

## PACKING LIST

**IMPORTER:** GREAT SOUTHERN W.P.
HIGHWAY 431 NORTH
ABBEVILLE - ALABAMA
36310 - USA

**PORT OF SHIPMENT:** PARANAGUA - BRAZIL          **N.PACKS:** 889

**PORT OF DESTINATION:** GULFPORT - USA          **N.PIECES:** 259.160

**NAME OF CARRIER:** KESTREL ARROW - V.45          **CUBIC METERS:** 761,925 m3

**DESCRIPTION OF GOODS:** ELLIOTTIS PINE LUMBER          **INVOICE:** B:11037
KILN DRIED 19%          142/2005
**PACKAGE MARKS:** GS          **ORIGIN:** BRAZIL

**WEIGHT:** 380.962 Kgs

| CODE | N.OF PACKS | PCS./PACK | N.PIECES | DIMENTIONS TH. | WD. | LG. | |
|------|-----------|-----------|----------|----------------|-----|-----|--|
| BRA-KD1D | 630 | 240 | 151200 | 5/8 in. | 5 1/2 in. | 6 ft. | DOG EAR |
| BRAR1DII | 30 | 240 | 7200 | 5/8 in. | 5 1/2 in. | 6 ft. | DOG EAR |
| BRAR9D | 229 | 440 | 100760 | 1/2 in. | 4 in. | 6 ft. | DOG EAR |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| **TOTAL:** | **889** | | **259.160** | | | | |

BRASILMAD COM. EXP. LTDA.

# BRASILMAD COM. EXP. LTDA.

**INVOICE**

**B:11037**
142/2005

**SHIP TO:** GREAT SOUTHERN W.P.
HIGHWAY 431 NORTH
ABBEVILLE - ALABAMA
36310 - USA

**BILL TO:** GREAT SOUTHERN W.P.
HIGHWAY 431 NORTH
ABBEVILLE - ALABAMA
36310 - USA

| CONSIGNEE: | GREAT SOUTHERN WOOD PRESERVING | WEIGHT: | 380.962 Kgs |
| Payment terms: | SIGHT COLLECTION | CUBAGE: | 761,925 m3 |
| Method of shipment: | KESTREL ARROW – V.45 | FOB point: | PARANAGUA - BRAZIL |
| Invoice number: | B:11037 | Invoice date: | 06/JUL/2005 |
| Order number: | 142/2005 | DESTINATION: | GULFPORT - USA |

| ITEM NO. | QTY. | DESCRIPTION AND SIZES | | PRICE EACH | AMOUNT |
|---|---|---|---|---|---|
| | PIECES | ELLIOTTIS PINE LUMBER 19% KD | | | |
| 1 | 151200 | BRA-KD1D | 630 PACKS | 0,8643 | 130.682,16 |
| 2 | 7200 | BRAR1DII | 30 PACKS | 0,7000 | 5.040,00 |
| 3 | 100760 | BRAR9D | 229 PACKS | 0,4484 | 45.180,78 |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |

| | |
|---|---|
| Sub total: | 180.902,94 |
| -FREIGHT | 32.381,81 |
| You pay this amount: | 148.521,13 |

**BRASILMAD COM. EXP. LTDA.**

# GLOBAL FIBER TRADING S/A.

**INVOICE**

**B:11036**
141/2005

**SHIP TO:** *GREAT SOUTHERN W.P.*
*HIGHWAY 431 NORTH*
*ABBEVILLE - ALABAMA*
*36310 - USA*

**BILL TO:** *GREAT SOUTHERN W.P.*
*HIGHWAY 431 NORTH*
*ABBEVILLE - ALABAMA*
*36310 - USA*

| CONSIGNEE: | GREAT SOUTHERN WOOD PRESERVING | WEIGHT: | 1.238.198 Kgs |
|---|---|---|---|
| Payment terms: | SIGHT COLLECTION | CUBAGE: | 2476,395 m3 |
| Method of shipment: | KESTREL ARROW - 45 | FOB point: | PARANAGUA - BRAZIL |
| Invoice number: | B:11036 | Invoice date: | 06/JUL/2005 |
| Order number: | 141/2005 | DESTINATION: | GULFPORT - USA |

| ITEM NO. | PIECES | ELLIOTTIS PINE FENCEBOARD/FENCING 19% K.D. | | PRICE EACH | AMOUNT |
|---|---|---|---|---|---|
| 1 | 21504 | BAL10A | 56 PACKS | 0,8150 | 17.525,76 |
| 2 | 14720 | C2DX | 46 PACKS | 1,2000 | 17.664,00 |
| 3 | 332640 | CMB1D | 1386 PACKS | 0,8643 | 287.500,75 |
| 4 | 96800 | CR15DRA | 55 PACKS | 0,2594 | 25.109,92 |
| 5 | 21450 | FGS1A | 25 PACKS | 0,4265 | 9.148,43 |
| 6 | 8580 | FGS2B | 10 PACKS | 0,4916 | 4.217,93 |
| 7 | 68160 | KD1D | 284 PACKS | 0,8643 | 58.910,69 |
| 8 | 24000 | L4/06 | 100 PACKS | 0,6389 | 15.334,32 |
| 9 | 28000 | PP1KD | 200 PACKS | 1,0705 | 29.974,84 |
| 10 | 1980 | R144D | 3 PACKS | 0,3690 | 730,62 |
| 11 | 53280 | R1DII | 222 PACKS | 0,7000 | 37.296,00 |
| 12 | 163240 | R9D | 371 PACKS | 0,4484 | 73.196,82 |
| 13 | 20160 | RB89D | 42 PACKS | 0,3834 | 7.729,34 |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |

| | | |
|---|---|---|
| Sub total: | | 584.339,41 |
| -FREIGHT | | 105.246,79 |
| You pay this amount: | | 479.092,63 |

GSWP  67

**GLOBAL FIBER TRADING S/A.**

# GLOBAL FIBER TRADING S/A.

## PACKING LIST

**IMPORTER:**     *GREAT SOUTHERN W.P.*
*HIGHWAY 431 NORTH*
*ABBEVILLE - ALABAMA*
*36310 - USA*

**PORT OF SHIPMENT:**   PARANAGUA - BRAZIL    **N.PACKS:**     2.800

**PORT OF DESTINATION:**   GULFPORT - USA    **N.PIECES:**     854.514

**NAME OF CARRIER:**   KESTREL ARROW - V.45    **CUBIC METERS:**   2476,395 m3

**DESCRIPTION OF GOODS:** ELLIOTTIS PINE FENCE BOARDS    **INVOICE:**    B:11036
FENCING/KILN DRIED 19%      141/2005
**PACKAGE MARKS:**    GS      **ORIGIN:**     BRAZIL

**WEIGHT:**     1.238.198 Kgs

| CODE | N.OF PACKS | PCS./PACK | N.PIECES | DIMENTIONS | | | |
|------|-----------|-----------|----------|------------|------|------|------|
| | | | | TH. | WD. | LG. | |
| BAL10A | 56 | 384 | 21504 | 1 5/16 in. | 1 5/16 in. | 36 in. | BALLUSTER |
| C2DX | 46 | 320 | 14720 | 5/8 in. | 5 1/2 in. | 8 ft. | DOG EAR |
| CMB1D | 1386 | 240 | 332640 | 5/8 in. | 5 1/2 in. | 6 ft. | DOG EAR |
| CR15DRA | 55 | 1760 | 96800 | 1/2 in. | 4 in. | 48 in. | DOG EAR |
| FGS1A | 25 | 858 | 21450 | 3/4 in. | 3 1/2 in. | 42 in. | F.GOTHIC |
| FGS2B | 10 | 858 | 8580 | 3/4 in. | 3 1/2 in. | 48 in. | F.GOTHIC |
| KD1D | 284 | 240 | 68160 | 5/8 in. | 5 1/2 in. | 6 ft. | DOG EAR |
| L4/06 | 100 | 240 | 24000 | 3/4 in. | 3 1/2 in. | 6 ft. | S4S |
| PP1KD | 200 | 140 | 28000 | 3/4 in. | 6 in. | 6 ft. | DOG EAR |
| R144D | 3 | 660 | 1980 | 5/8 in. | 4 in. | 4 ft. | DOG EAR |
| R1DII | 222 | 240 | 53280 | 5/8 in. | 5 1/2 in. | 6 ft. | DOG EAR |
| R9D | 371 | 440 | 163240 | 1/2 in. | 4 in. | 6 ft. | DOG EAR |
| RB89D | 42 | 480 | 20160 | 1/2 in. | 3 1/2 in. | 6 ft. | DOG EAR |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| **TOTAL:** | **2.800** | | **854.514** | | | | |

**GLOBAL FIBER TRADING S/A.**

GSWP 68



**Av. Andrés Bello 2777, of.603**
Santiago - Chile
Tel./ Phone: 56 2 203 3344
Fax: 56 2 203 3099
e-mail: tradex@tradex.cl
www.tradex.cl



*100898*

MELINKA
F o r e s t a l

Date    July 25th, 2005

## FACTURA DE EXPORTACIÓN / COMMERCIAL INVOICE N° 004-00012

| Señores/ Messrs: | Vía Transfer to: |
|---|---|
| Great Southern Wood Preserving | ABA N° 026005652 Banco de Chile |
| | 535 Madison Av., 9 th. Floor  New York. NY 10022 |
| Dirección/ Address: | Attn: Mr. Roberto Campos |
| 397 W.Washington St. | To be credited to:  Tradex Ltda. |
| Abbeville, AL 36310, USA | |
| Condiciones de Pago/ Payment Terms: | Account N°:  209946 304 1 |
| Next 10 days after arrival | |
| Pto. de Embarque/ Loading Port: | Pto. de Destino/ Destination Port: |
| Campana - Argentina | GULFPORT - USA |
| Nave/ Vessel M/V: | Origen Mercadería Embarcada/ |
| KESTREL ARROW V.045 ETD 06.07.2005 | Good of Origin Shipped: Argentina |
| Marca de Embarque/ Shipping Mark: | Precio Unitario/ Unit Price: |
| 110 | FOB Campana |

### ESPECIFICACIONES/ SPECIFICATIONS:

1.920  BF OF RADIATA PINE  DOG EAR ROUGH KILN DRIED SIZES  1" x 4" x 4'
22.440  BF OF RADIATA PINE  DOG EAR ROUGH KILN DRIED SIZES  1" x 4" x 6'
89.280  BF OF RADIATA PINE  DOG EAR ROUGH KILN DRIED SIZES  1" x 6" x 6'

| Order # | Sizes | | | | | Bundles | Pieces | Volumen BFs | Unit Price USD | Total Amount USD | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GP06GS441 | Dog Ear | 1" | x | 4" | x | 4' 021030 3 | 1.440 | 1.920 | 0.28 | 403,20 | USD/Piece |
| GP06GS461 | Dog Ear | 1" | x | 4" | x | 6' 026000 34 | 11.220 | 22.440 | 0.33 | 3.702,60 | USD/Piece |
| GP06GS661 | Dog Ear | 1" | x | 6" | x | 6' 124 021090 | 29.760 | 89.280 | 0.63 | 18.748,80 | USD/Piece |
| **Total** | | | | | | **161** | **42.420** | **113.640** | | **22.854,60** | |

Notes :    Complete details of sizes and number of pieces in packing list

TRADEX LTDA.

PAID
DATE   7-27-05
WIRE #   000973

EXHIBIT H

**Shipper**
BRASILMAD COM. EXPORTADORA LTDA
ALAMEDA STA. MONICA, 1 – SAO DOMINGOS
SÃO JOSÉ DOS PINHAIS – PARANÁ – BRAZIL
83030-550

**ORIGINAL**
**BILL OF LADING**

| VSL: | KESTREL ARROW |
| VOY No: | 045 |
| B/L NO: | GBULKEA045PGA33B |

Serial No:00400461166



**Consignee**
GREAT SOUTHERN WOOD PRESERVING
MR.CHRIS BONNER   334 585 2253
WEST WASHINGTON ST.,305
ABBEVILLE – ALABAMA – UNITED STATES – 36310

**Notify address**
GREAT SOUTHERN WOOD PRESERVING
MR.CHRIS BONNER   334 585 2253
WEST WASHINGTON ST.,305
ABBEVILLE – ALABAMA – UNITED STATES – 36310

| Pre-Carriage by* | Place of receipt by pre-carrier |
| | |

| Vessel | Port of loading |
| KESTREL ARROW | PARANAGUÁ/BRAZIL |

| Port of discharge | Place of delivery by on carrier* |
| GULFPORT/USA | |

| Marks and Nos. | Particulars as hereinafter defined, furnished by the Merchant. Number and kind of packages; description of goods | | Gross weight | Measurement |
|---|---|---|---|---|
| BRAR9D | 229 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 87,592KGS 87,592NET | 175.185M3 |
| BRA-KD1D | 630 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 280,035KGS 280,035NET | 560.070M3 |
| BRAR1DII | 30 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 13,335KGS 13,335NET | 26.670M3 |
| TOTAL | 889 | | 380,962KGS 380,962NET | 761.925M3 |

CLEAN ON BOARD
SHIPPED UNDERDECK
FREIGHT COLLECT
INVOICE NR. 142/2005
NCM: 44071000

RE: 05/0994437/001
DDE: 2050804385/9

Value of the cargo when in excess of the Carrier's liability, as provided for in clause V overleaf, is declared as follows:

SHIPPED on board in apparent good order and condition, weight, measure, marks, numbers, quality, contents and value unknown, for carriage to the Port of Discharge or so near thereunto as the Vessel may safely get and lie always afloat, to be delivered in the like good order and condition at the aforesaid Port unto Consignees or their Assigns, they paying freight as indicated plus other charges incurred in accordance with the provisions contained in this Bill of Lading. In accepting this Bill of Lading the Merchant, as hereinafter defined, expressly accepts and agrees to all its stipulations on both pages, whether, as hereinafter

defined, written, printed, stamped or otherwise incorporated, as fully as if they were all signed by the Merchant.
One original Bill of Lading must be surrendered duly endorsed in exchange for the goods or delivery order.
IN WITNESS whereof the Master of the said Vessel has signed the number of originals Bills of Lading stated below, for and on behalf of the owners of the said vessel, and all of this tenor and dates, one of which being accomplished, the others to stand void.

GSWP   235

FREIGHT for the said goods, together with ancillary charges, shall be deemed earned on loading and payable by the Shipper on shipment in cash without deduction, vessel and/or cargo lost or not lost. If freight is not so paid on shipment at port of loading it shall also be due from and payable on demand by the Consignee at port of destination vessel and/or cargo lost or not lost.

| Place and date of issue | Number of original Bs/L | Signature | For and by authority of the Master |
| PARANAGUÁ,  Jul 12, 2005 | THREE   (3) | | MARCON SERVIÇOS DE DESPACHOS EM GERAL LTDA |
| | | | AS AGENTS FOR THE CARRIERS GEARBULK POOL LTD |
| Freight payable at | | | By CAPT. PETER JOHN, PRATLEY |
| DESTINATION | | | |

Shipper

GLOBAL FIBER TRADING S/A.
RUA JOÃO BETTEGA, 107 - PORTÃO
CURITIBA - PARANÁ - BRAZIL  81070000

**ORIGINAL**
**BILL OF LADING**

| VSL: | KESTREL ARROW |
|---|---|
| VOY No: | 045 |
| B/L NO: | GBULKEA045PGA32B |

Serial No:00400461163



Consignee

GREAT SOUTHERN WOOD PRESERVING
MR.CHRIS BONNER  334 585 2253
WEST WASHINGTON ST.,305
ABBEVILLE - ALABAMA - UNITED STATES - 36310

Notify address

GREAT SOUTHERN WOOD PRESERVING
MR.CHRIS BONNER  334 585 2253
WEST WASHINGTON ST.,305
ABBEVILLE - ALABAMA - UNITED STATES - 36310

| Pre-Carriage by | Place of receipt by pre-carrier |
|---|---|
| **Vessel** KESTREL ARROW | **Port of loading** PARANAGUÁ/BRAZIL |
| **Port of discharge** GULFPORT/USA | **Place of delivery by on carrier** |

| Marks and Nos. | Particulars as hereinafter defined, furnished by the Merchant. Number and kind of packages; description of goods | | Gross weight | Measurement |
|---|---|---|---|---|
| FGS1A | 25 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 16,338KGS 16,338NET | 32.675M3 |
| R9D | 371 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 141,908KGS 141,908NET | 283.815M3 |
| C2DX | 46 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 36,363KGS 36,363NET | 72.726M3 |
| CMB1D | 1386 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 616,077KGS 616,077NET | 1,232.154M3 |
| KD1D | 284 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 126,238KGS 126,238NET | 252.476M3 |
| CR15DRA | 55 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 56,100KGS 56,100NET | 112.200M3 |
| R1DII | 222 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 98,679KGS 98,679NET | 197.358M3 |
| RB89D | 42 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 15,498KGS 15,498NET | 30.996M3 |
| PPIKD | 200 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 63,200KGS 63,200NET | 126.400M3 |
| BAL10A | 56 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 26,852KGS 26,852NET | 53.704M3 |
| FGS2B | 10 | PACKS ELLIOTTI PINE FENCEBOARDS/ | 7,475KGS | 14.950M3 |

Value of the cargo when in excess of the Carrier's liability, as provided for in clause V overleaf, is declared as follows:

SHIPPED on board in apparent good order and condition, weight, measure, marks, numbers, quality, contents and value unknown, for carriage to the Port of Discharge or so near thereunto as the Vessel may safely get and lie always afloat, to be delivered in the like good order and condition at the aforesaid Port unto Consignees or their Assigns, they paying freight as indicated plus other charges incurred in accordance with the provisions contained in this Bill of Lading. In accepting this Bill of Lading the Merchant, as hereinafter defined, expressly accepts and agrees to all its stipulations on both pages, whether, as hereinafter defined, written, printed, stamped or otherwise incorporated, as fully as if they were all signed by the Merchant. One original Bill of Lading must be surrendered duly endorsed in exchange for the goods or delivery order. IN WITNESS whereof the Master of the said Vessel has signed the number of originals Bills of Lading stated below, for and on behalf of the owners of the said vessel, all of this tenor and date, one of which being accomplished, the others to stand void.

GSWP  252

FREIGHT for the said goods, together with ancillary charges, shall be deemed earned on loading and payable by the Shipper on shipment in cash without deduction, vessel and/or cargo lost or not lost. If freight is not so paid on shipment at port of loading it shall also be due from and payable on demand by the Consignee at port of destination vessel and/or cargo lost or not lost.

| Place and date of issue PARANAGUÁ,  Jul 12, 2005 | Number of original Bs/L THREE   (3) | Signature |
|---|---|---|
| Freight payable at DESTINATION | | MARCON SERVIÇOS DE DESPACHOS EM GERAL LTDA AS AGENTS FOR THE CARRIERS GEARBULK POOL LTD By CAPT. PETER JOHN, PRATLEY |

For and by authority of the Master

| | | | | |
|---|---|---|---|---|
| | | FENCING, KILN DRIED TO 19%. | 7,475NET | |
| L4/06 | 100 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 31,750KGS 31,750NET | 63.500M3 |
| R144D | 3 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 1,720KGS 1,720NET | 3.441M3 |
| TOTAL | 2800 | | 1,238,198KGS 1,238,198NET | 2,476.395M3 |

CLEAN ON BOARD
SHIPPED UNDERDECK
FREIGHT COLLECT
INVOICE NR. 141/2005
NCM: 44071000

RE:05/0993487/001-002-003-004-005
DDE: 2050804365/4

Value of the cargo when in excess of the Carrier's liability, as provided for in clause V overleaf, is declared as follows:

SHIPPED on board in apparent good order and condition, weight, measure, marks, numbers, quality, contents and value unknown, for carriage to the Port of Discharge or so near thereunto as the Vessel may safely get and lie always afloat, to be delivered in the like good order and condition at the aforesaid Port unto Consignees or their Assigns, they paying freight as indicated plus other charges incurred in accordance with the provisions contained in this Bill of Lading. In accepting this Bill of Lading the Merchant, as hereinafter defined, expressly accepts and agrees to all its stipulations on both pages, whether, as hereinafter

defined, written, printed, stamped or otherwise incorporated, as fully as if they were all signed by the Merchant.
One original Bill of Lading must be surrendered duly endorsed in exchange for the goods or delivery order.
IN WITNESS whereof the Master of the said Vessel has signed the number of originals Bills of Lading stated below, for and on behalf of the owners of the said vessel, all of this tenor and dates, one of which being accomplished, the others to stand void.

GSWP 253

FREIGHT for the said goods, together with ancillary charges, shall be deemed earned on loading and payable by the Shipper on shipment in cash without deduction, vessel and/or cargo lost or not lost. If freight is not so paid on shipment at port of loading it shall also be due from and payable on demand by the Consignee at port of destination vessel and/or cargo lost or not lost.

| Place and date of Issue PARANAGUÁ,  Jul 12, 2005 | Number of original Bs/L THREE    (3) | Signature                          For and by authority of the Master MARCON SERVIÇOS DE DESPACHOS EM GERAL LTDA |
|---|---|---|
| Freight payable at DESTINATION | | AS AGENTS FOR THE CARRIERS GEARBULK POOL LTD By CAPT. PETER JOHN, PRATLEY |

EXHIBIT I



Av. Andrés Bello 2777, of.603
Santiago - Chile
Tel./ Phone: 56 2 203 3344
Fax: 56 2 203 3099
e-mail: tradex@tradex.cl
www.tradex.cl



MELINKA
F o r e s t a l

## PACKING LIST / SPECIFICATION LIST

| Cliente/Customer: | Port of Shipment: |
|---|---|
| Great Southern Wood Preserving | Campana - Argentina |
| 397 W. Washington ST | Port of Discharge: |
| Abbeville, Al 36310, USA | Gulfport - USA |
| Fecha/Date: July 27th, 2005 | B/L Nbr:  SSR019CMP106 |
| Origen/Origin: Argentina | Vessel:   SANKO STREAM V.019 |
| Invoice N°: 004-00015 | Our Ref.: |

PRODUCTO/PRODUCT:

    5.120   BF OF RADIATA PINE DOG EAR KILN DRIED SIZES  1" x 4" x 4'
   26.400   BF OF RADIATA PINE DOG EAR KILN DRIED SIZES  1" x 4" x 6'
   56.220   BF OF RADIATA PINE DOG EAR KILN DRIED SIZES  1" x 6" x 6'
      720   BF OF RADIATA PINE DOG EAR #2 KILN DRIED SIZES  1" x 6" x 6'

| PO # | Sizes | | | | Item | Total Bundles | Pieces Bundles | Total Pieces | Volume BF | Gross Weight | Code # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GP07GS441 | 1 | x 4 | x | 4 | Dog Ear | 3 | 480 | 1.440 | 1.920 | 1.440 | GS441D |
| GP07GS441 | 1 | x 4 | x | 4 | Dog Ear | 3 | 480 | 1.440 | 1.920 | 1.440 | GS441D |
| GP07GS441 | 1 | x 4 | x | 4 | Dog Ear | 2 | 480 | 960 | 1.280 | 960 | GS441D |
| GP07GS461 | 1 | x 4 | x | 6 | Dog Ear | 20 | 330 | 6.600 | 13.200 | 9.900 | GS461D |
| GP07GS461 | 1 | x 4 | x | 6 | Dog Ear | 9 | 330 | 2.970 | 5.940 | 4.455 | GS461D |
| GP07GS461 | 1 | x 4 | x | 6 | Dog Ear | 11 | 330 | 3.630 | 7.260 | 5.445 | GS461D |
| GP07GS661 | 1 | x 6 | x | 6 | Dog Ear | 30 | 240 | 7.200 | 21.600 | 15.840 | GS661D |
| GP07GS661 | 1 | x 6 | x | 6 | Dog Ear | 38 | 240 | 9.120 | 27.360 | 20.064 | GS661D |
| GP07GS661 | 1 | x 6 | x | 6 | Dog Ear | 37 | 240 | 8.880 | 26.640 | 19.536 | GS661D |
| GP07GS662 | 1 | x 6 | x | 6 | Dog Ear # 2 | 1 | 240 | 240 | 720 | 528 | GS662D |

| Total Packing List | | | | | | 154 | | 42.480 | 107.840 | 79.608 | |

TRADEX LTDA.

 **TRADEX**

Av. Andrés Bello 2777, of.603
Santiago - Chile
Tel./ Phone: 56 2 203 3344
Fax: 56 2 203 3099
e-mail: tradex@tradex.cl
www.tradex.cl

**COPIA**

 **MELINKA** F o r e s t a l

| | Date | August 18th, 2005 |
|---|---|---|

## FACTURA DE EXPORTACIÓN / COMMERCIAL INVOICE N° 004-00015

| Señores/ Messrs:<br>Great Southern Wood Preserving | Via Transfer to:<br>**American Express Bank Ltd.- Miami**<br>**Swift: AEIBUS33       ABA #: 1240-7188-9** |
|---|---|
| **Dirección/ Address:**<br>397 W.Washington St.<br>Abbeville, AL 36310, USA | **i/n/o:** AEBI (American Express Bank International)<br>**Account N°:** 265161487<br>**Beneficiary:** Tradex Ltd. |
| **Condiciones de Pago/ Payment Terms:**<br>Next 10 days after arrival | |
| **Pto. de Embarque/ Loading Port:**<br>Campana - Argentina | **Pto. de Destino/ Destination Port:**<br>GULFPORT - USA |
| **Nave/ Vessel M/V:**<br>SANKO STREAM V.019 ETD 27.07.2005 | **Origen Mercadería Embarcada/**<br>**Good of Origin Shipped:** Argentina |
| **Marca de Embarque/ Shipping Mark:**<br>110 | **Precio Unitario/ Unit Price:**<br>FOB Campana |

**ESPECIFICACIONES/ SPECIFICATIONS:**

```
   5.120  BF OF RADIATA PINE  DOG EAR ROUGH KILN DRIED SIZES  1" x 4" x 4'
  26.400  BF OF RADIATA PINE  DOG EAR ROUGH KILN DRIED SIZES  1" x 4" x 6'
  75.600  BF OF RADIATA PINE  DOG EAR ROUGH KILN DRIED SIZES  1" x 6" x 6'
     720  BF OF RADIATA PINE  DOG EAR #2 ROUGH KILN DRIED SIZES  1" x 6" x 6'
```

| Order # | Sizes | | | | | | Bundles | Pieces | Volumen BFs | Unit Price USD | Total Amount USD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GP07GS441 | Dog Ear | 1" | x | 4" | x | 4' | 8 | 3.840 | 5.120 | 0,28 | 1.075,20 | USD/Piece |
| GP07GS461 | Dog Ear | 1" | x | 4" | x | 6' | 40 | 13.200 | 26.400 | 0,33 | 4.356,00 | USD/Piece |
| GP07GS661 | Dog Ear | 1" | x | 6" | x | 6' | 105 | 25.200 | 75.600 | 0,63 | 15.876,00 | USD/Piece |
| GP07GS662 | Dog Ear #2 | 1" | x | 6" | x | 6' | 1 | 240 | 720 | 0,43 | 103,20 | USD/Piece |
| **Total** | | | | | | | **154** | **42.480** | **107.840** | | **21.410,40** | |

**Notes :**    Complete details of sizes and number of pieces in packing list

 **TRADEX  LTDA.**

GSWP  265

# ⊙ GEARBULK AG.

C/O TREFORMA AG.
ZUGERSTRASSE 50
6340 BAAR
Tel: 00-41-41-768 11 11
Fax: 00-41-41-768 11 12

GREAT SOUTHERN WOOD PRESERVING,
P.°BOX 610
ABBEVILLE - ALABAMA
36310 - USA

| | |
|---|---|
| OUR REF.1: | SANKO STREAM V. 019 |
| OUR REF.2: | SMUS 28/05 |
| DATE: | 5-Aug-05 |

Attn.: Mr. MARTY GOFF

INVOICE NO.: SMUS 2233/05

MV SANKO STREAM V. 019
CAMPANA

| | | | | |
|---|---|---|---|---|
| Compl. loading | 27-Jul-05 | | | |
| Sailed | 27-Jul-05 | | | |
| Total loaded: | 133.208 | cbm of | Lumber | |
| Freight Basis: | Free on truck basis flat bed truck | | | |

| DESTINATION | B/L | | | | | | |
|---|---|---|---|---|---|---|---|
| GULFPORT | 106 | 133.208 | cbm | x | US$58.00 | / cbm | US$7,726.06 |
| Wharfage port security charges | | 79.608 | mt | x | US$0.11 | / mt | US$8.76 |
| Bunker Surcharge (USD1.00/cbm) | | 133.208 | cbm | x | US$1.00 | / cbm | US$133.21 |

$$\left.\begin{array}{c} A+ \\ 7734.8 \end{array}\right\}$$

TOTAL DUE TO GEARBULK                                     **US$7,868.03**

VALUE DATE:        12-Aug-05

PAYMENT INSTRUCTIONS:

| | |
|---|---|
| Correspondent: | The Bank of New York, New York<br>CHIPS ABA:  001<br>Fedwire ABA: 021000018<br>SWIFT code: IRVT US 3N |
| Beneficiary Bank: | DEN NORSKE BANK<br>TORGALM 2<br>5020 BERGEN - NORWAY<br>Account name: GEARBULK AG<br>International Bank Account Number  NO78 5205 0491 285<br>SWIFT: DNBANOBB<br>**Reference: SANKO STREAM V. 019 / GREAT SOUTHERN** |

or alternatively please mail payment to:

Gearbulk Pool Ltd
c/o Gearbulk, Inc.
Attn.: Elvira Gregorio
3000 Bayport Drive
Suite 450
Tampa, FL 33607
tel/fax  813 830-6000/6001

GSWP   267

# GLOBAL FIBER TRADING S/A.

# PACKING LIST

**IMPORTER:**     GREAT SOUTHERN W.P.
HIGHWAY 431 NORTH
ABBEVILLE - ALABAMA
36310 - USA

| | | | |
|---|---|---|---|
| **PORT OF SHIPMENT:** | PARANAGUA - BRAZIL | **N.PACKS:** | 3.907 |
| **PORT OF DESTINATION:** | GULFPORT - USA | **N.PIECES:** | 956.020 |
| **NAME OF CARRIER:** | SANKO STREAM - V.19 | **CUBIC METERS:** | 3551,439 m3 |
| **DESCRIPTION OF GOODS:** | ELLIOTTIS PINE FENCE BOARDS | **INVOICE:** | B:11044 |
| | FENCING/KILN DRIED 19% | | 154/2005 |
| **PACKAGE MARKS:** | GS | **ORIGIN:** | BRAZIL |
| | | **WEIGHT:** | 1.775.720 Kgs |

| CODE | N.OF PACKS | PCS./PACK | N.PIECES | DIMENTIONS | | | |
|---|---|---|---|---|---|---|---|
| | | | | TH. | WD. | LG. | |
| B58/8 | 50 | 400 | 20000 | 1 1/2 in. | 2 3/8 in. | 8 ft. | BACKER |
| C2DX | 40 | 320 | 12800 | 5/8 in. | 5 1/2 in. | 8 ft. | DOG EAR |
| CMB1D | 1000 | 240 | 240000 | 5/8 in. | 5 1/2 in. | 6 ft. | DOG EAR |
| KD1D | 2800 | 240 | 672000 | 5/8 in. | 5 1/2 in. | 6 ft. | DOG EAR |
| R144D | 17 | 660 | 11220 | 5/8 in. | 4 in. | 4 ft. | DOG EAR |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| | | | 0 | | | | |
| **TOTAL:** | **3.907** | | **956.020** | | | | |

GLOBAL FIBER TRADING S/A.

# GLOBAL FIBER TRADING S/A.

**INVOICE**

**B:11044**
154/2005

SHIP TO: GREAT SOUTHERN W.P.
HIGHWAY 431 NORTH
ABBEVILLE - ALABAMA
36310 - USA

BILL TO: GREAT SOUTHERN W.P.
HIGHWAY 431 NORTH
ABBEVILLE - ALABAMA
36310 - USA

| CONSIGNEE: | GREAT SOUTHERN WOOD PRESERVING | WEIGHT: | 1.775.720 Kgs |
| Payment terms: | SIGHT COLLECTION | CUBAGE: | 3551,439 m3 |
| Method of shipment: | SANKO STREAM - V.19 | FOB point: | PARANAGUA - BRAZIL |
| Invoice number: | B:11044 | Invoice date: | 27/JUL/2005 |
| Order number: | 154/2005 | DESTINATION: | GULFPORT - USA |

| ITEM NO. | PIECES | ELLIOTTIS PINE FENCEBOARD/FENCING 19% K.D. | PRICE EACH | AMOUNT |
|---|---|---|---|---|
| 1 | 20000 | B58/8 | | |
| 2 | 12800 | C2DX | 50 PACKS | 1,0121 | 20.242,00 |
| 3 | 240000 | CMB1D | 40 PACKS | 1,2000 | 15.360,00 |
| 4 | 672000 | KD1D | 1000 PACKS | 0,8643 | 207.432,00 |
| 5 | 11220 | R144D | 2800 PACKS | 0,8643 | 580.809,60 |
| 6 | | | 17 PACKS | 0,3690 | 4.140,18 |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |

Sub total: 827.983,78

-FREIGHT 150.936,16
You pay this amount: 677.047,62

GLOBAL FIBER TRADING S/A.

GSWP   279

 **GEARBULK AG.**

C/O TREFORMA AG.
ZUGERSTRASSE 50
6340 BAAR
Tel: 00-41-41-768 11 11
Fax: 00-41-41-768 11 12

GREAT SOUTHERN WOOD PRESERVING,
P.ºBOX 610
ABBEVILLE - ALABAMA
36310 - USA

| | |
|---|---|
| OUR REF.1: | **SANKO STREAM V.019** |
| OUR REF.2: | **SMUS 28/05** |
| DATE: | **9-Aug-05** |

Attn.: Mr. MARTY GOFF

INVOICE NO.: **SMUS 2254/05**

**MV SANKO STREAM V.019**
**PARANAGUA**

| Compl. Loading : | 5-Aug-05 | | | | | | |
|---|---|---|---|---|---|---|---|
| Sailed : | 5-Aug-05 | | | | | | |
| Total loaded : | 3,551.439 | | CBM of | Lumber | | | |
| Freight Basis : | Port of rest | | | | | | |
| **DESTINATION** | | **B/L** | | | | | |
| Gulfport | | 20B | 3,551.439 | CBM | x | US$42.50 | / CBM | US$150,936.16 |
| Wharfage | | | 1,775.720 | MT | x | US$0.77 | / MT | US$1,367.30 |
| Handling | | | 3,551.439 | CBM | x | US$2.50 | / CBM | US$8,878.60 |
| Security Surcharge | | | 1,775.720 | MT | x | US$0.11 | / MT | US$195.33 |
| Bunker Surcharge (USD1.00/cbm) | | | 3,551.439 | CBM | x | US$1.00 | / CBM | US$3,551.44 |

**TOTAL DUE TO GEARBULK**                                       **US$164,928.83**

VALUE DATE:        16-Aug-05

*20B|100948|B11044*
*wharfage* = *1367.30 + 195.33 = 1562.63*
*handling*                    *= 8878.60*
                              *10 441.23*

**PAYMENT INSTRUCTIONS:**

| | |
|---|---|
| Correspondent: | The Bank of New York, New York |
| | CHIPS ABA: 001 |
| | Fedwire ABA: 021000018 |
| | SWIFT code: IRVT US 3N |
| | DEN NORSKE BANK |
| | TORGALM 2 |
| Beneficiary Bank: | 5020 BERGEN - NORWAY |
| | Account name: GEARBULK AG |
| | International Bank Account Number  NO78 5205 0491 285 |
| | SWIFT: DNBANOBB |
| | Reference: M/V SANKO STREAM V.019 / GREAT SOUTHERN |

or alternatively please mail payment to:

**Gearbulk Pool Ltd**
C/O Gearbulk, Inc.
Attn.: Elvira Gregorio
3000 Bayport Drive
Suite 450
Tampa, FL 33607
tel/fax  813 830-6000/6001

GSWP   283

EXHIBIT J

Shipper

FORESTAL G Y S
LOTE 55 FRAC 1 RUTA NAC NRO 14
3315 L.N. ALEM - MISIONES - ARGENTINA

Pg. 1

# BILL OF LADING

| | |
|---|---|
| VSL: | SANKO STREAM |
| VOY NO: | V.019 |
| B/L NO: | SSR019CMP106 |

Consignee

GREAT SOUTHERN WOOD PRESERVING
397 N. WASHINGTON ST. ABBEVILLE, AL 36310
ALABAMA - USA

Notify address

GREAT SOUTHERN WOOD PRESERVING
397 N. WASHINGTON ST. ABBEVILLE, AL 36310
ALABAMA - USA

GEARBULK

NOT NEGOTIABLE COPY

| Pre-Carriage by* | Place of receipt by pre-carrier |
|---|---|

| Vessel | Port of loading |
|---|---|
| SANKO STREAM V.019 | CAMPANA |

| Port of discharge | Place of delivery by on carrier* |
|---|---|
| GULFPORT | |

| Marks and Nos. | Particulars as hereinafter defined, furnished by the Merchant. Number and kind of packages; description of goods. | Gross weight | Measurement |
|---|---|---|---|
| | Said to Contain | Said to Weight Kilos | |
| | 154 BUNDLES | 79,608.00 | 133.2080 |
| | WITH 133,208 M2 OF RADIATA | | |
| | PINE DOG EAR KILN DRIED | | |
| | FREIGHT COLLECT | | |
| | CLEAN ON BOARD | | |
| GS661D 110 | 105 BUNDLES - 15X115X1830MM | 54,278.00 | 45.3580 |
| | 25,200 PIECES | | |
| GS451D 110 | 40 BUNDLES - 15X90X1830MM | 20,677.00 | 43.5050 |
| | 13,200 PIECES | | |
| GS441D 110 | 8 BUNDLES - 15X90X1220MM | 4,137.00 | 38.8000 |
| | 3,840 PIECES | | |
| GS662D 110 | 1 BUNDLE - 15X90X1220MM | 516.00 | 5.5450 |
| | 240 PIECES | | |
| Grand Totals | 154 | 79,608.00 | 133.2080 |

Value of the cargo when in excess of the Carrier's liability, as provided for in clause V overleaf, is declared as follows:

SHIPPED on board in apparent good order and condition, weight, measure, marks numbers, quality, contents and value unknown, for carriage to the Port of Discharge or so near thereunto as the Vessel may safely get and lie always afloat, to be delivered in the like good order and condition at the aforesaid Port unto Consignees or their Assigns, they paying freight as indicated plus other charges incurred in accordance with the provisions contained in this Bill of Lading. In accepting this Bill of Lading the Merchant, as hereinafter defined, expressly accepts and agrees to all its stipulations on both pages, whether, as

hereinafter defined, written, printed, stamped or otherwise incorporated, as fully as if they were all signed by the Merchant.
One original Bill of Lading must be surrendered duly endorsed in exchange for the goods or delivery order.
IN WITNESS whereof the Master of the said Vessel has signed the number of original Bill of Lading stated below, for and behalf of the owners of the said vessel, all of this tenor and date, one of which being accomplished, the others to stand void.

FREIGHT for the said goods, together with ancillary charges, shall be deemed earned on loading and payable by the Shipper or shipment in cash without deduction vessel and/or cargo lost or not lost. If freight is not so paid on shipment at port of loading it shall also be due from and payable on demand by the Consignee at port of destination, vessel and/or cargo lost or not lost.

| Place and date of issue | Number of original Bs/L | Signature | For and by authority of the Master |
|---|---|---|---|
| CAMPANA , 27/07/2005 | 3 (Three) | By AGENCIA MARITIMA DULCE S.A | |
| Freight payable at | | | |

GSWP  260

AS AGENT ONLY

* Applicable only when document used as a Through Bill of Lading

Shipper

FORESTAL G Y S
LOTE 55 FRAC 1 RUTA NAC NRO 14
3315 L.N. ALEM - MISIONES - ARGENTINA

Pg.  1

# BILL OF LADING

Consignee

GREAT SOUTHERN WOOD PRESERVING
397 W. WASHINGTON  ST. ABBEVILLE, AL 36310
ALABAMA - USA

| VSL: | |
|---|---|
| VOY NO: | SANKO STREAM<br>V.019 |
| B/L NO: | SSR019CMP106 |

Notify address

GREAT SOUTHERN WOOD PRESERVING
397 W. WASHINGTON  ST. ABBEVILLE, AL 36310
ALABAMA - USA

**GEARBULK**

ORIGINAL

| Pre-Carriage by | Place of receipt by pre-carrier |
|---|---|

| Vessel | Port of loading |
|---|---|
| SANKO STREAM V.019 | CAMPANA |

| Port of discharge | Place of delivery by on carrier |
|---|---|
| GULFPORT | |

| Marks and. Nos. | Particulars as hereinafter defined, furnished by the Merchant. Number and kind of packages; description of goods. | Gross weight | Measurement |
|---|---|---|---|
| | Said to Contain | Said to Weight Kilos | |
| | 154 BUNDLES | 79,608.00 | 133.2080 |
| | WITH 133,208 M3 OF RADIATA | | |
| | PINE DOG EAR KILN DRIED | | |
| | FREIGHT COLLECT | | |
| | CLEAN ON BOARD | | |
| GS661D 110 | 105 BUNDLES - 15X135X1830MM | 54,278.00 | 45.3580 |
| | 25,200 PIECES | | |
| GS461D 110 | 40 BUNDLES - 15X90X1830MM | 20,677.00 | 43.5050 |
| | 13,200 PIECES | | |
| GS441D 110 | 8 BUNDLES - 15X90X1220MM | 4,137.00 | 38.8000 |
| | 3,840 PIECES | | |
| GS662D 110 | 1 BUNDLE - 15X90X1220MM | 516.00 | 5.5450 |
| | 240 PIECES | | |
| Grand Totals | 154 | 79,608.00 | 133.2080 |

Value of the cargo when in excess of the Carrier's liability, as provided for in clause V overleaf, is declared as follows:

SHIPPED on board in apparent good order and condition, weight, measure, marks numbers, quality, contents and value unknown, for carriage to the Port of Discharge or so near thereunto as the Vessel may safety get and lie always afloat, to be delivered in the like good order and condition at the aforesaid Port unto Consignees or their Assigns, they paying freight as indicated plus other charges incurred in accordance with the provisions contained in this Bill of Lading. In accepting this Bill of Lading the Merchant, as hereinafter defined, expressly accepts and agrees to all its stipulations on both pages, whether, as

hereinafter defined, written, printed, stamped or otherwise incorporated, as fully as if they were all signed by the Merchant.
One original Bill of Lading must be surrendered duly endorsed in exchange for the goods or delivery order.
IN WITNESS whereof the Master of the said Vessel has signed the number of original Bill of Lading stated below, for vessel, all of this tenor and date, one of v stand void.

GSWP  266

FREIGHT for the said goods, together with ancillary charges, shall be deemed earned on loading and payable by the Shipper or shipment in cash without deduction, vessel and/or cargo lost or not lost. If freight is not so paid on shipment at port of loading it shall also be due from and payable on demand by the Consignee at port of destination, vessel and/or cargo lost or not lost.

| Place and date of issue | Number of original Bs/L | Signature | For and by authority of the Master |
|---|---|---|---|
| CAMPANA    27/07/2005 | 3 (Three) | By | AGENCIA MARITIMA DULCE S.A. |

Shipper

GLOBAL FIBER TRADING S/A.
RUA JOÃO BETTEGA, 107 – PORTÃO
CURITIBA – PARANÁ – BRAZIL  81070000

**ORIGINAL
BILL OF LADING**

| VSL: | SANKO STREAM |
|---|---|
| VOY No: | 019 |
| B/L NO: | GBULSSR019PGA20B |

Consignee

GREAT SOUTHERN WOOD PRESERVING
MR.CHRIS BONNER  334 585 2253
WEST WASHINGTON ST.,305
ABBEVILLE – ALABAMA – UNITED STATES – 36310

Serial No:00400466967



Notify address

GREAT SOUTHERN WOOD PRESERVING
MR.CHRIS BONNER  334 585 2253
WEST WASHINGTON ST.,305
ABBEVILLE – ALABAMA – UNITED STATES – 36310

| Pre-Carriage by* | Place of receipt by pre-carrier |
|---|---|
| Vessel<br>SANKO STREAM | Port of loading<br>PARANAGUÁ/BRAZIL |
| Port of discharge<br>GULFPORT/USA | Place of delivery by on carrier* |

| Marks and Nos. | Particulars as hereinafter defined, furnished by the Merchant.<br>Number and kind of packages; description of goods | | Gross weight | Measurement |
|---|---|---|---|---|
| B58/8 | 50 | PACKS ELLIOTTI PINE FENCEBOARDS/<br>FENCING, KILN DRIED TO 19%. | 45,250KGS<br>45,250NET | 90.500M3 |
| C2DX | 40 | PACKS ELLIOTTI PINE FENCEBOARDS/<br>FENCING, KILN DRIED TO 19%. | 31,620KGS<br>31,620NET | 63.240M3 |
| KD1D | 2800 | PACKS ELLIOTTI PINE FENCEBOARDS/<br>FENCING, KILN DRIED TO 19%. | 1,244,600KGS<br>1,244,600NET | 2,489.200M3 |
| R144D | 17 | PACKS ELLIOTTI PINE FENCEBOARDS/<br>FENCING, KILN DRIED TO 19%. | 9,750KGS<br>9,750NET | 19.499M3 |
| CMB1D | 1000 | PACKS ELLIOTTI PINE FENCEBOARDS/<br>FENCING, KILN DRIED TO 19%. | 444,500KGS<br>444,500NET | 889.000M3 |
| TOTAL | 3907 | | 1,775,720KGS<br>1,775,720NET | 3,551.439M3 |

CLEAN ON BOARD
SHIPPED UNDERDECK
FREIGHT COLLECT
INVOICE NR. 154/2005
NCM: 44071000

RB: 05/1125159/001-002-003-004-005-006
DDE:2050915946/0

Value of the cargo when in excess of the Carrier's liability, as provided for in clause V overleaf, is declared as follows:

SHIPPED on board in apparant good order and condition, weight, measure, marks, numbers, quality, contents and value unknown, for carriage to the Port of Discharge or so near thereunto as the Vessel may safely get and lie always afloat, to be delivered in the like good order and condition at the aforesaid Port unto Consignees or their Assigns, they paying freight as indicated plus other charges incurred in accordance with the provisions contained in this Bill of Lading. In accepting this Bill of Lading the Merchant, as hereinafter defined, expressly accepts and agrees to all its stipulations on both pages, whether, as hereinafter

defined, written, printed, stamped or otherwise incorporated, as fully as if they were all signed by the Merchant.
One original Bill of Lading must be surrendered duly endorsed in exchange for the goods or delivery order.
IN WITNESS whereof the Master of the said Vessel has signed the number of originals Bills of Lading stated below, for and on behalf of the owners of the said vessel, all of this tenor and dates, one of which being accomplished, the others to stand void.

GSWP  274

FREIGHT for the said goods, together with ancillary charges, shall be deemed earned on loading and payable by the Shipper on shipment in cash without deduction, vessel and/or cargo lost or not lost. If freight is not so paid on shipment at port of loading it shall also be due from and payable on demand by the Consignee at port of destination vessel and/or cargo lost or not lost.

| Place and date of issue<br>PARANAGUÁ , Aug 5, 2005 | Number of original Bs/L<br>THREE  (3) | Signature     For and by authority of the Master<br>MARCON SERVIÇOS DE DESPACHOS EM GERAL LTDA<br>AS AGENTS FOR THE CARRIERS GEARBULK POOL LTD<br>By CAPT. MACADAMG, ROGELIO M |
|---|---|---|
| Freight payable at<br>DESTINATION | | |

| * Applicable only when document | Original 2 of 3 | For and on behalf of the owners of the said vessel |
|---|---|---|

**Shipper**

GLOBAL FIBER TRADING S/A.
RUA JOÃO BETTEGA, 107 – PORTÃO
CURITIBA – PARANÁ – BRAZIL  81070000

**COPY-NON NEGOTIABLE**
**BILL OF LADING**

| VSL: | SANKO STREAM |
| VOY No: | 019 |
| B/L NO: | GBULSSR019PGA20B |

**Consignee**

GREAT SOUTHERN WOOD PRESERVING
MR.CHRIS BONNER  334 585 2253
WEST WASHINGTON ST.,305
ABBEVILLE – ALABAMA – UNITED STATES – 36310

Serial No:00400466984



**Notify address**

GREAT SOUTHERN WOOD PRESERVING
MR.CHRIS BONNER  334 585 2253
WEST WASHINGTON ST.,305
ABBEVILLE – ALABAMA – UNITED STATES – 36310

| Pre-Carriage by* | Place of receipt by pre-carrier |
| --- | --- |
| **Vessel** SANKO STREAM | **Port of loading** PARANAGUÁ/BRAZIL |
| **Port of discharge** GULFPORT/USA | **Place of delivery by on carrier*** |

| Marks and Nos. | Particulars as hereinafter defined, furnished by the Merchant. Number and kind of packages; description of goods | | Gross weight | Measurement |
| --- | --- | --- | --- | --- |
| B58/8 | 50 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 45,250KGS 45,250NET | 90.500M3 |
| C2DX | 40 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 31,620KGS 31,620NET | 63.240M3 |
| KD1D | 2800 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 1,244,600KGS 1,244,600NET | 2,489.200M3 |
| R144D | 17 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 9,750KGS 9,750NET | 19.499M3 |
| CMB1D | 1000 | PACKS ELLIOTTI PINE FENCEBOARDS/ FENCING, KILN DRIED TO 19%. | 444,500KGS 444,500NET | 889.000M3 |
| TOTAL | 3907 | | 1,775,720KGS 1,775,720NET | 3,551.439M3 |

CLEAN ON BOARD
SHIPPED UNDERDECK
FREIGHT COLLECT
INVOICE NR. 154/2005
NCM: 44071000

RE:.05/1125159/001-002-003-004-005-006
DDE:2050915946/0

Value of the cargo when in excess of the Carrier's liability, as provided for in clause V overleaf, is declared as follows:

SHIPPED on board in apparent good order and condition, weight, measure, marks, numbers, quality, contents and value unknown, for carriage to the Port of Discharge or so near thereunto as the Vessel may safely get and lie always afloat, to be delivered in the like good order and condition at the aforesaid Port unto Consignees or their Assigns, they paying freight as indicated plus other charges incurred in accordance with the provisions contained in this Bill of Lading, in accepting this Bill of Lading the Merchant, as hereinafter defined, expressly accepts and agrees to all its stipulations on both pages, whether, as hereinafter

defined, written, printed, stamped or otherwise incorporated, as fully as if they were all signed by the Merchant.
One original Bill of Lading must be surrendered duly endorsed in exchange for the goods or delivery order.
IN WITNESS whereof the Master of the said Vessel has signed the number of originals Bills of Lading stated below, for and on behalf of the owners of the said vessel, all of this tenor and dates, one of which being accomplished, the others to stand void.

GSWP  275

FREIGHT for the said goods, together with ancillary charges, shall be deemed earned on loading and payable by the Shipper on shipment in cash without deduction, vessel and/or cargo lost or not lost. If freight is not so paid on shipment at port of loading it shall also be due from and payable on demand by the Consignee at port of destination vessel and/or cargo lost or not lost.

| Place and date of issue | Number of original Bs/L | Signature For and by authority of the Master |
| --- | --- | --- |
| PARANAGUÁ,  Aug 5, 2005 | THREE   (3) | MARCON SERVIÇOS DE DESPACHOS EM GERAL LTDA AS AGENTS FOR THE CARRIERS GEARBULK POOL LTD By CAPT. MACADAEG, ROGELIO M |
| Freight payable at DESTINATION | | |

* Applicable only when document

For and on behalf of the owners of the said vessel

EXHIBIT K

# ORIGINAL



## MISSISSIPPI STATE PORT AUTHORITY AT GULFPORT

### SPACE ASSIGNMENT AGREEMENT

---

This AGREEMENT is made this 1st day of August 2005 by and between the Mississippi State Port Authority (hereinafter referred to as "MSPA"), P.O. Box 40, One Hancock Plaza, Suite 1401, Gulfport, Mississippi 39502, and whose FAX is (228) 865-4320; and

**Great Southern Wood Preserving**
**P.O. Box 610**
**Abbeville, AL 36310**
**334-585-2253**

(hereafter referred to as "Customer").

The parties agree that:

**A.     Space Assignment.**  Subject to the terms and conditions set forth herein and the rules and regulations established within the MSPA Port Terminal Tariff No. 4, as amended from time to time, or any successor Tariff, MSPA assigns to Customer certain space at the Port of Gulfport (hereinafter "Assigned Space") for the handling and storage of cargo.

The Assigned Space consists of sufficient covered storage area within the Port of Gulfport to accommodate the receipt and storage of up to 3,000 tons of cargo monthly.  In consideration of this space, Great Southern Wood Preserving will guarantee a three month volume of 3,000 short tons of lumber at a wharfage rate of $1.70 per short ton. Great Southern Wood Preserving will pay to the Port $1.70 per ton of any short fall from the three month tonnage guarantee.

The Customer shall pay to MSPA, in accordance with established MSPA accounting and billing procedures.  Charges for cargo handling from the assigned space to load out to truck or rail shall be billed separately by the stevedore as designated in Paragraph G of the Agreement.

**B.     Use.**  The Assigned Space shall only be used for the receipt and short-term storage of lumber and related products in support of the cargo operations of the Customer at the Port of Gulfport.

**C.     Term.**   The assignment shall commence on July 1, 2005 and shall expire on December 31, 2005.

**D.     Free Time.**   Free time shall be in the amount of forty-five (45) days from the date of receipt of each shipment from vessel.



DEFENDANT'S
EXHIBIT

*11*

**E.    Demurrage.**  Following free time the Customer shall pay to MSPA demurrage as set forth in MSPA Tariff No. 4, as amended, from time to time, or any successor tariff.

If the party responsible for payment of demurrage is other than the Customer, then the responsible party must be identified and must be acceptable to the Mississippi State Port Authority. The party responsible for payment of demurrage is:

_____

**F.    Care, Custody, and Control.**    The sole responsibility for the care, custody, control and protection of customer's cargo shall be the Customer or, as appropriate, the person designated as the Responsible Party. The Mississippi State Port Authority has no responsibility for the care, custody, control or protection of Customer's cargo. If the party responsible for the care, custody, control and protection of Customer's cargo is someone other than the Customer, then please identify the responsible party for care, custody, and control.

**G.    Stevedore.**  Customer shall use a stevedore, cargo handler, and terminal operator that has been, or is granted, a permit by the Mississippi State Port Authority Board of Commissioners for handling cargo at the Port of Gulfport. The designated Stevedore is:

| | |
|---|---|
| **P & O Ports** | **Stevedoring Services of America** |
| P.O. Box 4241 | P.O. Box 1960 |
| Gulfport, MS 39502 | Gulfport, MS 39502 |
| 228-5663-1009 | 228-863-3922 |

The Stevedore shall be responsible for payment of all license and usage fees directly to the MSPA on behalf of the Customer. If the Stevedore fails to pay the usage fees, the Customer shall be responsible for payment of all fees assessed in accordance with the Port Terminal Tariff.

**H.    Placement of Cargo.**    Customer's cargo shall only be placed within the Assigned Space. If cargo is placed outside the assigned space, it shall nevertheless be subject to all of the provisions of this Agreement except Customer shall immediately move its cargo from the non-assigned space to the Assigned Space upon the directions from the Operations Director of the MSPA. Failure to remove the cargo may result in the MSPA sustaining substantial damages.

**I.    Removal of Cargo.**    Failure to clear all cargo and equipment from the Assigned Space at the expiration of this Agreement will result in the Port assessing a penalty equal to five times (5x) the published wharf demurrage rate. Further, upon order from the Executive Director of the MSPA, Customer's cargo shall be removed from the Assigned Space and from the property of MSPA. In this regard, Customer acknowledges that he MSPA has limited space for the storage or placement of cargo and, accordingly, that a failure to move Customer's cargo from the Assigned Space upon expiration of free time period and upon orders of the Executive Director may result in substantial damages due to

the liability of the MSPA to handle scheduled vessel calls at the Port of Gulfport because the Assigned Space is needed for the loading or unloading of other cargo. Therefore, if Customer does not comply with the orders of the Executive Director to move its cargo as required herein, MSPA may, but is not obligated to, move Customer's cargo and such movement may be off MSPA property, all at Customer's cost and expense, in order to mitigate the damages the MSPA may otherwise sustain.

**J.    Attorneys Fees.**    Upon a breach of this Agreement by either party, the prevailing party (whether by negotiation settlement or suit) shall be entitled to its reasonable attorneys fees from the non-prevailing party.

**K.    Special Provisions.**    No special provisions shall apply to this Space Assignment:

_____

CUSTOMER:

By:    _____

Title:    _____

Date:    _____

PARTY RESPONSIBLE FOR CARE, CUSTODY AND CONTROL (Paragraph F) if different from Customer:

By:    _____

Title:    _____

Date:    _____

PARTY RESPONSIBLE FOR PAYMENT OF DEMURRAGE (Paragraph E) if different from Customer:

By:    _____

Title:    _____

Date:    _____

MISSISSIPPI STATE PORT AUTHORITY

By:  _David McNeil_

Operations Division

Date: _Aug. 9, 2001_

APPROVED:

By:  _Donald R. Allen_

Executive Director

Date: _8/9/25_