IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREAT SOUTHERN WOOD PRESERVING,   )
INC.,   )
  )
     Plaintiff   )
  )
v.   )     CV: 1:06 cv 708-CSC
  )
AMERICAN HOME ASSURANCE CO., et al.,   )
  )
     Defendants.   )

## PLAINTIFF'S RESPONSE TO DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Great Southern Wood Preserving, Inc. ("Great Southern") submits this response to the Defendants' Reply to Great Southern's Opposition to the Motion for Summary Judgment. Great Southern reasserts that genuine issues of material fact do exist, the Defendants are not entitled to a judgment as a matter of law and the Defendants' Motion for Summary Judgment should be denied. In addition to its original Response to the Defendants' Motion for Summary Judgment, Great Southern responds to the Defendants' Reply as follows:

### I. DISMISSAL OF AIG, AMERICAN INTERNATIONAL UNDERWRITERS CORP. AND AMERICAN INTERNATIONAL MARINE AGENCY

The Defendants assert that summary judgment is proper against all entities except American Home Assurance Company ("American Home") because Great Southern has not asserted a claim against any of the other defendants. American Home admits that it issued the policy and denied the claim at issue in this lawsuit. While conceding that American Home is likely the main defendant in this case, Great Southern believes that release of the other defendants would not be proper at this time because discovery is not finished in this case.

At this time, Great Southern is not clear as to the identity of the proper defendants. For example, Selena Ho's deposition is not even scheduled until August 8, 2007. Ms. Ho is the person who actually denied Great Southern's claim under the policy that American Home issued. Ms. Ho, however, states that she is an Assistant Vice President and Regional Claims Manager for AI Marine Adjusters, Inc. which is an adjusting entity for Defendant AIG. *See* Declaration of Selena Ho which is attached as **Exhibit 1**, page 1 ¶ 1. Defendants American Home and American International Underwriters Corp. are both wholly owned subsidiaries of Defendant AIG. *See* Defendants' Conflict Disclosure Statement which is attached as **Exhibit 2**, page 1. At the time of the claim, furthermore, Defendant American International Marine Agency was the managing agent for Defendant AIG. *See* Robert Sciachetano Declaration which is attached as **Exhibit 3**, page 1 ¶ 1.

## II.    BREACH OF CONTRACT CLAIM

The Defendants argue they properly denied Great Southern's claim for the loss of the lumber at issue because the loss was outside the scope of the Open Marine Cargo Insurance Policy ("the Policy), specifically the "warehouse to warehouse" provision. The Defendants assert that the lumber was not covered because it had been discharged from the cargo ships and was no longer "in transit." This interpretation, however, completely ignores the language of the "warehouse to warehouse" provision of the Policy. *See* the Policy, which is Bates Stamped GSWP 3 through GSWP 26 and is attached at **Exhibit 4**. This provision states in relevant part,

> the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days, if the final destination to which the goods are insured is outside the limits of the port) whichever shall first occur.

The Policy, **Exhibit 4**, page GSWP 13 ¶ 19. The Policy obviously intended to cover cargo beyond the actual ocean voyage or else there would be no reason to include the "warehouse to

warehouse" provision, which expressly states that coverage continues until the goods reach the final destination or for 30 days after discharge.[1] *See e.g. Vuarnet Footwear, Inc. v. Sea-Rail Services Corp.*, 759 A.2d 1230, 1236 (N.J. Super. Ct. App. Div. 2000) (holding that denying coverage for goods awaiting transit to the final destination as outside the scope of the "warehouse to warehouse" provision would be contrary to an insured's expectations for having such a provision in a marine open cargo insurance policy); *see also Citron v. Hartford Accident and Indem. Co.*, 381 N.Y.S. 2d 650, 652 (N.Y. City Civ. Ct. 1976) (holding a "very liberal interpretation to the words 'in transit' should be given" and the "failure to do so would be to rob the insured of the very coverage that he reasonably intended and assumed he would get").

In the Reply to Great Southern's Opposition to the Motion for Summary Judgment, the Defendants also focus entirely on the phrase "in transit" to suggest that "warehouse to warehouse" provision is not ambiguous.  Great Southern, however, does not argue that the phrase "in transit" creates the ambiguity.  Instead, Great Southern states that the ambiguity lies with the whole phrase, "in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the policy," because no final destination is actually named in the policy. *See e.g. Exchange Lemon Products Co. v. Home Ins. Co.*, 235 F.2d 558, 561 (9th Cir. 1956) (holding that in interpreting the terms of an insurance contract one must look "at the whole before dissecting it – looking too hard at the single words and not the sentence").  The Defendants simply ignore the final destination language and attempt to avoid liability for a term that they failed to define in the Policy.

If American Home had not intended the Policy to cover the cargo beyond the ocean voyage, it could have simply omitted the sentence stating that the insurance continues while the

---

[1] In this case, the 30 day provision and not the 15 day provision applies because Great Southern does not have treatment facilities within the limits of the Port of Gulfport.

goods are in transit and/or awaiting transit to the final destination. In other words, the "warehouse to warehouse" provision could have concluded by simply stating that the insurance continues "until the goods are discharged overside from the overseas vessel at the final port." The Policy, **Exhibit 4**, page GSWP 13 ¶ 19. If the "warehouse to warehouse" provision of the Policy concluded in this manner, the clause would not be ambiguous and the "final port" would be wherever the ship discharges its cargo.

Because the term "final warehouse at the destination named in the policy" is not defined anywhere in the Policy, the "warehouse to warehouse" provision is open to more than one interpretation. According the Eleventh Circuit Court of Appeals, having more than one possible interpretation is the actual definition of an ambiguous insurance contract. *See Twin City Fire Ins. Co., Inc. v. Ohio Cas. Ins. Co., Inc.*, 480 F.3d 1254, 1262 (11th Cir. 2007); *Continental Ins. Co. v. Roberts*, 410 F.3d 1331, 1333 (11th Cir. 2005). Whenever an ambiguity in an insurance contract exists, that ambiguity should be resolved in favor of the insured. *See Twin City Fire*, 480 F.3d at 1264; *Roberts*, 410 F.3d at 1332; *Hancock v. New York Life Ins. Co.*, 899 F.2d 1131, 1135 (11th Cir. 1990); *Shalimar Contractors Inc. v. American States Ins. Co.*, 975 F. Supp. 1450, 1454 (M.D. Ala. 1997). Here, that means there is coverage for Great Southern.

In this case, neither the remaining lumber from the *Kestrel Arrow*, Voyage 45 ("*Kestrel Arrow*") nor the lumber from the *Sanko Stream*, Voyage 19 ("*Sanko Stream*") had reached its final destination. Hurricane Katrina destroyed all of the lumber in question before Great Southern could transport it to one of its treatment facilities outside the Port of Gulfport. *See* relevant portions of Deposition of Marty Goff, which are attached as **Exhibit 5**, page 86 line 16; page 89, line 20 through page 90, line 13; page 93, lines 14-22; page 100, line 10 through page 104, line 11; page 119, line 20 through page 120, line 4; page 124, lines 4-10.

The Defendants offer a Great Southern delivery breakdown and sales invoices to Georgia Pacific to suggest that the wood from the *Kestrel Arrow* had reached its final destination in Gulfport because some was sold as raw lumber to an outside customer. The lumber from the *Kestrel Arrow* described in the delivery breakdown and sales invoices, however, had already left the warehouse facility at the Port of Gulfport and is not at issue in this case. Great Southern's claim is for lumber at the port at the time it was destroyed. No evidence exists which would suggest that Great Southern intended for any of the destroyed lumber to go anywhere but one of its treatment facilities.

Ultimately, the Defendants argue that the lumber at issue is not covered under the "warehouse to warehouse" provision because the lumber was in the warehouse space that Great Southern leased from the Mississippi State Port Authority ("MSPA"). As a result, the Defendants claim the lumber was no longer in transit. Great Southern did not have a choice about putting the discharged lumber into the warehouse because the discharged lumber cannot be left on the dock. Use of the warehouse space at the Port of Gulfport was not simply for Great Southern's convenience but a requirement of MSPA. In fact, all the ports that Great Southern uses have warehouse facilities where discharged cargo is placed temporarily until it can be sent on to the final destination. *See* Goff Depo., **Exhibit 5**, page 28, line 4 through page 29 line 13. The logistical constraints at the Port of Gulfport prevented Great Southern from being able to remove all of its imported lumber within the 30 days of free time; thus, Great Southern had the lease agreement. *See* Goff Depo., **Exhibit 5**, page 29, lines 7 through page 31, line 7; page 61, lines 8-20. The lease agreement between Great Southern and MSPA, however, was a short term lease which allowed free storage time of 45 days. *See* MSPA Lease, which is Exhibit 11 to Marty Goff's Deposition and is attached as **Exhibit 6**, page 1 ¶¶ B and D. If Great Southern did

5

not leave cargo in the warehouse for more than 45 days, it would not have to pay MSPA for use of the space. *See* Lease, **Exhibit 6**, page 1 ¶ A. Great Southern's interests are best served by removing all lumber as quickly as possible rather than storing the wood in the facility for long periods of time.

Courts have held that goods are "considered in transit when [they are] moving from one location to another." *Hartford Cas. Ins. Co. v. Banker's Note, Inc.*, 817 F. Supp. 1567, 1573 (N.D. Ga. 1993). Goods do not have to be continuously moving, however, to remain "in transit." As the Second Circuit Court of Appeals held, the "true test is whether the good, even though temporarily at rest, were still on their way, with the stoppage being merely incidental to the main purpose of delivery." *Ore & Chemical Corp. v. Eagle Star Ins. Co., Ltd.*, 489 F.2d 455, 457 (2nd Cir. 1973); *see also Banker's Note*, 817 F. Supp at 1573; *Franklin v. Washington General Ins. Corp.*, 310 N.Y.S. 2d 648, 650 (N.Y. Sup. Ct. 1970); *Ben Pulitzer Creations Inc. v. Phoenix Ins. Co.*, 263 N.Y.S. 2d 373, 376 (N.Y. City Civ. Ct. 1965). A simple temporary interruption in moving the goods from one place to another also does not cause insurance coverage to stop if the interruption is related to the transit itself. *See Palm Dessert Nat'l Bank v. Federal Ins. Co.*, 474 F. Supp. 2d 1044, 1049 (N.D. Cal. 2007); *Glendinning Co., Inc. v. Aetna Ins. Co.*, 395 A.2d 354, 356 (Conn. Super. Ct. 1978).

In the current case, all of the lumber at issue was still on its way to the final destination when Hurricane Katrina hit. Although movement of this raw lumber was temporarily stopped while it was in the warehouse at the Port of Gulfport, this interruption was incidental to the main purpose of delivery. Great Southern sells treated wood; therefore, the main purpose in delivering the imported raw wood is to get it to one of its treatment facilities located outside the Port of Gulfport. *See* Goff Depo., **Exhibit 5**, page 11, line 3 through page 12, line 8; page 124, lines 4-

10.   The destroyed wood from the *Kestrel Arrow* had only been in the warehouse approximately 23 days. This length of time, however, did not stop the lumber from still being in transit because the delays in removal were related to the limitations of removing cargo from the Port of Gulfport and the physical limitations of removing an entire ship load of lumber by tractor-trailers. *See Vuarnet Footwear*, 759 A.2d at 1236 (holding that "a delay in transit is equitable with awaiting transit"). Despite the logistical constraints, Great Southern averaged removing 173 packs of lumber a day from the *Kestrel Arrow* and would have had all of the remaining wood out of the temporary warehouse and to its final destination on or before September 1, 2005, a date which was within the 30 days of the "warehouse to warehouse" provision of the Policy. *See* Goff Depo., **Exhibit 5**, page 90, lines 2-9; page 93, lines 14-22; *see also Vuarnet Footwear*, 759 A.2d at 1236 (holding that "goods awaiting transit within the thirty-day period are covered").

The raw lumber from the *Sanko Stream* was also still in transit when it was destroyed. At the time of Hurricane Katrina, the United States Department of Agriculture ("USDA") had not yet cleared and released the wood from the *Sanko Stream*. *See* Goff Depo., **Exhibit 5**, page 86, lines 12-20; page 120, lines 6-17.[2]  Again, the interruption of the movement of this wood was incidental to the main purpose of delivery, getting the raw lumber to one of Great Southern's treatment facilities so that finished product could be sold to customers. All imported wood must receive clearance and release from USDA before leaving any United States port and continuing inland. *See* 7 C.F.R. 319.40-2.

The Defendants rely on several cases to make the assertion that the lumber at issue was not "in transit" and thus outside the coverage of the "warehouse to warehouse" provision of the

---

[2] Despite Marty Goff's testimony that the shipment had not cleared United States Customs until October 5, 2005, it appears that it was actually USDA which had the lumber from the *Sanko Stream* on hold until October 5, 2005. *See* ABI Processing Status Report 7501, which is Bates Stamped GSWP 105 and is attached as **Exhibit 7**.

Policy. None of the authority that the Defendants cite is factually similar to the current situation. Thus, all of the cases that the Defendants rely on can be distinguished.

In *San-Nap-Pak Mfg. Co., Inc. v. Fireman's Ins. Fund Co.*, 47 N.Y.S. 2d 542 (N.Y. City Ct. 1944), the plaintiff loaded two tractor-trailers for delivery at its facility and left them in an area next to the factory and loading area. *Id.* at 543. While the tractor-trailers were awaiting the start of delivery, the contents were destroyed by a flood. *Id.* The court interpreted the transportation policy and held that the shipments were not in transit because they had not left the plaintiff's facility and had not started moving toward a final destination. Leaving the loaded trucks at the facility was simply a convenience for the plaintiff to expedite the delivery of the goods to its consignee. *Id.* at 545-46.

The court in *Brammer Corp. v. Holland-American Ins. Co.*, 228 N.Y.S. 2d 512 (N.Y. Sup. Ct. 1962), interpreted a marine open cargo insurance policy which contained a "warehouse to warehouse" provision like the one in Great Southern's insurance policy. *Id.* at 513. However, the court in *Brammer* determined that the "warehouse to warehouse" provision did not apply because the goods had not yet started in transit. *Id.* Just like the situation in *San-Nap-Pak Mfg.*, the plaintiff moved the goods from the manufacturing area to the shipping area. The goods remained in the shipping area until they were destroyed. *Brammer* 228 N.Y.S. 2d at 513. In *Brammer*, the court concluded that the goods were not in transit because, again, they were in the plaintiff's facility and had not started moving toward a final destination. *Id.*

Similarly, the plaintiff in *Kessler Export Corp. v. Reliance Ins. Co. of Philadelphia, Pa.*, 207 F. Supp. 355 (E.D. N.Y. 1962), arranged for the shipment of goods from its facilities. During the course of loading, the truck in question was moved onto the sidewalk outside the plaintiff's facilities but all of the actual loading occurred inside the plaintiff's property. *Id.* at 357. When

the loading was complete, the truck was moved back totally inside the plaintiff's property and left. *Id.* The truck and its contents were stolen from the plaintiff's facility before delivery could begin. *Id* at 357-58. The plaintiff sought to recover for the loss under the "warehouse to warehouse" provision of a marine insurance policy which was similar to the one at issue in the current case. *Id.* at 356-58. The court concluded in *Kessler* that the plaintiff could not prevail under the "warehouse to warehouse" clause because there was no transit because the goods had never left the plaintiff's facility. *Id.* at 360.

In *Pacific Tall Ships Co. v. Kuehne & Nagel, Inc.*, 76 F. Supp. 2d 886 (N.D. Ill. 1999), the plaintiff put 76 of its model ships into a container outside its facility in the Philippines. *Id.* at 891-92. In preparation for transport, a fumigator placed a can of phosphine tablets inside the container but did not properly ventilate the container. As a result, the model ships were destroyed. *Id.* at 892. The plaintiff sought recovery for the loss under the "warehouse to warehouse" clause of the open marine cargo insurance policy. *Id.* at 891-92. The loss occurred while the model ships were being prepared for transit. The court held that goods cannot be both prepared for transit and actually in transit. *Id.* at 893. Because the cargo container had not left the plaintiff's facility and was not in transit, the "warehouse to warehouse" provision did not apply. *Id.*

The lumber at issue in this case had clearly already started in transit because it arrived at the Port of Gulfport from South America. Unlike the situation in *Pacific Tall Ships*, the lumber was not being prepared for transport. Instead, it was merely awaiting transit to one of Great Southern's treatment plants, the final destination. Great Southern did not store the lumber in the warehouse facility for simple convenience but rather because MSPA required Great Southern to do so. In addition, the policy in *San-Nap-Pak Mfg.* was not the same as the policy at issue here

9

because it did not contain a "warehouse to warehouse" provision that extended coverage for extra time while the goods were awaiting transit to the final destination.

In *M. J. Federman Co. v. American Ins. Co.*, 196 N.E. 297 (N.Y. 1935), the plaintiff chose not to receive a shipment of merchandise into its facility because the shipment arrived after the plaintiff had closed. *Id.* at 297-98. The trucking company that handled the plaintiff's local trucking agreed to receive the shipment and hold it until the plaintiff could pick it up the following Monday. The trucking company drove the shipment to a public garage and left it. The goods were stolen before they could be re-delivered to the plaintiff's facility. *Id.* at 298. The court concluded that the transportation insurance policy did not apply and held that the goods had reached the final destination. At the plaintiff's request, the merchandise was unloaded from the original truck, put onto one of the plaintiff's own trucks and taken for storage. *Id.*

Likewise, the court in *Haggar Co. v. United States Fire Ins. Co.*, 497 S.W. 2d 61 (Tex. App. Texarkana 1973), held that inland floater insurance policy did not apply because the goods had reached the final destination and transit had stopped. *Id.* at 64. In that case, the truck driver delivered the shipment to the plaintiff's facilities after the receiving department had closed. As was custom, the driver backed the trailer all the way against the warehouse and drove off with the tractor. *Id.* at 62. The court held that the plaintiff's warehouse was clearly the intended destination of the shipment and that act of backing the trailer against the dock so that it was ready for the plaintiff to unload meant that transit had concluded. *Id.* at 63-64.

Neither the remainder of the shipment from the *Kestrel Arrow* nor the shipment from the *Sanko Stream* had arrived at the final destination when the loss occurred. These two shipments, therefore, were still in transit and covered under the terms of the Policy. Additionally, both *M. J. Federman* and *Haggar* did not deal with insurance policies that granted an extension of coverage

for a specific time period while the goods were awaiting transport to the final destination as is the case with the "warehouse to warehouse" provision of the Policy.

The Defendants also cite several cases in which the courts refused to grant coverage because the interruption in transit was not incidental to the main purpose of delivery. For example, in *Koshland v. Columbia Ins. Co.*, 130 N.E. 41 (Mass. 1921), the plaintiff's representatives bought wool throughout California and sent the wool to a facility in Stockton, California for cleaning. *Id.* at 42. The wool would usually remain in Stockton for three to six months and then would be shipped on to Boston. In this particular situation, the plaintiff's wool had been at the Stockton facility for a range of a few days to more than eight months when it was destroyed by a flood. *Id.* The court held that the insurance policy covering the inland shipment of the wool was not applicable because the stoppage was not incidental to the transit of the wool. The main purpose of sending the wool to Stockton was to reduce the bulk of the wool and thus lower the cost of the freight to Boston. *Id.* at 43-44.

The court in *Dealers Dairy Products Co. v. Royal Ins. Co.*, 164 N.E. 2d 745 (Ohio 1960), likewise, refused to grant coverage under the transportation insurance which covered shipments until they reached their destination but only while incidental to transportation. *Id.* at 746-47. The plaintiff delivered a shipment of ice cream to one of its customers and picked up some machinery and equipment that the plaintiff had bought from the customer. *Id.* at 746. While in route to the plaintiff's facility in Buffalo, the plaintiff contacted the driver and told him to leave the machinery and equipment in Cleveland so that he could pick up another load of ice cream. When the driver returned to Cleveland to pick up the machinery and equipment, it had been stolen. *Id.* at 747. The court concluded that depositing the load in Cleveland for the purposes of

11

picking up a load of different cargo ended the transit of the original load because it had been temporarily abandoned. *Id.*

Similarly, the court in *Allied Leisure Industries, Inc. v. American Mutual Liability Ins. Co.*, 342 So. 2d 540 (Fla. Dist. Ct. App. 1977), held that canceling the original shipment ended transit and took the shipment outside the transportation insurance policy. The delay in deciding to reship the goods to another purchaser or to return the goods to the plaintiff's facility was not incidental to the transit even though the goods remained at the dock. *Id.* at 540-41.

In *Insurance Co. of North America v. U.S. Fire Ins. Co.*, 322 N.Y.S. 2d 520 (N.Y. Sup. Ct. 1971), the assured shipped fertilizer from interior locations to the Port of Gulfport.[3] *Id.* at 522. The assured then bagged the fertilizer before loading it for shipment overseas. While still being bagged, a shipment of the fertilizer was destroyed by Hurricane Camille. *Id.*   The plaintiff paid the assured for its loss under the open marine cargo policy and the defendant refused to pay on the reinsurance. The court held that the bagging of the fertilizer was an interruption in the transit which was not incidental to the main purpose of the delivery. Because the bagging was not necessary for shipment overseas, the bagging operation was something not covered under the original insurance policy. *Id.* at 522, 524.

The plaintiff in *Glendinning Companies* shipped a load of towels and flatware to one of its customers. The customer, however, was unable to use the shipment. *Glendinning Companies*, 395 A.2d at 354-55. The plaintiff instructed the customer to sign for the shipment and to store it until the plaintiff could make arrangement to ship the goods to a different location. *Id.* at 355. While the goods were being stored by the customer, the goods were stolen. The court held that the goods were not covered by the in transit insurance coverage. The stoppage was not

---

[3] This lawsuit involved two insurers because a policy of reinsurance had been issued.

incidental to the main purpose of the delivery because the goods had arrived at their original intended final destination. *Id.* at 357.

In the current situation, the interruption of the movement of the lumber at the Port of Gulfport was incidental to the main purpose of delivery. Great Southern clearly had not abandoned the lumber but was in the process of moving it to the final destination outside the port. It also made no attempts to cancel the shipments once they arrived. Furthermore, Great Southern did not do anything extra to the lumber such as the bagging operation that occurred in *Insurance Co. of North America.*

*Koshland, Dealer's Dairy, Allied Leisure, Insurance Co. of North America* and *Glendinning Companies* can also be factually distinguished on the basis of the type of insurance policies that were at issue in each of those cases. None of those cases involved insurance policies that had provisions similar to the "warehouse to warehouse" provision at issue here.

Two other cases that the Defendants rely on can be distinguished on the basis of time. In *Exchange Lemon*, for instance, the lemon products had been in a warehouse in Kansas City for approximately eight months prior to being destroyed in a flood. *Exchange Lemon*, 235 F.2d at 559. The lemon products were earmarked for eventual shipment to Chicago, but at the time of the flood the plaintiff did not have purchase orders for any of the lemon products. *Id.* The court held that the lemon products were not covered by the transportation policy because they were not in transit and were simply in storage without any effective orders to ship. *Id.* at 561.

In *Sovereign Recycling International Inc. v. New York Marine and General Ins. Co.*, 2001 WL 225243 (S.D.N.Y. Mar. 6, 2001), the shipment of metals in question had been in the plaintiff's warehouse for two months at the time of the loss. *Id.* at * 3. The court held that the

shipment was not in transit and, as a result, not covered by the "warehouse to warehouse" provision of the marine insurance policy. *Id.* at * 8.

None of the lumber at issue in this case had been in the MSPA warehouse for an extended period of time. At the time of the hurricane, the lumber from the *Kestrel Arrow* had only been in the warehouse for approximately 23 days and the shipment from the *Sanko Stream* had only been in the warehouse for two days. *See* Goff Depo., **Exhibit 5**, page 85 line 14 through page 86, line 16. Unlike *Exchange Lemon* and *Sovereign Recycling*, the lumber here had been in the warehouse less than the 30 days allowed by the "warehouse to warehouse" provision of the Policy.

Additionally, the Defendants argue the issue of custody and control to show that the destroyed lumber was no longer in transit. The Defendants rely on case law to try to support their argument. Again, however, none of the case law, much of which is merely persuasive authority, is factually similar to the current situation and can be distinguished.

In *Jomark Textiles, Inc. v. International Fire and Marine Ins. Co., Ltd.*, 771 F. Supp. 577 (S.D.N.Y. 1989), for example, the textiles in question were removed from the port by the insured and taken to a *private* warehouse located *outside* the port. *Id.* at 578. The textiles remained in that warehouse for seven days and then were sent to a second *private* warehouse also located *outside* the port. The textiles were to remain in the second private warehouse until the plaintiff determined their final destination. The textiles were destroyed while they were at this second private warehouse. *Id.* The all risk marine cargo insurance policy in *Jomark Textiles* stated that coverage ended when the goods were delivered to a warehouse used for storage not in the ordinary course of transit or for distribution or allocation. *Id.* The policy did not contain a "warehouse to warehouse" provision which extended coverage for a period of 15 or 30 days like

the policy issued to Great Southern. The court held that the loss was not covered because the plaintiff exercised dominion and control over the good by clearly using the second warehouse as a staging area for allocation or distribution. *Id.* at 579-80. In the current case, Great Southern's lumber clearly was stored at the MSPA warehouse in the ordinary course of transit.

Likewise, the court in *New York Marine & General Ins. Co. v. Tradeline (L.L.C.)*, 2003 WL 548877 (S.D.N.Y. Feb. 25, 2003), held the goods were not covered by the marine cargo insurance policy in question because the insured exercised dominion and control by using the storage silo as a staging area. *Id.* at * 2-3. The insurance policy contained similar language as that found in *Jomark Textiles* and specifically stated that coverage terminated if the goods were delivered at a warehouse used for storage not in the ordinary course of transit or for distribution or allocation. The policy in *Tradeline* also stated that coverage terminated if the goods were delivered to the warehouse at the destination named in the policy, and the policy of insurance did not contain a "warehouse to warehouse" provision which extended coverage for an additional 15 or 30 days.   The port where the goods were delivered was actually listed as the final destination in the policy. *Id.* at * 1-2.

The situation here is not factually similar to either *Jomark Textiles* or *Tradeline*. The wood subject to Great Southern's claim remained at the Port of Gulfport and was not transported to another warehouse outside the limits of the port. The Port of Gulfport was not named as the final destination in the insurance policy at issue here. In fact, no final destination was listed anywhere within the policy. *See* the Policy, **Exhibit 4**, pages GSWP 3 through GSWP 26. The insurance policies in question in both *Jomark Textiles* and *Tradeline* contained exclusionary provisions not contained in Great Southern's policy. Great Southern's policy, unlike those in either *Jomark Textiles* or *Tradeline*, contains the "warehouse to warehouse" provision which

15

specifically covers the goods for an additional 30 days while awaiting transit to the final destination.

The Eleventh Circuit Court of Appeals in *Lumber & Wood Products, Inc. v. New Hampshire Ins. Co.*, 807 F.2d 916 (11th Cir. 1987), found that the plaintiff had exercised complete dominion and control over a shipment of lumber that was delivered to the dock of a third party consignee. As a result, the "warehouse to warehouse" provision did not apply. *Id.* at 921. The consignee in *Lumber & Wood Products* was in the business of purchasing raw lumber and then reselling it directly from its dock. *Id.* at 917-18. The delivery of the lumber occurred at the consignee's private dock facilities. *Id.* at 917. At the time of the loss, the lumber had been on the consignee's dock for 32 days, beyond the 15 day period of the "warehouse to warehouse" provision in that marine open cargo insurance policy.[4] *Id.* at 919.

Great Southern is in the business of selling treated wood. At the time of Hurricane Katrina, none of the lumber at issue had been treated and was thus not a finished product. In addition, Great Southern's wood was destroyed during the extended time period of the "warehouse to warehouse" provision.

Specifically with regard to the *Sanko Stream*, Great Southern exercised no dominion and control over this wood because at the time of Hurricane Katrina the wood had not yet received USDA clearance and release. *See* Goff Depo., **Exhibit 5**, page 86, lines 12-20; page 120, lines 6-17. Without USDA clearance and release, the imported wood could not leave the Port of Gulfport. *See* 7 C.F.R. 319.40-2. Also without full USDA clearance, Great Southern had no authority to take it beyond the limits of the port:

---

[4] The "warehouse to warehouse" provision at issue in *Lumber & Wood Products* did contain the same alternate 30 day provision; however, the destination was not outside the limits of the port because the discharge of the lumber was at the private dock facilities of the consignee.

> A: *My opinion is that the cargo is not in our custody or our control unless there's full clearance given to us via the U.S.D.A. and customs.*
> Q: As between you and the Mississippi Port Authority, though, you agreed that when that cargo was in their warehouse, it was in your, custody, care and control. Is that a fair statement?
> A: Yes. *But I cannot pick it up until I'm given clearance.*
> Q: I understand that. But it wasn't in anybody's elses [sic] control?
> A: Yes. I agree.
> Q: All right.
> A: *I couldn't pick it up nor could anyone else.*

Goff Depo, **Exhibit 5**, page 121, lines 7-23 (emphasis added).

The Defendant relies on the MSPA Lease to suggest that Great Southern did in fact have custody, control and possession of the wood from the *Sank Stream*. *See* MSPA Lease, **Exhibit 6**, pages 1-4. The MSPA Lease does contain a section stating that Great Southern has sole responsibility for the custody and care of its cargo that is put into the warehouse facility. *See* MSPA Lease, **Exhibit 6**, page 2 ¶ F. This section of the lease, however, simply serves as a release of liability for MSPA. It does not have any bearing on the coverage or the interpretation of the subject insurance policy at issue in this case. The MSPA Lease, moreover, is between only Great Southern and MSPA. *See* MSPA Lease, **Exhibit 6**, page 1. As a result, the Defendants do not have any rights under the lease agreement and cannot claim rights as a third party beneficiary. *See e.g. Crayton v. Canseco Finance Corp.*, 237 F. Supp. 2d 1322, 1326 (M.D. Ala. 2002) (quoting *Weathers Auto Glass Inc. v. Alfa Mut. Ins. Co.*, 619 So. 2d 1328, 1329 (Ala. 1993) (holding that a "party claiming to be a third party beneficiary of a contract must establish that the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental, benefit upon the third party")).

The defendant also relies on *Fireman's Fund Ins. Co. v. Service Transport Co.*, 466 F. Supp. 943 (D.C. Md. 1979), to assert that a government hold on goods does not make them in transit for insurance purposes. *Fireman's Fund*, however, is not factually similar to the current

situation and can be distinguished. The shipment of coffee in *Fireman's Fund* was shipped under seal from New York to Baltimore because it had not cleared customs in New York. *Id.* at 935. While the coffee was held in Baltimore, the FDA inspected the coffee and placed it on hold until further notice. The coffee was destroyed by fire before being released by the FDA. *Id.* The court held that the coffee was not covered by the transportation insurance because the coffee was no longer in the ordinary course of transit. In reaching its holding, the court determined that the parties intended the final destination to be Baltimore and that the FDA hold merely delayed its distribution. *Id.* at 937.

The final destination for the lumber from the *Sanko Stream* was one of Great Southern's treatment facilities and not the Port of Gulfport. Moreover, unlike the situation in *Fireman's Fund*, the USDA hold occurred immediately after the lumber was discharged from the ship and thus suspended the transit of the wood rather than the distribution of the goods from its final destination.

Despite the Defendants' contentions, the current situation is similar to that in *Ocean Marine Ins. Co. v. Lindo*, 30 F.2d 782 (9th Cir. 1929). In that case, a shipment of cotton was placed temporarily into a customs warehouse. The cotton was destroyed in a fire while the cotton was still in the customs warehouse and before it had cleared customs. *Id.* at 783. Because the cotton had to clear customs before the consignee could take possession of it, the court held that deposit of the goods into the customs warehouse did not end transit. As a result, the cotton was covered under the "warehouse to warehouse" provision of the marine cargo insurance policy which as the court said, "was evidently intended to cover the goods after being discharged at port of destination while in the ordinary course of transit." *Id.* at 784.

Just as the cotton in *Lindo* had to clear customs before the consignee could take possession, the lumber from the *Sanko Stream* had to receive clearance and release from USDA before Great Southern could do anything with the lumber. *See* Goff Depo., **Exhibit 5**, page 56, lines 17-20; page 121, lines 7-23; *see also Northern Feather International, Inc. v. Those Certain London Underwriters Subscribing to Policy No. JWP108 Through Wigham Poland, Ltd.*, 714 F. Supp. 1352, 1358 (D.N.J. 1989) (holding "the U.S. Customs Service prevented plaintiff from assuming control over the two shipments"). Although in *Lindo* the cotton was placed into a separate customs warehouse, the court held,

> it cannot be said, we think, that the goods were safely deposited in the consignee's or other warehouse within the meaning of the policy, while in the custom house, *regardless of the nature or character of the building or structure used by the government for the storage of goods while passing customs.*

*Lindo*, 30 F.2d at 784 (emphasis added). The Port of Gulfport requires Great Southern to temporarily store shipments of lumber in its warehouse and the lumber must clear USDA before leaving the port. Because the wood from the *Sanko Stream* had not been cleared and released by USDA, Great Southern could not exercise dominion and control over it.

As the Defendants point out, the Eleventh Circuit Court of Appeals has held that in cases dealing with "warehouse to warehouse" provisions the fundamental issue is whether or not the goods are in transit. *See Lumber & Wood Products* 807 F.2d at 918-19. As the court in *Fireman's Fund* held, however, "the determination whether property is 'in transit' is a common-sense issue, one dependent on the peculiar facts and circumstances of the individual case." *Fireman's Fund* 466 F. Supp. at 936; *see also Hillcrea Export & Import Co., Inc. v. Universal Ins. Co.*, 110 F. Supp. 204, 208 (S.D.N.Y. 1953) (citing *Lindo*, 30 F.2d at 784, and holding "'whether goods covered by a marine policy containing a 'from warehouse to warehouse' clause'

are within or outside the duration of risk, 'is a question of fact from the circumstances of each particular case'"). Because the issue of whether or not the lumber was in transit at the time of the loss is a fact question, summary judgment is not proper on the issue of breach of contract.

In this case, the lumber at issue was discharged from the *Kestrel Arrow* and the *Sanko Stream*. As required by MSPA, the lumber was placed into temporary warehouse facilities at the Port of Gulfport while awaiting further transit outside the port. This lumber was covered by an Open Cargo Marine Insurance Policy which contained a "warehouse to warehouse" provision that granted an additional 30 days of coverage after discharge while the lumber was awaiting transit or in transit to the final destination. The final destination for the lumber at issue was one of Great Southern's treatment facilities located outside the Port of Gulfport. When Hurricane Katrina hit, the lumber from the *Kestrel Arrow* had been in the warehouse for 23 days and the lumber from the *Sanko Stream* had been in the warehouse for only two days. According to the language of the "warehouse to warehouse" provision, both shipments were covered by the 30 day extension of coverage.

### III.    BAD FAITH

No reasonably legitimate or arguable reason to deny the claim of the lumber destroyed by Hurricane Katrina exists. None of the wood in question had reached its "final destination." Instead, the wood from the *Kestrel Arrow* and the *Sanko Stream* was awaiting transit to the "final destination" outside the Port of Gulfport. Any delays in transport were merely "incidental to the main purpose of delivery." *Ore & Chemical Corp.*, 489 F.2d at 457; *see also Banker's Note*, 817 F. Supp at 1573; *Franklin*, 310 N.Y.S. 2d at 650; *Ben Pulitzer Creations*, 263 N.Y.S. 2d at 376. The lumber from the *Sanko Stream*, furthermore, was clearly still in transit because it had not yet received clearance and release from USDA, meaning Great Southern exercised no dominion and

control over it. The hurricane hit before the expiration of the 30 day extension of coverage under the "warehouse to warehouse" provision.

The Defendants argue that the denial of the claim was not in bad faith because the "warehouse to warehouse" provision is not ambiguous. They focus entirely on the phrase "in transit" without looking at the entire language of the "warehouse to warehouse" provision. *See Exchange Lemon*, 235 F.2d at 561 (holding that in interpreting the terms of an insurance contract one must look "at the whole before dissecting it – looking too hard at the single words and not the sentence"). Because the term "final destination" is not named anywhere in the Policy, it is ambiguous. Under Alabama law, reliance by the insurer on an ambiguous portion of the policy to deny a claim is a proper reason for a claim of abnormal bad faith. *See Nat'l Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 130-31 (Ala. 2002).

Moreover, the Defendants assert that the failure to discover the USDA hold did not constitute a bad faith failure to investigate. However, one basis the Defendants use for seeking summary judgment is that Great Southern exercised dominion and control over the lumber at issue. The USDA hold prevented Great Southern from exercising custody and control over the wood from the *Sanko Stream*. The Defendants took it upon themselves to investigate the loss and to determine coverage. As such, they are charged with knowledge upon which they placed their denial of coverage.

The Defendants also imply that Great Southern acted improperly because of raising the issue of the USDA hold in response to the Motion for Summary Judgment. The Defendants argue that they did not know about the USDA hold until seeing Great Southern's Response to the Motion for Summary Judgment. Counsel for the Defendants, however, learned that the wood had not cleared USDA at the time of the loss during Marty Goff's Deposition on May 22, 2007.

Defense counsel filed the Motion for Summary Judgment asserting Great Southern's custody and control over the wood from the *Sanko Stream* on May 30, 2007.

The Defendants claim they did not have the document showing the USDA hold at the time they denied the claim. The Defendants made no inquiries about any possible holds at any time during the investigation. In fact, after Great Southern responded to the denial letter and stated that Great Southern did not have custody and control over the shipment from the *Sanko Stream*, the Defendants sought no explanation.

Great Southern is not in the insurance business. As a result, Great Southern has no way of knowing what documents would be necessary for the investigation of a claim. The only duty that Great Southern has is to provide whatever documentation that the Defendants request. Great Southern complied with its duty and in fact sent the requested information to the Defendants on more than one occasion.

Great Southern's claim for bad faith is not based on a delay but rather a failure to investigate properly. Regardless of when the Defendants may have received notice of the USDA hold, they now are aware that USDA had not fully cleared and released the shipment from the *Sanko Stream* at the time of the loss. Therefore, nothing is preventing the Defendants from reopening the claim and reversing the previous denial of coverage.

## IV.     CONCLUSION

Genuine issues of material fact do exist and the Defendants are not entitled to a judgment as a matter of law. The Defendants' motion should be denied.

Respectfully submitted,

s/Kenneth A. Dowdy
Kenneth A. Dowdy (DOW015)
Attorney for Plaintiff
LUSK, LUSK, DOWDY &
CALDWELL, P.C..

2101 Highland Avenue, Suite 410
Birmingham, Alabama 35205
Telephone:   (205) 933-7090
Facsimile:    (205) 933-7099
E-mail: kad@lusklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on August 1, 2007, served the foregoing on counsel for the Defendants via the E-file system and a separate copy via United States Mail, postage prepaid and properly addressed to:

Blane H. Crutchfield, Esq.
Louis C. Norvell, Esq.
Hand Arendall, L.L.C.
P.O. Box 123
Mobile, Alabama 36601-0123

s/Kenneth A. Dowdy

# EXHIBIT 1

Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

GREAT SOUTHERN WOOD                    *
PRESERVING, INC.,                      *
                                       *
        Plaintiff,                     *
                                       *
v.                                     *    Civil No. 1:06-cv-00708-CSC
                                       *
AMERICAN HOME ASSURANCE                *
CO., AIG, AMERICAN INTERNATIONAL       *
UNDERWRITERS CORP., AMERICAN           *
INTERNATIONAL MARINE AGENCY,           *
                                       *
        Defendants.                    *


### SELENA HO DECLARATION

STATE OF ILLINOIS        )
COUNTY OF COOK           )

1.    My name is Selena Ho.  I am an Assistant Vice President and Regional Claims Manager with AI Marine Adjusters, Inc., an adjusting entity for the AIG group of companies ("AIG").  I have personal knowledge of the matters stated herein.

2.    On August 31, 2005, Great Southern reported a loss of lumber as a result of Hurricane Katrina.  Although the lumber had reportedly been shipped from various ports of origin in South America, all of the lumber included in the claim was stored in a warehouse in Gulfport, Mississippi.

3.    American Home conducted an investigation of the claim based on customary and prudent practices in the insurance industry.

4.    Following receipt of notice of the claim, American Home retained SGS North American/Marine Services, an independent marine surveyor, to investigate the claim. SGS North American/Marine Services inspected the site of the loss and assisted in obtaining shipping documents and other relevant information.

5.    American Home also corresponded directly with Great Southern, its lawyers and insurance brokers in its effort to investigate the claim.

6.    As a result of the investigation, American Home determined that in addition to the four (4) shipments at issue in this case, Great Southern submitted claims for eight (8) separate shipments which had been shipped from ports of origin before the June 2, 2005 effective date of the policy. By letter dated May 24, 2006, the claims for these pre-policy shipments were denied. The May 24, 2006 denial letter is attached hereto as Exhibit 1.

7.    Great Southern reported that all of the lumber had been stored in warehouse space leased to Great Southern by the Mississippi State Port Authority. The Gulfport, Mississippi warehouse lease is attached hereto as Exhibit 2.

8.    Under the warehouse lease, Great Southern assumed all responsibility for the care, custody, control and protection of the lumber. See Lease Agree., § F.

9.    Great Southern reported that the warehouse was used to store lumber while awaiting distribution by Great Southern. Great Southern's practice was to remove the lumber from the Gulfport warehouse and direct it to Great Southern treatment plants, depending on its inventory needs and the availability of trucks, or to sell the lumber to outside customers and ship the lumber directly from the Gulfport warehouse. Broker Dan Morton's June 28, 2006 email noting direct sales from Gulfport, and discretionary dispatch of lumber by Great Southern, is attached hereto as Exhibit 3.

10.    Great Southern provided documents showing the length of storage time for lumber which was the subject of the claim as well as prior shipments. These documents reflected that the duration of storage time varied with some lumber remaining in the warehouse for several months prior to being shipped by Great Southern to its treatment plants or being sold to third parties.

11.    The shipping documents provided by Great Southern reflected that the lumber was shipped from South American ports for delivery at the port of Gulfport, Mississippi. The ocean carrier's freight invoices submitted by Great Southern also showed the destination as Gulfport, Mississippi with no on-carriage charges or destination. The commercial invoices for the lumber also show Gulfport, Mississippi as the "destination."

12.    The documents and information provided by Great Southern revealed that the lumber which was subject of the claim had been received into the custody and control of Great Southern at its final destination and was no longer in the ordinary course of transit at the time of the loss.

13.    On May 23, 2006 American Home issued a letter to Great Southern reserving its rights with respect to coverage under the policy.

2

14.    On July 7, 2006, American Home issued a letter declining coverage for the shipments at issue in this case under the policy. The July 7, 2006 letter is attached hereto as Exhibit 4.

15.    The July 7, 2006 denial letter explained:

The information submitted establishes that Great Southern used the warehouse at the pier as a storage facility for its lumber after vessel discharge, and the lumber was removed by Great Southern from the warehouse as it was needed at Great Southern's various processing facilities.

We have also been advised that occasionally the material was sold and shipped to customers directly from the Gulfport warehouse. The spreadsheets we received indicate that it typically takes Great Southern 90 days or longer to remove the lumber delivered by a particular vessel completely from the Gulfport warehouse. The contract between Great Southern and the Mississippi State Port Authority establishes that Great Southern had contracted for assigned space at the warehouse in Gulfport, and Great Southern assumed all responsibility for the care, custody, control and protection of the cargo. SSA is the designated stevedore, cargo handler and terminal operator on behalf of Great Southern. In addition, all of the bills of lading show that the place of delivery is the Port of Gulfport, and the space designated for "Place of delivery by on carrier" is blank. The Commercial invoices for each shipment show the "destination" as Gulfport.

These facts establish that Great Southern exercised full dominion and control over the lumber once it was discharged from the vessels and placed into the warehouse in Gulfport. Therefore, the ordinary course of transit had ceased, and the lumber had been delivered to its final destination warehouse within the meaning of the Policy.

We conclude there is no coverage for these losses under the Policy because the losses occurred after coverage under the Policy had ceased.

(July 7, 2006 Den. Let.).

16.    Following the denial, Great Southern's broker advised that Great Southern had obtained replacement coverage with Lloyds of London. Under the new coverage, Great Southern obtained additional coverage for goods after delivery to its port warehouse facility. In advising American Home of the new policy, Great Southern's broker noted: "No gaps in coverage in case another hurricane type loss." See Broker Georgia DeHart's July 20, 2006 email acknowledging the gaps in coverage is attached hereto as Exhibit 5.

I declare under penalty of perjury under the laws of the United States of America that to the best of my knowledge the foregoing is true and correct.

Executed on this 30th day of May, 2007.

SELENA HO

4

EXHIBIT 2

Exhibit 2

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| GREAT SOUTHERN WOOD PRESERVING, INC., | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. 1:06-cv-00708-CSC |
| | * | |
| AMERICAN HOME ASSURANCE CO., AIG, AMERICAN INTERNATIONAL UNDERWRITERS CORP., AMERICAN INTERNATIONAL MARINE AGENCY, | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |

## DEFENDANTS' CONFLICT DISCLOSURE STATEMENT

COME NOW Defendants in the above-captioned matter, and in accordance with the order of this Court, make the following disclosures concerning parent companies, subsidiaries, partners, limited liability entity members and managers, trustees (but not trust beneficiaries), affiliates, or similar entities reportable under the provisions of the Middle District of Alabama's General Order No. 3047:

American International Group, Inc., which is commonly known as AIG, is a publicly traded company. Back O'Beyond, Inc. holds more than 10% of the shares of American International Group, Inc.

American International Underwriters Corp. is a wholly owned subsidiary of American International Group, Inc.

American Home Assurance Co. is a wholly owned subsidiary of AIG Commercial Insurance Group, Inc.

American International Marine Agency, Inc. is a wholly-owned subsidiary of C.V. Starr & Co., Inc.

s/Louis C. Norvell
BLANE H. CRUTCHFIELD (CRUTB4243)
LOUIS C. NORVELL (NORVL4585)
Attorneys for Defendants
American Home Assurance Company, AIG,
American International Underwriters Corporation,
and American International Marine Agency

1

OF COUNSEL:

HAND ARENDALL, L.L.C.
P. O. Box 123
Mobile, AL 36601-0123
Tel:  (251) 432-5511
Fax:  (251) 694-6375
bcrutchfield@handarendall.com
lnorvell@handarendall.com


## CERTIFICATE OF SERVICE

I hereby certify that I have on this 9th day of July, 2007 served the foregoing pleading on counsel of record via electronic notice or by United States mail first class, postage prepaid.

Kenneth A. Dowdy, Esq.
*kad@lusklaw.com*
Lusk, Lusk, Dowdy & Caldwell, P.C.
2101 Highland Ave.
Suite 410
Birmingham, AL 35205

Leslie Ann Caldwell, Esq.
*lac@lusklaw.com*
Lusk, Lusk, Dowdy & Caldwell, P.C.
2101 Highland Ave.
Suite 410
Birmingham, AL 35205


s/Louis C. Norvell

# EXHIBIT 3

Exhibit 3

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

GREAT SOUTHERN WOOD     \*
PRESERVING, INC.,     \*
     \*
    Plaintiff,     \*
     \*
v.     \*     Civil No. 1:06-cv-00708-
CSC     \*
AMERICAN HOME ASSURANCE     \*
CO., AIG, AMERICAN INTERNATIONAL     \*
UNDERWRITERS CORP., AMERICAN     \*
INTERNATIONAL MARINE AGENCY,     \*
     \*
    Defendants.     \*

## ROBERT SCIACHETANO DECLARATION

STATE OF ILLINOIS     )
COUNTY OF COOK     )

    1.    My name is Robert Sciachetano.  In 2005, I was a Senior Underwriter with American International Marine Agency, managing agent for AIG.  I have personal knowledge of the matters stated herein.

    2.    In April 2005, Great Southern's insurance broker, Hilb, Rogal & Hobbs, requested a quote from AIG for various lines of insurance coverage, including Ocean Marine Cargo Insurance and Inland Truck Transportation.

3.     By letter dated March 8, 2005, Great Southern designated Hilb, Rogal & Hobbs as its broker of record. The Great Southern March 8, 2005 letter is attached hereto as Exhibit 1.

4.     The broker's submission indicated with specificity the types and amounts of coverage requested and delineated coverage particulars for "cargo," referencing inland truck transportation and "ocean cargo" which specified: "Domestic Transit – No Coverage." Excerpts from the broker's submission are attached hereto as Exhibit 2.

5.     In conjunction with its submission, the broker also submitted a declarations page from a prior Great Southern cargo policy issued by Travelers Insurance Co. The Travelers' declaration page provided "no coverage" for domestic transit.

6.     AIG's ocean cargo quote was accepted and thereafter American Home Assurance Co. ("American Home") issued Marine Open Cargo Policy number 88590C to Great Southern with an effective date of June 2, 2005. The policy is attached hereto as Exhibit 3.

7.     American Home performed a loss control review dated July 22, 2005 concerning Great Southern. The loss control review was provided to Great Southern's insurance broker on July 26, 2005 via e-mail. That e-mail stated that although the review discussed inland transit exposure, the ocean marine cargo policy did "not cover inland transit shipments wholly within the United States." The July 26, 2005 email from underwriter Robert Sciachetano to broker Georgia DeHart is attached hereto as Exhibit 4.

I declare under penalty of perjury under the laws of the United States of America that to the best of my knowledge the foregoing is true and correct.

Executed on this 30th day of May, 2007.

ROBERT SCIACHETANO

EXHIBIT 4

*Exhibit 4*

# MARINE OPEN CARGO POLICY NO. 88590C

## of the

# AMERICAN HOME ASSURANCE COMPANY

### (A CAPITAL STOCK INSURANCE COMPANY)
### 70 PINE STREET, NEW YORK, N. Y. 10270

### ISSUED TO
### GREAT SOUTHERN WOOD PRESERVING, INC., ET AL
### U.S. HIGHWAY 431 NORTH
### ABBEVILLE, ALABAMA 36310

### NOTICE - PLEASE READ YOUR ENTIRE POLICY.

1. This Policy covers automatically on all shipments which come within its scope. It is important that all such shipments be reported as soon as known and the valuation thereof declared as soon as ascertained.

2. Your attention is called to the basis of insured value as set forth in the Valuation Clause, (Clause number 10). The insured value should always be in accordance with the basis specified therein unless otherwise agreed with the Company prior to shipment.

3. Any damage to the goods should be noted on the receipt given to the carrier if possible; and in any event as soon as it is known that the shipment has sustained loss or damage, written claim should be filed with the carrier. Such steps may be necessary to preserve your rights and the Company's rights of subrogation against the carrier.

4. In the event of any known or reported loss or damage you should promptly notify the Company, or the office of the American International Marine Agency that issued this policy, to protect the interests of all concerned. If no such party is available, then prompt notice should be given to the nearest Correspondent of the American Institute of Marine Underwriters or to the nearest accredited representative of Lloyd's, London.

GSWP  3

Rev. 03/02

Endorsement No.                    1

Name of Assured          Great Southern Wood Preserving, Inc., et al

Attached to and forming part of Marine Open Cargo Policy
No. ____88590C____ of the_ American Home Assurance Company

### ANNUAL MARINE MINIMUM & DEPOSIT PREMIUM

In consideration of the issuance of this policy from June 2, 2005 through July 31, 2005, an Annual Marine Minimum & Deposit Premium of $26,250.00 ($22,167.00 Marine, $4,083.00 War) shall be payable on June 2, 2005.

The Assured agrees to report all shipments covered under this policy on an <u>annual</u> basis and the Assurer to calculate premium thereon at the rates indicated in the rate schedule. When the premium so earned exceeds the minimum premium charged any additional premium shall be due and payable to these Assurers.

No portion of the above premium is refundable in the event of cancellation, either by the Assured or the Assurer.

All other terms and conditions remaining unchanged.

Dated: June 6, 2005                        By: _____
                                              Authorized Representative
                                           American International Marine Agency

GSWP   4

Endorsement No. _____2_____

Name of Assured _____Great Southern Wood Preserving, Inc., et al_____

Attached to and forming part of Marine Open Cargo Policy
No. ____88590C____ of the ___American Home Assurance Company_____

Effective June 2, 2005, it is hereby understood and agreed the following is added to this policy:

**AIMU**
**EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE WITH U.S.A. ENDORSEMENT**
**(March 1, 2003)**

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

1.   In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from:

    1.1   ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel.

    1.2   the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof.

    1.3   any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

    1.4   the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

**RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE (U.S.A. ENDORSEMENT)**

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that:

    if fire is an insured peril

    and

    where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions

    and

    a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance (reinsurance), be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

All other terms and conditions remaining unchanged.

Dated: June 6, 2005                              By:_____
                                                     Authorized Representative
                                           American International Marine Agency

Endorsement No.          3

Name of Assured          Great Southern Wood Preserving, Inc., et al

Attached to and forming part of Marine Open Cargo Policy
No.      88590C      of the  American Home Assurance Company

Effective June 2, 2005, it is hereby understood and agreed the following is added to this policy:

**AIMU**
**CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, AND ELECTROMAGNETIC EXCLUSION**
**CLAUSE**
**(March 1, 2003)**

This clause shall be paramount and shall override anything contained in this insurance
inconsistent therewith.

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by
or contributed to or arising from an actual or threatened act  involving a chemical, biological, bio-
chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile
manner.

**AIMU U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE**

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade
sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury
Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or
any claim that would be in violation of U.S. economic or trade sanctions as described above shall also
be null and void.

All other terms and conditions remaining unchanged.

Dated: June 6, 2005                        By:  _George J_____

                                           Authorized Representative
                                    American International Marine Agency

GSWP   6

# MARINE OPEN CARGO POLICY INDEX

| Clause | Page # |
|---|---|
| ACCUMULATION (12) | 5 |
| ADDITIONAL TERMS & CONDITIONS, IF ANY (18) | 7 |
| ASSIGNMENT VOID (48) | 15 |
| ASSURED (1) | 3 |
| ATTACHMENT AND CANCELLATION (2) | 3 |
| AVERAGE TERMS AND CONDITIONS (17) | 6 |
| BILL OF LADING, ETC. (25) | 10 |
| BOTH TO BLAME CLAUSE (24) | 10 |
| BROKER AS AGENT FOR ASSURED (40) | 13 |
| CARRIER CLAUSE (9) | 4 |
| CERTIFICATE AUTHORITY (38) | 12 |
| CONSTRUCTIVE TOTAL LOSS CLAUSE (35) | 12 |
| CONVEYANCES (7) | 4 |
| CRAFT CLAUSE (8) | 4 |
| DECLARATIONS (37) | 12 |
| DELAY CLAUSE (52c) | 17 |
| DELIBERATE DAMAGE/POLLUTION HAZARD CLAUSE (30) | 11 |
| DEVIATION CLAUSE (6) | 4 |
| ERRORS AND OMISSIONS (39) | 13 |
| EXPLOSION CLAUSE (29) | 11 |
| FREE OF CAPTURE AND SEIZURE WARRANTY (F.C.& S.) (52a) | 16 |
| FREE OF PARTICULAR AVERAGE (15) | 6 |
| GENERAL AVERAGE CLAUSE (33) | 11 |
| GENERAL AVERAGE CONTRIBUTORY CLAUSE (34) | 11 |
| GEOGRAPHIC LIMITS (5) | 4 |
| GOODS INSURED (3) | 3 |
| GOVERNING LAW (53) | 17 |
| GROUNDING CLAUSE (31) | 11 |
| ILLICIT TRADE (4) | 4 |
| IMPORT DUTY (51) | 15 |
| INCHMAREE CLAUSE (32) | 11 |
| LABELS CLAUSE (28) | 10 |
| LANDING. WAREHOUSING & | |

| Clause | Page # |
|---|---|
| FORWARDING CHARGES (22) | 9 |
| LIMIT OF LIABILITY (11) | 5 |
| LOADING OF GRAIN, PETROLEUM AND HEAVY CARGOES (26) | 10 |
| MACHINERY CLAUSE (27) | 10 |
| MARINE EXTENSION CLAUSE (20) | 8 |
| NORMAL LOSS (43) | 13 |
| NOTICE OF LOSS (41) | 13 |
| NUCLEAR EXCLUSION CLAUSE - CARGO - (4/1/91) (52d) | 17 |
| OTHER INSURANCE (50) | 15 |
| PARAMOUNT WARRANTIES (52) | 16 |
| PARTIAL LOSS (44) | 14 |
| PAYMENT OF LOSS (45) | 14 |
| PERILS WATERBORNE (14) | 6 |
| PREMIUM PAYMENTS (36) | 12 |
| PROOFS OF LOSS (42) | 13 |
| PROVISIONS REQUIRED BY LAW TO BE STATED IN THIS POLICY (54) | 17 |
| RETURNED SHIPMENTS (23) | 9 |
| SCHEDULE OF RATES | 18 |
| SHORE CLAUSE (16) | 6 |
| SOUTH AMERICAN CLAUSE (21) | 9 |
| STRIKES, RIOTS & CIVIL COMMOTIONS ENDORSEMENT - (02/21/03) TRIA FORM | 19 |
| STRIKES. RIOTS AND CIVIL COMMOTIONS WARRANTY (S.R. & C.C.) (52b) | 16 |
| SUBROGATION AND IMPAIRMENT OF SUBROGATION (49) | 15 |
| SUE AND LABOR CLAUSE (46) | 14 |
| TIME FOR SUIT (47) | 14 |
| VALUATION (10) | 5 |
| VALUE AT RISK (13) | 5 |
| WAR RISK ONLY OPEN POLICY (CARGO) - (12/2/93) | 20 |
| WAREHOUSE TO WAREHOUSE (19) | 8 |

## 1) ASSURED

THE AMERICAN HOME ASSURANCE COMPANY (hereinafter referred to as the Company or as the ASSURERS) in consideration of premiums to be paid at the rates set forth herein, or as may be endorsed hereon, does insure **GREAT SOUTHERN WOOD PRESERVING, INC., ET AL, U.S. HIGHWAY 431 NORTH, ABBEVILLE, ALABAMA 36310** (hereinafter referred to as the ASSURED) subject to all the terms, conditions, exceptions and warranties hereinafter set forth.

## 2) ATTACHMENT AND CANCELLATION

This Policy and the coverage granted hereunder to be deemed continuous and to attach and cover in respect of all insured goods and/or merchandise shipped on and after **JUNE 2, 2005** and will continue in force until cancelled by either party giving the other, or its agent, thirty (30) days written notice, or unless otherwise mutually agreed upon or otherwise provided for herein, or unless otherwise voided by reason of breach of warranty, misrepresentation or concealment.

Notwithstanding anything herein to the contrary, the Company may effect immediate cancellation of this Policy by giving written notice thereof at any time when any premium has been due and unpaid for a period of thirty (30) days.

However, such cancellation(s), shall not affect any risks which are in due course of transit and which have attached prior to such notice of cancellation.

## 3) GOODS INSURED

Upon lawful goods and/or merchandise suitably packed for export, consisting principally of **UNFURNISHED LUMBER** and similar merchandise usual and incidental to the business of the ASSURED, shipped under deck and/or on deck by the ASSURED, (a) being the property of the ASSURED, or that of others in which the ASSURED may have an insurable interest, or for which the ASSURED may hold or receive instructions to effect insurance, provided such instructions be given in writing prior to shipment, and before any known or reported loss or accident; and/or (b) consigned to the ASSURED, or to others for the account or control of the ASSURED, being the property of the ASSURED or that of others in which the ASSURED may have an insurable interest or for which the ASSURED may hold or receive instructions to effect insurance, provided such instructions be given in writing prior to shipment, and before any known or reported loss or accident; but excluding shipments sold by the ASSURED on F.O.B., F.A.S., Cost and Freight, or similar terms whereby the ASSURED is not obligated to furnish marine insurance and also excluding such shipments as are bought by the ASSURED on C.I.F. terms, or other terms which include marine insurance.

Page 3

## 4) ILLICIT TRADE

Warranted free from any charge, expense, damage or loss which may arise in consequence of a seizure or detention, for, or on account of any illicit or prohibited trade, or any trade in articles contraband of war, or in the violation of any port rule or regulation.

## 5) GEOGRAPHIC LIMITS

At and from ports and/or places in **THE WORLD** to ports and/or places in **THE WORLD** direct or via other ports or places, with privilege of transshipment by land and/or water, but excluding shipments to or from Nigeria, Cuba, Iraq and North Korea (and/or to or from those countries which the Government of the United States currently forbids trade, if different from the above), also excluding Inland Transit worldwide.

## 6) DEVIATION CLAUSE

This insurance shall not be vitiated by any unintentional error in description of vessel, voyage or interest, or by deviation, overcarriage, change of voyage, transshipment or any other interruption of the ordinary course of transit, from causes beyond the control of the ASSURED. It is agreed however, that any such error, deviation or other occurrence mentioned above shall be reported to this Company as soon as known to the ASSURED, and additional premium paid if required.

## 7) CONVEYANCES

(a) Per Iron and/or Steel Steamer or Steamers and/or Iron and/or Steel Vessel or Vessels propelled by power (excluding sailing vessels, with or without auxiliary power, except as connecting conveyances) and connecting conveyances;
(b) By aircraft and connecting conveyances;
(c) By approved iron and/or steel barge, other than as a connecting conveyance;
(d) By truck, trailer or rail car, other than as connecting conveyances.

## 8) CRAFT CLAUSE

This insurance also to cover during any special or supplementary lighterage provided written notice be given the ASSURERS in all such cases when such facts are known to the ASSURED and additional premium to be paid if and as required, with each craft and/or lighter to be deemed a separate insurance. This insurance shall not be prejudiced by any agreement exempting lightermen from liability.

## 9) CARRIER CLAUSE

Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.

Page 4

**10)  VALUATION**

Valued at amount of invoice, including all charges included in the invoice and including prepaid or advance freight and/or freight payable "vessel lost or not lost", not included in the charges included in the invoice, plus **10 %**. Foreign currency is to be converted into United States currency at Banker's sight rate of exchange on the date of issuance of each invoice and/or credit and/or draft.

**11)  LIMIT OF LIABILITY**

This insurance shall not attach or cover and these Assurers shall not be liable for more than **$2,500,000.** by any one conveyance or, in any one place or, at any one time or, in any one disaster or accident or; as specified in the following sub-limits, or unless otherwise specified elsewhere herein.

(a) **$250,000.** for On Deck shipments, when subject to an On Deck Bill of Lading;
(b) **$Not Covered** by any one aircraft (except when used as a connecting conveyance) ;
(c) **$Not Covered** by any one truck, trailer or rail car (except when used as a connecting conveyance);
(d) **$Not Covered** by any one approved iron and/or steel barge (except when used as a connecting conveyance), nor for more than **$Not Covered** in any one tow.
(e) **$    5,000.** for any one package shipped by mail or parcel post.

**12)  ACCUMULATION**

Should there be an accumulation of shipments in respect of which the insured value exceeds the limits expressed in this Policy by reason of an interruption of transit, or by reason of a casualty, or at a transshipping point, or on a connecting conveyance, the ASSURERS shall hold covered such excess amount and shall be liable for the full amount at risk (but in no event for more then double the applicable limit of liability) provided such accumulation is beyond the control of the Assured and provided written notice be given to the ASSURERS in all such cases as soon as the fact becomes known to the ASSURED.

**13)  VALUE AT RISK**

In the event that the total value at risk exceeds the applicable Limit of Liability set forth herein, these Assurers shall nevertheless be entitled to receive premium on the full value at risk. The acceptance of such premiums by the Assurer shall in no way alter or increase the applicable Limits of Liability, but the Assurer shall be liable for the full amount of loss up to, but not exceeding such Limit of Liability. In the event of loss which exceeds the applicable Limit of Liability, any deductible will be subtracted from the applicable Limit of Liability and not from the full amount of loss.

GSWP  10

**14) PERILS WATERBORNE**

Touching the adventures and perils which the ASSURERS are contented to bear and take upon themselves while the goods and/or merchandise are waterborne (notwithstanding any extension of coverage provided under this Policy, unless otherwise specifically agreed) they are of the Seas, Fires, Assailing Thieves, Jettisons, Barratry of the Master and Mariners, and all other like perils losses and misfortunes that have or shall come to the hurt, detriment or damage of the said goods or any part thereof, except as may be otherwise specifically provided for herein or endorsed hereon.

NOTE: For perils insured against while the goods are on docks, wharves or elsewhere on shore and/or during land transportation within the coverage of this Policy, see Clause 16.

**15) FREE OF PARTICULAR AVERAGE**

Warranted free from Particular Average unless the Vessel or craft be stranded, sunk, or burnt, but notwithstanding this warranty these ASSURERS are to pay any loss of or damage to the interest insured which may reasonably be attributed to fire, collision or contact of the vessel and/or craft and/or conveyance with any external substance (ice included) other than water, or to discharge of cargo at port of distress. The foregoing warranty, however, shall not apply where broader terms of Average are provided for hereon or in the certificate or policy to which these clauses are attached.

**16) SHORE CLAUSE**

Unless broader terms and conditions have been provided for in Clause 17 or elsewhere herein; where this insurance by its terms covers while on docks, wharves, or elsewhere on shore, and/or during land transportation, it shall include the risks of collision, derailment, overturning or other accident to the conveyance, fire, lightning, sprinkler leakage, cyclones, hurricanes, earthquakes, floods (meaning the rising of navigable waters) and/or collapse or subsidence of docks or wharves, even though the insurance be otherwise Free of Particular Average.

**17) AVERAGE TERMS AND CONDITIONS**

(a) **SHIPMENTS UNDER DECK.** Except while on deck of the ocean vessel and subject to an On Deck Bill of Lading, shipments of **UNFURNISHED LUMBER**, suitably packed for export, are insured, against All Risks of physical loss or damage from any external cause, irrespective of percentage, but excluding those risks excepted by the Free of Capture and Seizure Warranty and the Strikes, Riots, and Civil Commotions Warranty contained herein, unless such risks are specifically assumed hereunder by endorsement.

(b) **SHIPMENTS ON DECK.** Shipments of **UNFURNISHED LUMBER**, suitably packed for export, which are shipped on deck subject to an On Deck Bill of Lading are insured, Warranted free from Particular Average unless caused by the stranding, sinking, burning and/or collision of the vessel: but to pay the insured value of any merchandise and/or goods jettisoned and/or washed overboard, irrespective of percentage. Notwithstanding the foregoing, merchandise and/or goods shipped on deck subject to an Under Deck bill of lading, without the knowledge and consent of the Assured, shall be treated as under deck cargo and insured as per Clause 17 (a) above.

Page 6

Notwithstanding the above, all insured goods shipped in fully enclosed containers which are stowed on deck, are insured subject to the provisions of this policy applying to under deck shipments, provided such goods are subject to an Under Deck or an optional Under Deck/On Deck Bill of Lading.

**(c) SHIPMENTS BY AIRCRAFT.** Shipments of **NOT COVERED** by aircraft, suitably packed for export, are insured against All Risks of physical loss or damage from any external cause, irrespective of percentage, but excluding those risks excepted by the Free of Capture and Seizure Warranty and the Strikes, Riots, and Civil Commotions Warranty contained herein, unless such risks are specifically assumed hereunder by endorsement. Also warranted free of claim for loss or damage due to changes in atmospheric pressure and/or temperature. Whenever the words "ship", "vessel", "seaworthiness", "ship owner", or "vessel owner" appear in this Policy (except in Clause 7 "Conveyance" and Clause 11 "Limit of Liability"), they are deemed to include also the words "aircraft", "air worthiness" or "aircraft owner".

**(d) SHIPMENTS BY BARGE.** Shipments of **NOT COVERED** via approved iron and/or steel Barge (other than as a connecting conveyance), suitably packed for export, are insured Warranted free from Particular Average unless caused by the vessel and/or interest insured being stranded sunk, burnt, on fire or in collision with another ship or vessel or with ice or with any substance other than water, but liable for jettison and/or washing overboard irrespective of percentage.

**(e) SHIPMENTS BY MAIL.** Shipments of **UNFURNISHED LUMBER** by mail or parcel post, suitably packed for export, while in the custody of postal authorities, are insured against All Risks of physical loss or damage from any external cause, irrespective of percentage, but excluding those risks excepted by the Free of Capture and Seizure Warranty and the Strikes, Riots, and Civil Commotions Warranty contained herein, unless such risks are specifically assumed hereunder by endorsement.

It is understood and agreed that a certificate of mailing will be secured from the Postal Authorities for each package shipped by ordinary mail or parcel post if possible. Shipments are to be made in accordance with United States Postal Service rules or regulations, or in accordance with the rules and regulations of the postal authorities of the country where mailed, if such mailing occurs outside the United States. When permitted, mail shipments are to be sent by Government insured parcel post or, if this is not possible, by registered parcel post if permissible. The ASSURED agrees that each package shipped by Government insured parcel post will be insured with the Government for the maximum amount of insurance allowed by the Government.

**18)   ADDITIONAL TERMS & CONDITIONS, IF ANY**
**DEDUCTIBLE:**
**EACH CLAIM SHALL BE SUBJECT TO A DEDUCTIBLE OF $10,000.00 ANY ONE ACCIDENT OR OCCURRENCE EXCLUDING GENERAL AVERAGE AND SALVAGE CHARGES.**

Page 7

**19) WAREHOUSE TO WAREHOUSE**

This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the Declaration and/or Certificate for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment, if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be agreed in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the ASSURED.

It is necessary for the ASSURED to give prompt notice to these ASSURERS when they become aware of an event for which they are "held covered" under this Policy and the right to such cover is dependent on the compliance with this obligation.

**20) MARINE EXTENSION CLAUSE**

I. This insurance attaches from the time the goods leave the Warehouse at the place named in the Policy, Certificate or Declaration for the commencement of the transit and continues until the goods are delivered to the final Warehouse at the destination named in the Policy, Certificate or Declaration, or a substituted destination as provided in Clause III hereunder.

II. This insurance specially to cover the goods during deviation, delay, forced discharge, re-shipment, transshipment and any other variation of the adventure arising from the exercise of a liberty granted to the shipowner or charterer under the contract of affreightment

III. In the event of the exercise of any liberty granted to the shipowner or charterer under the contract of affreightment whereby such contract is terminated at a port or place other than the original insured destination, the insurance continues until the goods are sold and delivered at such port or place; or, if the goods be not sold but are forwarded to the original insured destination or to any other destination this insurance continues until the goods have arrived at final warehouse as provided in Clause I.

IV. If while this insurance is still in force and before the expiry of 15 days from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel at the final port of discharge is completed, the goods are re-sold (not being a sale within the terms of Clause III) and are to be forwarded to a destination other than that covered by this insurance, the goods are covered hereunder while deposited at such port of discharge until again in transit or until the expiry of the aforementioned 15 days whichever shall first occur. If a sale is effected after the expiry of the aforementioned 15 days while this insurance is still in force the protection afforded hereunder shall cease as from the time of the sale.

V. Held covered at a premium to be arranged in case of change of voyage or of any omission or error in the description of the interest, vessel or voyage.

Page 8

VI. This insurance shall in no case be deemed to extend to cover loss damage or expense proximately caused by delay or inherent vice or nature of the subject matter insured.

VII. It is a condition of this insurance that there shall be no interruption or suspension of transit unless due to circumstances beyond the control of the ASSURED.

None of the foregoing subdivisions of this Clause 20 shall be construed as in any way enlarging any of the other terms and conditions of this Policy (except in so far as any of the provisions of Clause 19. of this Policy are inconsistent herewith), it being particularly understood and agreed that the F.C.& S. Warranty remains in full force and effect and that nothing in the foregoing shall be construed as extending this insurance to cover any risks of war or consequences of hostilities.

## 21)    SOUTH AMERICAN CLAUSE

Notwithstanding anything contained elsewhere herein to the contrary (particularly the Marine Extension Clause and the Warehouse to Warehouse Clause) the insurance provided hereunder for all shipments to South America shall continue to cover for sixty (60) days [ninety (90) days on shipments via the Magdalena River] after completion of discharge of the overseas vessel at port of destination or until the goods are delivered to the final Warehouse at destination, whichever may first occur, and shall then terminate.

The time limit above to be reckoned from midnight of the day on which the discharge of the insured goods from the overseas vessel is completed.

## 22)    LANDING, WAREHOUSING & FORWARDING CHARGES

Notwithstanding any Average warranty contained herein, these ASSURERS agree to pay any landing, warehousing, forwarding or special charges when they are incurred by reason of a peril insured against. Also to pay the insured value of any package or packages which may be totally lost in loading, transshipment or discharge.

## 23)    RETURNED SHIPMENTS

In the event of refusal or inability of the ASSURED, or the consignee at the destination named in the policy, certificate or declaration, to accept delivery of goods and/or merchandise which have been insured by this Policy, then this Policy is extended to cover such goods and/or merchandise when reshipped in its original packing to the original point of origin. It being understood and agreed that notice must be given to the ASSURER by the ASSURED as soon as refusal of acceptance is known to them, and prior to any further movement of the said goods and/or merchandise to any destination other than that named in the policy, certificate or declaration. Such goods and/or merchandise being held covered at rates, terms and conditions to be agreed.

Page 9

## 24)  BOTH TO BLAME CLAUSE

Where goods are shipped under a Bill of Lading containing the so-called "Both to Blame Collision" Clause, these ASSURERS agree as to all losses covered by this insurance, to indemnify the ASSURED for this Policy's proportion of any amount (not exceeding the amount insured) which the ASSURED may be legally bound to pay to the shipowners under such clause. In the event that such liability is asserted, the ASSURED agrees to notify these ASSURERS who shall have the right at their own cost and expense to defend the ASSURED against such claim.

## 25)  BILL OF LADING ETC., CLAUSE

The ASSURED is not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the Bill of Lading and/or Charter Party. The seaworthiness of the vessel as between the ASSURED and these ASSURERS is hereby admitted and the wrongful act or misconduct of the shipowner or his servants causing a loss is not to defeat the recovery by an innocent ASSURED if the loss in the absence of such wrongful act or misconduct would have been a loss recoverable on the Policy. With leave to sail with or without pilots, and to tow and assist vessels or craft in all situations, and to be towed.

## 26)  LOADING OF GRAIN, PETROLEUM AND HEAVY CARGOES

Warranted by the ASSURED that vessels to be loaded with Grain, Petroleum and/or heavy cargoes shall be loaded under the inspection of a surveyor appointed or approved by the Company for that purpose and his certificate as to proper loading and seaworthiness must be obtained before the sailing of such vessels or the insurance under this Policy in respect of such cargo to be void.

## 27)  MACHINERY CLAUSE

When the property insured under this Policy includes a machine, article, interest or set consisting when complete for sale or use of several parts, then in case of loss or damage covered by this insurance to any part of such machine, article, interest or set, these ASSURERS shall be liable only for the proportion of the insured value of the part lost or damaged, or at the ASSURED'S option, for the cost and expense, including labor and forwarding charges, of replacing or repairing the lost or damaged part; but in no event shall these ASSURERS be liable for more than the insured value of the complete machine, article, interest or set.

## 28)  LABELS CLAUSE

In case of damage affecting labels, capsules or wrappers, these ASSURERS, if liable therefor under the terms of this Policy, shall not be liable for more than an amount sufficient to pay the cost of new labels, capsules or wrappers, and the cost of reconditioning the goods, but in no event shall these ASSURERS be liable for more than the insured value of the damaged merchandise.

Rev. 03/02

## 29)  EXPLOSION CLAUSE

Including the risk of explosion, howsoever or wheresoever occurring during the currency of this insurance unless excluded by the F.C. & S. Warranty or the S.R. & C.C. Warranty set forth herein or unless proximately caused by the inherent vice or nature of the subject matter insured or by the personal negligence or act of the ASSURED.

## 30)  DELIBERATE DAMAGE/POLLUTION HAZARD CLAUSE

This Policy is extended to cover, but only while the property insured is on board a waterborne conveyance, loss of or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under this Policy (subject to all its terms, conditions and warranties) if the property insured would have sustained physical loss or damage as a direct result of such accident or occurrence. This agreement shall not increase the Limits of Liability provided for in this Policy.

## 31)  GROUNDING CLAUSE

Grounding in canals, harbors, or tidal rivers not to be deemed a stranding within the meaning of this Policy or any amendment thereof; but the ASSURERS to pay for any loss or damage to the goods or merchandise which may be proved to have resulted directly therefrom and which would be recoverable under the terms of this Policy if caused by stranding.

## 32)  INCHMAREE CLAUSE

This insurance is also specially to cover any loss of or damage to the interest insured hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the master, mariners, mates, engineers or pilots.

## 33)  GENERAL AVERAGE CLAUSE

General Average and Salvage Charges payable according to United States laws and usage and/or as per Foreign Statements and/or as per York-Antwerp Rules (as prescribed in whole or in part) if in accordance with the Contract of Affreightment.

## 34)  GENERAL AVERAGE CONTRIBUTORY CLAUSE

The Company shall be liable for only such proportion of General Average and Salvage Charges as the sum hereby insured (less Particular Average for which this Company is liable hereunder, if any) bears to the contributory value of the goods or merchandise insured hereunder.

GSWP   16

Rev. 03/02

## 35)  CONSTRUCTIVE TOTAL LOSS CLAUSE

No recovery for a Constructive Total Loss shall be had hereunder unless the property insured is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it cannot be preserved from actual total loss without an expenditure which would exceed its insured value when the expenditure had been incurred.

## 36)  PREMIUM PAYMENTS

Premiums at the rates specified in the schedule attached hereto or as otherwise agreed shall be paid in cash and due immediately upon attachment of the risk; and the Company shall be entitled to premium on all shipments covered by the Policy, whether reported or not.

## 37)  DECLARATIONS

The ASSURED by the acceptance of this Policy warrants and agrees to report all shipments in respect of which insurance is provided hereunder to the Company, or the office of the American International Marine Agency which issued this policy as soon as known to the ASSURED, or as soon thereafter as may be practicable. Should the ASSURED willfully fail to report shipments covered by this Policy, then the Policy as to all subsequent shipments shall at the Company's option become null and void. The Company or its agents shall be permitted to examine the books, accounts and records of the ASSURED for the purpose of tabulating and verifying all shipments in respect of which insurance is provided hereunder.

## 38)  CERTIFICATE AUTHORITY

Authority is hereby granted the ASSURED to countersign and issue the form of Certificate of Insurance or Special Marine Policy furnished by the ASSURERS for any or all shipments in respect of which insurance is provided hereunder and in consideration thereof the ASSURED warrants that no Certificate or Special Marine Policy will be issued with terms thereon varying from the conditions of this Policy and/or any written instructions that are or may be given by the ASSURERS and/or the office of the American International Marine Agency that issued this policy.

The ASSURED further warrants and agrees to mail or deliver a full and complete copy of each Certificate or Special Marine Policy issued, on the day of issuance of the Certificate or Special Marine Policy or as soon thereafter as may be practicable, to the Company, or to the office of the American International Marine Agency that issued this policy. If the ASSURED issues a Certificate of Insurance or Special Marine Policy without incorporating the applicable deductible set forth in the policy, if any, the ASSURED agrees to reimburse this Company, for the full amount of any loss that this Company pays under such Certificate of Insurance or Special Marine Policy, including all loss adjustment expenses up to the amount of the deductible. If the ASSURED issues a Certificate of Insurance or Special Marine Policy with terms varying from the conditions of this Policy and/or any written instructions given by the ASSURER or their agents, the ASSURED agrees to reimburse the Company for the full amount of the loss that the Company pays, including loss adjustment expenses caused by such variation under such Certificate of Insurance or Special Marine Policy. The Assured further agrees that all such reimbursements shall be due and payable to the Company, within 60 days of presentation to the Assured.

Page 12

## 39)  ERRORS AND OMISSIONS

It is agreed that this insurance shall not be prejudiced by any unintentional delay or inadvertent omission in reporting hereunder, or any unintentional error in the description of the interest, vessel or voyage, if prompt notice be given the ASSURERS in all such cases as soon as said delay and/or omission and/or error becomes known to the ASSURED and adjustment of premium be made if and as required.

## 40)  BROKER AS AGENT FOR ASSURED

If the laws of the state in which this policy is issued permit, it is agreed that the Assured's Broker **HILB ROGAL & HOBBS, 425 NORTH MARTINGALE ROAD, SUITE 1100, SCHAUMBURG, ILLINOIS 60173,** who caused this insurance to be written, or any substituted broker, shall be deemed to be and continue to be the Agent of the ASSURED for all purposes in connection with this insurance, including but not limited to, receiving notice of cancellation or for accepting or rejecting any proposed modification or alteration in the terms of this Policy. Any such notice given to the said Agent of any such cancellation, modification or alteration agreed to by the said Agent shall have the same effect as if given to, or agreed to by, the ASSURED. This agency shall continue until written notice of revocation by the ASSURED shall have been received by the ASSURERS, or by the office of the American International Marine Agency that issued this policy.

If the laws of the state in which this policy is issued do not recognize the Broker as Agent for the Assured, then all such notices of cancellation, modification or alteration shall be mailed by the Assurers directly to the last known mailing address of the Assured with copies to the Agent of record.

## 41)  NOTICE OF LOSS

Warranted by the ASSURED that all claims for loss of, or damage to, the goods and/or merchandise insured hereunder shall be promptly reported to the Company or to the office of the American International Marine Agency that issued this policy.

## 42)  PROOFS OF LOSS

Proofs of loss and all bills for expenses must be approved by the Settling Agent of this Company, if there be one at or near the place where the loss occurs or the expenses are incurred or, if there be none in the vicinity, by the Correspondent of the American Institute of Marine Underwriters, or the nearest accredited representative of Lloyd's, London, and such agent or correspondent must be represented on all surveys.

## 43)  NORMAL LOSS

In the event of claim under this insurance for loss of and/or damage to merchandise and/or goods upon which there is a normal or usual loss, it is hereby mutually agreed that the claim shall be adjusted and the insured value of the part or parts lost or damaged shall be arrived at in the adjustment of the claim on the basis of expected outturn, whether or not the deduction of normal loss be provided in this insurance or be a trade custom.

### 44)   PARTIAL LOSS

In all cases of partial loss or damage caused by perils insured against, the loss shall be determined by a separation of the damaged portion of the insured property from the sound portion, and the amount of loss determined by;

a) an agreed estimate (by survey) of the percentage of damage of such damaged portion, in which event the ASSURED will receive such percentage of the insured value of the damaged merchandise; or, if such agreement is not practicable,

b) then such damaged portion shall be sold either at public auction or by private sale (whichever the Company shall deem most advisable) for the account of the owner of the property, in which event the amount of the loss shall be the difference between the net amount so realized by the auction or sale and the insured value of the portion so sold.

### 45)   PAYMENT OF LOSS

In case of loss or other claim, such loss or claim to be paid in funds current in the United States to the ASSURED or order, or to bank, or bankers as their interests may appear, within thirty (30) days after submission to the Company or to its agent of proper proof of loss and proper proof of interest in the goods or merchandise so involved (the amount of premium, if unpaid, and all other indebtedness due the Company by the ASSURED being first deducted). In the event that payment is required in other than United States currency, the rate of exchange shall be that in effect on the date the claim is settled.

### 46)   SUE AND LABOR CLAUSE

In case of any loss or misfortune, it shall be lawful and necessary for the ASSURED, his or their factors, servants and assigns to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods and merchandise insured hereunder, or any part thereof, without prejudice to this insurance, to the charges whereof this Company will contribute according to the rate and quantity of the sum hereby insured; nor shall the acts of the ASSURED or this Company in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of an abandonment.

### 47)   TIME FOR SUIT

It is a condition precedent to any action, suit or proceeding for the recovery of any claim upon, under, or by virtue of this Policy that such action, suit or proceeding shall be commenced within twelve (12) months next after the date of the accident, disaster or event causing loss of, or damage to, the insured goods or giving rise to a claim for sue and labor expenses or, in case of a claim for General Average contribution, salvage and/or special charges, next after the date of actual payment thereof by the ASSURED. Provided however, that if by the laws of the State or other place within which this Policy or any certificate thereunder is issued or where the action, suit or proceeding is instituted, such limitation is invalid, then any such claim shall become barred and void unless such action, suit or proceeding shall be commenced within the shortest limit of time permitted by the laws of such State or place to be fixed herein for the bringing of such suit, action or proceeding.

Page 14

## 48) ASSIGNMENT VOID

Warranted by the ASSURED that the assignment of this Policy or any insurable interest therein or the subrogation of any rights thereunder, if any, to any party without the consent of the Company shall render the insurance affected by such assignment or subrogation void.

## 49) SUBROGATION AND IMPAIRMENT OF SUBROGATION

It is agreed that upon payment of any loss, the ASSURED shall assign and subrogate to this Company all their rights against carriers, bailees and other third parties to the extent of such payments and shall permit suit to be brought in the ASSURED'S name (but at this Company's expense), and the ASSURED further agrees to render all reasonable assistance in the prosecution of said suit or suits.

It is further a condition of this insurance that if the ASSURED or their assigns have entered or shall enter into any agreement whereby any carrier, bailee or other third party is released from its liability for any loss, and/or waive, compromise, settle or otherwise impair any right of claim against such third party, to which this Company would be subrogated upon payment of a loss; then this Company shall be free from liability with respect to such loss, but premium shall not be affected.

## 50) OTHER INSURANCE

a) If an interest insured hereunder is covered by other insurance, which attached prior to the coverage provided by this Policy, then this Company shall be liable only for the amount in excess of such prior insurance; and this Company shall return the premium upon so much of the sum by it insured as it shall be exonerated from by such prior insurance.

b) If an interest insured hereunder is covered by other insurance which attached subsequent to the coverage provided by this Policy, then this Company shall nevertheless be liable for the full amount of the insurance, without right to claim contribution from such subsequent insurers, and shall accordingly be entitled to retain the premium it received in the same manner as if no such subsequent insurance had been made.

c) Other insurance upon the property with the same attachment date as the coverage's provided by this Policy, shall be deemed simultaneous, and this Company will be liable only for a ratable contribution to the loss or damage, in proportion to the amount for which this Company would otherwise be liable under this Policy, and will return to the ASSURED an amount of premium proportionate to such reduction of liability.

## 51) IMPORT DUTY

This insurance also covers subject to policy terms of Average, the risk of partial loss by reason of perils insured against on the duties imposed on goods imported into the United States and/or Canada and insured hereunder, it being understood and agreed, however, that when the risk upon the goods continues beyond the time of landing from the overseas vessel, the increased value, consequent upon the payment of such duties, shall attach as an additional insurance upon the goods from the time such duty is paid or becomes due, to the extent of the amount thereof actually paid or payable.
Any limit of liability expressed in this policy shall be applied separately to such increased value.
The ASSURED warrants that on all risks insured hereunder a separate amount shall be reported

Page 15

sufficient to cover the said duty, upon which the rate of premium shall be an agreed percentage of the merchandise rate.

The ASSURED will, in all cases use reasonable efforts to obtain an abatement or refund of duties paid or claimed in respect of goods lost damaged or destroyed. It is further agreed that the ASSURED shall, when this Company elects, surrender the merchandise to the customs authorities and recover duties thereon as provided by law, in which event the claim under this policy shall be only for a total loss of the merchandise so surrendered and expenses.

This insurance on duty and/or increased value shall terminate at the end of the import movement covered under this policy (including the Warehouse to Warehouse and Marine Extension Clause if incorporated therein), but nothing contained in these clauses shall alter or affect any coverage granted elsewhere in the policy during the storage or transit subsequent thereto.

## 52)   PARAMOUNT WARRANTIES

The following Warranties set forth in Clause 52(a - d) shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon unless such other provision refers specifically to the risks excluded by such Warranties and expressly assumes the said risks.

### 52 (a)  FREE OF CAPTURE AND SEIZURE WARRANTY (F.C.& S.)

Notwithstanding anything herein contained to the contrary, this insurance is warranted free from capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise; also warranted free, whether in time of peace or war, from all loss, damage or expense caused by any weapon of war employing atomic or nuclear fission and/or fusion or other reaction or radioactive force or matter or by any mine or torpedo, also warranted free from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, rockets or similar missiles or with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather, fire or explosion unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein is performing) by a hostile act by or against a belligerent power; and for the purposes of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power.

Further warranted free from the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or from the consequences of the imposition of martial law, military or usurped power, or piracy.

### 52 (b)  STRIKES, RIOTS AND CIVIL COMMOTIONS WARRANTY (S.R. & C.C.)

Notwithstanding anything herein contained to the contrary, this insurance is warranted free from loss, damage or expense caused by or resulting from:

(1) strikes, lockouts labor disturbances, riots, civil commotions, or the acts of any person or persons taking part in any such occurrences or disorders,

Page 16

(2) vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional.

### 52 (c) DELAY CLAUSE

Warranted free of claim for loss of market or for loss, damage or deterioration arising from delay, whether caused by a peril insured against or otherwise, unless expressly assumed in writing hereon.

### 52 (d) NUCLEAR EXCLUSION CLAUSE - CARGO (AIMU, APRIL 1, 1991)

Notwithstanding anything to the contrary herein, it is hereby understood and agreed that this Policy shall not apply to any loss, damage or expense due to or arising out of, directly or indirectly, nuclear reaction, radiation or radioactive contamination, regardless of how it was caused. However, subject to all provisions of this Policy, if this Policy insures against fire, then direct physical damage to the property insured located within the United States, or any territory of the United States or Puerto Rico by fire directly caused by the above excluded perils, is insured, provided that the nuclear reaction, radiation, or radioactive contamination was not caused, whether directly or indirectly, by any of the perils excluded by the F.C. & S. Warranty of this Policy (Clause 52 (a) above).

Nothing in this Clause shall be construed to cover any loss, damage, liability or expense caused by nuclear reaction, radiation or radioactive contamination arising directly or indirectly from the fire mentioned above.

### 53)    GOVERNING LAW

All questions of liability arising under this Policy are to be governed by the law and customs of England, except in the United States and its territories and possessions, where the law and customs of the United States will prevail.

### 54)    PROVISIONS REQUIRED BY LAW TO BE STATED IN THIS POLICY:

This Policy is in a capital stock corporation.

IN WITNESS WHEREOF, this Insurance Company has executed and attested these presents; but this Policy shall not be valid unless countersigned by a duly authorized representative of the Company.

*Elizabeth M. Tuck*

Secretary

Countersigned at **CHICAGO, ILLINOIS**
this **6TH** day of **JUNE, 2005**

President

By: ...........................

Authorized Representative

Page 17

GSWP  22

Rev. 03/02

## SCHEDULE OF RATES

Attached to and forming part of Policy No. 88590C of the AMERICAN HOME ASSURANCE COMPANY
Dated: JUNE 2, 2005, issued to GREAT SOUTHERN WOOD PRESERVING, INC., ET AL

(1) The following are the present rates of premium of this Company applying to Under Deck shipments on metal-hulled, self-propelled vessels which are not over 20 years of age nor less than 1000 net registered tons and which are classed A1. American Record or equivalent by a Member of the International Association of Classification Societies; or

(2) Vessels over 20 years of age which are approved by this Company, and which are not less than 1000 net registered tons and classed as in (1) above, but only while operating in their regular trades;

  but in either case excluding vessels built;
  (a) for service on the Great Lakes;
  (b) solely for military or naval service; or
  (c) for the carriage of dry bulk or liquid bulk cargoes, and which are more than 15 years of age,
    unless specifically approved by this Company.

Rates to be fixed by this Company at the time of declaration of risk for shipments not specified herein in respect of which insurance is provided under the policy. Transshipments at rates to be agreed.

The rates below are subject to change on thirty (30) days notice.

VESSEL - STEAMER SHIPMENTS PER ABOVE, UNDER DECK - DIRECT.
AIRCRAFT - VIA CERTIFICATED AIRCRAFT

RATES FOR UNFURNISHED LUMBER, SUITABLY PACKED FOR EXPORT, PER POLICY TERMS AND CONDITIONS.

  RATES FROM PORTS AND OR PLACES AS BELOW TO PORTS AND OR PLACES AS BELOW;

| AT/FROM: | TO: | MARINE: |
|---|---|---|
| THE WORLD | THE WORLD | 0.09 PER $100.00 OF ANNUAL VALUES SHIPPED |

WAR AND S.R. & C.C. RATES (EXCEPT FOR AREAS OF THE WORLD "ON APPLICATION") ARE INCLUDED IN THE MARINE RATE.

DUTY, NOT COVERED.

All other terms and conditions remaining unchanged.

Dated: JUNE 6, 2005                                    By: *George I. Koch*
                                                        Authorized Representative

Page 18

**American Institute (AIMU)**

**Endorsement for Open Policies (Cargo)**
**STRIKES, RIOTS & CIVIL COMMOTIONS (MARCH 1, 2002)**

_____be attached to and form a part of Policy No. 88590C of the AMERICAN HOME ASSURANCE COMPANY

insuring GREAT SOUTHERN WOOD PRESERVING, INC., ET AL

S.R. & C. C. Endorsement (Form No. 11)

THIS INSURANCE ALSO COVERS:

(1)  Physical loss of or damage to property insured directly caused by strikers, locked-out workmen, or persons taking part in labor disturbances or riots or civil commotions;

(2)  Physical loss of or damage to the property insured directly caused by vandalism, sabotage or malicious acts; and,

(3)  Physical loss of or damage to the property insured directly caused by the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; PROVIDED that any claim to be recoverable under this subsection (3) be not excluded by the F.C. & S. Warranty in the Policy to which this endorsement is attached. Notwithstanding the foregoing, coverage under this subsection (3) is conditional upon the property insured being in the ordinary course of transit and, in any event, shall terminate:

(a)  As per the Warehouse to Warehouse Clause, Marine Extension Clause, 60 Day South American Clause and any other clauses relating to duration of transit contained in or endorsed onto the Policy; or,

(b)  on delivery to the consignee's or other final warehouse or place of storage at the destination named herein; or,

(c)  on delivery to any warehouse or place of storage, whether prior to or at the destination named herein, which the Assured elects to use either for storage other than in the ordinary course of transit or for allocation or distribution; or,

(d)  in respect of marine transits, on the expiry of 60 days after completion of discharge overside of the property insured from the vessel at the port of discharge; or,

(e)  in respect of air transits, on the expiry of 30 days after unloading the property insured from the aircraft at the place of discharge;

whichever shall first occur.

.....hile the property insured is at risk under the terms and conditions of this insurance within the United States of America, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and Canada, this insurance is extended to cover physical loss of or damage to the property insured directly caused by acts committed by an agent of any government, party or faction engaged in war, hostilities or other warlike operations, provided such agent is acting secretly and not in connection with any operation of military or naval armed forces in the country where the described property is situated.

Nothing in this endorsement shall be construed to cover any loss, damage or expense directly or indirectly arising from, contributed to or caused by any of the following, whether due to a peril insured against or otherwise:

(a)  change in temperature or humidity;

(b)  the absence, shortage, or withholding of power, fuel, or labor of any description whatsoever during any strike, lockout, labor disturbance, riot or civil commotion;

(c)  loss of market or loss, damage or deterioration arising from delay;

(d)  hostilities, warlike operations, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, except to the limited extent that the acts of certain agents acting secretly have been expressly covered above; or,

(e)  nuclear reaction, radiation or radioactive contamination.

The Assured agrees to report all shipments attaching under this cover and to pay premiums therefore at the rates established by the Assurer from time to time.

This endorsement may be canceled by either party upon forty-eight hours written, telegraphic or telefaxed notice to the other party, but such cancellation shall not affect any risks which have already attached hereunder.

Effective with respect to shipments made on or after JUNE 2, 2005

All other terms and conditions remaining unchanged.

Dated: JUNE 6, 2005                                            By:...._George J Kus_............................
                                                                           Authorized Representative

Rev. 03/02

Page 19

GSWP   24

American Institute (AIMU)
**WAR RISK OPEN POLICY (CARGO)**
**(DECEMBER 2, 1993)**          **AMERICAN HOME ASSURANCE COMPANY**
NEW YORK, NEW YORK   A CAPITAL STOCK COMPANY FOUNDED 1853

THIS POLICY OF INSURANCE WITNESSETH, that in consideration of premiums as agreed to be paid, the Assurer does make insurance and cause GREAT SOUTHERN WOOD PRESERVING, INC., ET AL to be insured, lost or not lost, for account of whom it may concern, against War Risks only, in accordance with the terms and conditions hereinafter set forth.

To apply to shipments made on or after JUNE 2, 2005,

This Company shall not be liable hereunder for more than $2,500,000. by any one vessel.

In cases where the total value(s) at risk on any one vessel exceed(s) the limit of liability as set forth in this Policy, the Assured agrees, nevertheless, to report to the Assurer full value(s) at risk and to pay premium thereon at the agreed rates. The Assured further agrees that acceptance of such reports and premium by the Assurer shall not serve to revoke or to overrule the limit of liability set forth in this Policy; however, subject to the limit of liability, the Assurer in accepting these reports does agree to pay partial losses covered by this Policy without reduction by reason of any coinsurance which otherwise may have existed in the absence of this special agreement.

Subject to the provisions of Clause 4 of this Policy, should there be an accumulation of interests exceeding the above limit of liability by reason of any interruption of transit beyond the control of the Assured or by reason of any casualty, and/or after the interests have been discharged from the incoming overseas Vessel at an intermediate port or place for on-carriage from that or any other port or place by another overseas Vessel, and/or on the on-carrying overseas Vessel, this Policy shall attach for the full amount at risk (but in no event for more than twice the Policy limit which would be applicable to any one Vessel) provided written notice be given to this Assurer as soon as known to the Assured.

This Policy shall cover only those shipments which are insured against marine risks under Policy No. 88590C of this Company, it being agreed that the description of such shipments, the valuations thereof, the voyage, the designation of the overseas Vessel (which shall be construed to include aircraft if included under the marine policy) on which the goods are to be carried and the ports and/or places of loading and discharge, as reported under the said Policy against marine risks, shall be deemed incorporated herein. Notwithstanding the foregoing, this policy shall not cover purely domestic shipments by air between points in the United States of America (excluding Alaska and Hawaii).

Any loss payable hereunder shall be payable in funds current in the United States, to the order of Assured or Order thirty days after full proofs of loss and proofs of interest have been filed with the Assurer.

1.(a)  This insurance is only against the risks of capture, seizure, destruction or damage by men-of-war, piracy, takings at sea, arrests, restraints, detainments and other warlike operations and acts of kings, princes and peoples in prosecution of hostilities or in the application of sanctions under international agreements, whether before or after declaration of war and whether by a belligerent or otherwise, including factions engaged in civil war, revolution, rebellion or insurrection, or civil strife arising therefrom; the imposition of martial law, military or usurped power, and including the risks of aerial bombardment, floating or stationary mines and stray or derelict torpedoes. Warranted not to abandon (on any ground other than physical damage to ship or cargo) until after condemnation of the property insured.

(b)  This insurance also covers, but only while the property insured is on board a waterborne conveyance, loss of or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under this Policy (subject to all of its terms, conditions and warranties) if the property insured would have sustained physical loss or damage as a direct result of such accident or occurrence.

2.  Warranted free from any claim based upon loss of, or frustration of, the insured voyage or adventure caused by arrests, restraints or detainments.

3.  This insurance does not cover any loss, damage or expense directly or indirectly arising from, contributed to, or caused by any of the following, whether due to a peril insured against or otherwise:

(a) Commandeering, preemption, requisition or nationalization by the government (defacto or otherwise) of the country to or from which the goods are insured.

(b) Seizure or destruction under quarantine, environmental or customs regulations.

(c) Delay, deterioration and/or loss of market.

(d) Nuclear reaction, radiation or radioactive contamination, regardless of how it was caused.

4. (a) The insurance against the risks enumerated in Clause 1, except the risks of floating or stationary mines and stray or derelict torpedoes, floating or submerged referred to in (b) below, shall not attach to the interest hereby insured or to any part thereof:

(i) prior to being on board an overseas Vessel (For the purpose of this Clause 4 an overseas Vessel shall be deemed to mean a Vessel carrying the interest from one port or place to another where such voyage involves a sea passage by that Vessel);

(ii) after being discharged overside from an overseas Vessel at the intended port or place of discharge,
or
after the expiry of 15 days from midnight of the day of arrival of the overseas Vessel at the intended port or place of discharge, whichever shall first occur;

(iii) after expiry of 15 days from midnight of the day of arrival of the overseas Vessel at an intermediate port or place to discharge the interest for on-carriage from that or any other port or place by another overseas Vessel, but shall reattach as the interest is loaded on the on-carrying overseas Vessel. During the said period of 15 days the insurance remains in force whether the interest is awaiting transit or in transit between the overseas Vessels.

(iv) For the purposes of this Clause 4 arrival at the intended port or place of discharge shall be deemed to mean that time when the overseas Vessel first

Rev. 03/02                    Page 20                    GSWP  25

berths, anchors, moors or is secured in an area subject to regulation by the authorities of such port or place.

(b) The insurance against the risks of float  or stationary mines and stray or derelict torpedoes, float  submerged, attaches as the interest hereby insured is first loaded on a lighter, craft or vessel after leaving the warehouse at point of shipment in transit for the destination declared hereunder, and ceases to attach as the interest is finally landed from the vessel, craft or lighter prior to delivery to warehouse at such destination.

(c) If the contract of affreightment is terminated at a port or place other than the destination named therein such port or place shall be deemed the intended port or place of discharge for the purpose of this Clause 4.

(d) Shipments by mail, if covered by this Policy, are insured continuously from the time of leaving the sender's premises until delivered to the place of address.

(e) Shipments by air (other than by air mail), if covered by this Policy are insured subject to the same terms and conditions as shipments by overseas Vessel.

(f) It is a condition of this insurance that the Assured shall act with reasonable dispatch in all circumstances within their control.

(g) If anything contained in this Policy shall be inconsistent with this Clause 4 it shall to the extent of such inconsistency be null and void.

5. This insurance shall not be vitiated by deviation, overcarriage, change of voyage, or by any error or unintentional omission in the description of interest, vessel or voyage, provided the same be communicated to the Assurer as soon as known to the Assured and an additional premium paid if required.

6. And in case of any loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said goods, and merchandises, or any part thereof, without prejudice to this insurance; nor shall the acts of the Assured or Assurers, in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of an abandonment; and to the charges whereof, the said Assurers will contribute according to the rate and quantity of the sum hereby insured.

7. General Average and Salvage Charges payable according to United States laws and usage and/or as per Foreign Statement and/or as per York-Antwerp Rules (as prescribed in whole or in part) if in accordance with the Contract of Affreightment.

8. It is agreed that the reports of shipments made under the Policy against marine risks mentioned above shall be deemed to be reports under this Policy also, and the Assured agrees to pay premiums on all shipments insured under this Policy at the war risk rates of the Assurer as fixed from time to time.

9. No claim shall be payable hereunder which arises from collision, contact with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather or fire unless caused directly (and independently of the nature of the voyage or service which the Vessel concerned or, in the case of a collision, any other Vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purpose of this paragraph "power" includes any authority maintaining naval, military or air forces in association with a power.

10. No recovery for a Constructive Total Loss shall be had hereunder unless the property insured is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it cannot be preserved from actual total loss without an expenditure which would exceed its value if the expenditure had been incurred.

11. It is agreed that this Policy is a separate and wholly independent contract and is not subject to any terms or conditions of the Policy against marine risks above mentioned (whether physically attached thereto or not) except as such terms or conditions shall have been expressly incorporated herein by reference.

12. This insurance may be cancelled by either party upon forty-eight hours written, telegraphic or telefaxed notice to the other party, but such cancellation shall not affect any shipment on which this insurance has attached under the terms of Clause 4 hereof prior to the effective date of such notice. Shipments on which this insurance has not so attached but for which, prior to the effective date of such notice, bills of lading have been issued and (in the case of exports) Certificates or special policies have been issued and negotiated, shall be covered from the time of loading on the overseas Vessel, as provided in Clause 4, at the rates of the Assurer, provided that, prior to said effective date, such shipments were at the risk of the Assured and were covered under the said Policy against marine risks.

In the event of loss which may give rise to a claim under this Policy, prompt notice shall be given to this Company.

This Policy shall not be valid unless countersigned by a duly authorized representative of the Company.

Secretary

Countersigned at CHICAGO, ILLINOIS
This 6TH day of JUNE, 2005

By:

President

Authorized Representative

GSWP   26

Rev. 03/02

Page 21

EXHIBIT 5

# FREEDOM COURT REPORTING

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              EASTERN DIVISION

4

5    GREAT SOUTHERN WOOD          )          COPY

6    PRESERVING, INC.,            )

7          Plaintiff,             )

8    vs.                          )  CASE NUMBER:

9    AMERICAN HOME ASSURANCE      )  1:06-CV-00708-CSC

10   CO., AIG, AMERICAN           )

11   INTERNATIONAL                )

12   UNDERWRITERS CORP.,          )

13   AMERICAN INTERNATIONAL       )

14   MARINE AGENCY,               )

15          Defendants.           )

16

17          DEPOSITION OF MARTY GOFF

18          In accordance with Rule 5(d) of

19   The Alabama Rules of Civil Procedure, as

20   Amended, effective May 15, 1988, I, Cindy

21   Weldon, am hereby delivering to Blane

22   Crutchfield, the original transcript of the

23   oral testimony taken on the 22nd day of May,

# FREEDOM COURT REPORTING

Page 2

1    2007, along with exhibits.

2              Please be advised that this is the

3    same and not retained by the Court Reporter,

4    nor filed with the Court.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

Page 3

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3             EASTERN DIVISION

4

5   GREAT SOUTHERN WOOD     )

6   PRESERVING, INC.,      )

7      Plaintiff,        )

8   vs.                 ) CASE NUMBER:

9                     ) 1:06-CV-00708-CSC

10  AMERICAN HOME ASSURANCE  )

11  CO., AIG, AMERICAN      )

12  INTERNATIONAL         )

13  UNDERWRITERS CORP.,     )

14  AMERICAN INTERNATIONAL   )

15  MARINE AGENCY,         )

16      Defendants.       )

17

18       S T I P U L A T I O N

19       IT IS STIPULATED AND AGREED, by

20  and between the parties through their

21  respective counsel, that the deposition of

22  MARTY GOFF, may be taken before Cindy

23  Weldon, Certified Shorthand Reporter,

# FREEDOM COURT REPORTING

Page 4

1  Commissioner and Notary Public, at the

2  offices of Kaufman & Rothfeder, 2660

3  EastChase Center, Suite 300, Montgomery,

4  Alabama, on May the 22nd, 2007 at 10:00 a.m.

5          IT IS FURTHER STIPULATED AND

6  AGREED that the signature to and the reading

7  of the deposition by the witness is waived,

8  the deposition to have the same force and

9  effect as if full compliance had been had

10  with all laws and rules of Court relating to

11  the taking of depositions.

12          IT IS FURTHER STIPULATED AND

13  AGREED that it shall not be necessary for

14  any objections to be made by counsel to any

15  questions, except as to form or leading

16  questions, and that counsel for the parties

17  may make objections and assign grounds at

18  the time of trial, or at the time said

19  deposition is offered in evidence, or prior

20  thereto.

21          IT IS FURTHER STIPULATED AND

22  AGREED that notice of filing of the

23  deposition by the Commissioner is waived.

# FREEDOM COURT REPORTING

Page 5

1              A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4              MR. KENNETH A. DOWDY

5              LUSK, LUSK, DOWDY & CALDWELL

6              SUITE 410, 2101 HIGHLAND AVENUE

7              BIRMINGHAM, ALABAMA   35205

8

9    FOR THE DEFENDANT:

10             MR. BLANE CRUTCHFIELD

11             HAND, ARENDALL

12             107 SAINT FRANCIS STREET

13             SUITE 3000

14             MOBILE, ALABAMA   36601

15

16

17

18

19

20

21

22

23

## FREEDOM COURT REPORTING

Page 7

1              MARTY GOFF,

2     after first being duly sworn, testified

3                as follows:

4   EXAMINATION BY MR. CRUTCHFIELD:

5              THE COURT REPORTER:  Usual

6   stipulations?

7              MR. DOWDY:  Please.

8              MR. CRUTCHFIELD:  That's fine.

9     Q.    Mr. Goff, my name is Blane

10  Crutchfield.  We've been introduced this

11  morning.  And I understand you're here as

12  the designated representative for Great

13  Southern for this 30(b)(6) deposition.

14             (Whereupon, Defendant's Exhibit

15  No. 1 was marked for identification and

16  attached to the original transcript.)

17    Q.    Mr. Goff, I'm going to ask you

18  some questions, as you probably know from

19  talking with Mr. Dowdy, that we had

20  designated some areas of inquiry and that

21  you're being put up as the representative

22  that has knowledge on those matters.

23             And I don't want to go through

## FREEDOM COURT REPORTING

Page 11

1    Great Southern does and generally how their

2    business operates.

3         A.    At Great Southern, we purchase

4    pine lumber, different species of pine, but

5    all soft wood lumbers.  We then bring it

6    into our facilities, we treat it, and then

7    sell it and distribute the product to

8    customers in the building industry, both

9    retail and independent --

10        Q.    All right.

11        A.    -- businesses.

12        Q.    Go ahead.

13        A.    And we -- For an example, we may

14   sell to Buddy's Hardware in Abbeville and we

15   also sell Home Depot.

16        Q.    And is there a particular brand

17   name that you sell under?

18        A.    Yes.  Yella Wood.  Yella Wood is

19   the trade name that belongs to Great

20   Southern.

21        Q.    And where does Great Southern have

22   -- Well, you said the corporate

23   headquarters is in Abbeville.  Where does it

# FREEDOM COURT REPORTING

Page 12

1   have facilities?

2       A.   We have facilities in Mobile

3   Alabama, of course, Abbeville, Alabama,

4   Muscle Shoals, Alabama, Conyers, Georgia,

5   Savannah, Georgia -- I'm sorry -- Jessup,

6   Georgia and Lake Panasofkee, Florida.  And

7   then we have satellite production centers as

8   well.  Those are our main facilities.

9       Q.   And when you say you import pine

10  lumber, do you also buy domestic lumber?

11      A.   Yes, sir.  We buy -- Approximately

12  eighty-five to ninety percent of our

13  purchases are domestic southern yellow pine

14  with the balance being imported subspecies

15  of pine.

16      Q.   And are you involved at all in the

17  domestic production?

18      A.   No, sir.  Not at this time.  In

19  prior jobs, yes.  But not now.

20      Q.   And as the import manager -- you

21  may have already touched on this -- but can

22  you kind of give me a description of what

23  you do on a daily basis?  It may change from

# FREEDOM COURT REPORTING

Page 28

1    point of origin or a port in a South

2    American country?

3        A.    Yes, sir.

4        Q.    In Port Manatee, do you have a

5    facility there where the -- or does anyone

6    have a facility there where the lumber is

7    stored prior to being -- prior to inland

8    transit?

9        A.    Yes.  All ports do.

10       Q.    All right.  And do you lease space

11   there in Port Manatee?

12       A.    No, sir.

13       Q.    In this case, we've been provided

14   with a lease for the warehouse space in

15   Gulfport.

16       A.    Uh-huh.

17       Q.    Are there any other ports where

18   you have a lease of a similar arrangement?

19       A.    No.

20       Q.    In those other ports, I take it

21   that whatever the terminal is there,

22   basically the cargo comes in and you have a

23   certain amount of free time and they --

# FREEDOM COURT REPORTING

Page 29

1   there's not a formal lease arrangement

2   entered into?

3        A.   At all other ports, we are given

4   thirty days of free space which is, you

5   know, the norm for our particular products.

6        Q.   Okay.

7        A.   And we had a space agreement with

8   the port of Gulfport because of inland

9   logistics.  It is much, much easier to get

10  freight out of the ports from other

11  facilities than it is from Gulfport.  It's

12  basically trucking lanes, inland logistics

13  in the lanes of traffic.

14       Q.   All right.  I don't want to put

15  words in your mouth.  So in Gulfport because

16  of the -- with the delays in getting the

17  trucks lined up to get the lumber out of the

18  port, is that -- You tell me.  I don't want

19  to --

20       A.   Yes.

21       Q.   -- put words in your mouth.

22       A.   The thing that we found in the

23  port of Gulfport was that due to the natural

## FREEDOM COURT REPORTING

Page 30

1  lanes, trucking lanes, we were always under

2  pressure to get the amount of cargo we pick

3  up out of that port, which is a small port.

4           The port of Gulfport is a small

5  port.  So after talking with the port, they

6  understood our need and they understood the

7  -- they understood the need that we were

8  asking for because I think they had been

9  asked from other people as well.

10      Q.    In other words, because of the

11  trucking lanes and the delays that occurred

12  in terms of getting your product out, you

13  needed a place to put it essentially until

14  it could be trucked out?

15      A.    No, not really.  I mean, the port

16  of Gulfport give us -- once we asked for it

17  -- a space agreement because the thirty day

18  free time which was typical at all other

19  ports did not work for us in the port of

20  Pascagoula -- I mean the port of Gulfport

21  due to the inland logistics that we were

22  just discussing as well as the nature of the

23  port.

## FREEDOM COURT REPORTING

Page 31

1      I mean, that was a small port.

2  And, you know, I would bring in -- for

3  example, on the Sanko Stream that had just

4  discharged, there were a hundred truck loads

5  on that.  So logistically for us, it was

6  tough to maintain a -- picking up a hundred

7  truck loads in three -- thirty days.

8      Q.    I've got you.

9      A.    And they understood that.  And I

10  think they worked well.  I was told they

11  worked similar space agreements with others

12  as well.

13      Q.    On the ocean carriage side of

14  things or really from the point at which you

15  purchased the product in South American

16  countries, who at Great Southern would have

17  been responsible for seeing to it that there

18  was insurance coverage placed to cover that

19  lumber?

20      A.    William Ray.

21      Q.    William Ray?

22      A.    Our CFO.

23      Q.    Can you -- You may not know

# FREEDOM COURT REPORTING

Page 56

1      A.    Yes, it is.

2      Q.    Tell me what -- And we can get

3  into some of these.  I almost hesitate to

4  because they are thick and look to be

5  involved.  But the delivery breakdown, the

6  import stock report.

7          But tell me generally speaking,

8  once cargo is discharged from the vessel at

9  Gulfport, what happens to it and where it

10 goes from there.

11     A.    Once the material is discharged,

12 in this case, the port of Gulfport, for

13 Great Southern, at that point in time, it is

14 still considered raw product.  I mean, it

15 has to come to our facilities to become a

16 finished good.

17          And once the material is

18 discharged and we get full U.S.D.A. release

19 and customs release, we then begin to

20 dispatch the cargo for pick up.

21          And that cargo is dispatched one

22 truckload at a time.  And it is then put

23 into our internal system and our

# FREEDOM COURT REPORTING

Page 61

1    of the warehouse and on to the facility?

2        A.    I would say it -- In our system,

3    we have means in which we can mark cargo

4    ready for pick up.  And once that cargo is

5    ready for pick up, we then start the pick up

6    process.

7            And it is -- Now, the timing

8    depends on a couple of things.  Inland

9    logistics, you know, can we get these trucks

10   positioned in that location or that area.

11   And also it depends on the port and how busy

12   they are.

13           Because again, the port of

14   Gulfport was a small port.  And they were

15   limited to the amount of trucks they could

16   load per day.  And so, you know, they

17   require a twenty-four hour appointment.

18           And depending on whether we could

19   get an appointment, you know, we could pick

20   up more or less.

21       Q.    Okay.  But given those factors,

22   then it's -- typically it was Great

23   Southern's determination of when the cargo

# FREEDOM COURT REPORTING

Page 85

1    arrival date and then it took whatever it

2    took, two days to complete the discharge?

3         A.    Yes, sir.

4         Q.    On the --

5         A.    On the Sanko.

6         Q.    And so what they're doing is

7    taking the -- I'm sorry.  I didn't mean to

8    interrupt.

9         A.    No.  It's okay.

10        Q.    So what they're doing is they're

11   discharging on the dock and then with

12   forklifts, taking the product as it comes

13   off the ship to the warehouse?

14        A.    Yes, sir.  On the Kestrel, she

15   arrived on 8-3.  She completed discharge on

16   8-6.  And U.S.D.A -- When she was completely

17   discharged, U.S.D.A. had it on inspection

18   hold.

19        Q.    All right.

20        A.    U.S.D.A. released it from

21   inspection hold for our pick up on 8-7.

22        Q.    Okay.  Now, I have 8-5 and the

23   complaint says 8-5 for arrival on the

# FREEDOM COURT REPORTING

Page 86

1   Kestrel Arrow.  But you --

2        A.    Yes.  And we were basing that on

3   the shipping schedule that the ship line

4   provides us with.  So during the -- I guess

5   the discovery or production, we then defined

6   that from the ship line the exact date of

7   arrival and the exact date of departure.

8        Q.    So that was --

9        A.    So that has changed.

10       Q.    8-3 to 8-6?

11       A.    Yes, sir.  That's on the Kestrel.

12       Q.    And on the Sanko Stream voyage

13  nineteen, the release from customs was when?

14       A.    The Sanko Stream arrived on 8-25.

15  She completed the discharge on 8-27.

16  Hurricane Katrina hit Monday morning 8-29.

17  U.S. -- We finally got U.S. customs to

18  release on 10-4.

19       Q.    Okay.  Never got a chance.

20       A.    No, sir.

21       Q.    All right.  And on the very -- Do

22  I understand that there is no claim on the

23  Penguin Arrow?  That's not part of the

# FREEDOM COURT REPORTING

Page 87

1   complaint?

2        MR. DOWDY:  Since I don't have the

3   complaint in front of me, I think what

4   you're going to find is the focus is on

5   those last two boats.

6        MR. CRUTCHFIELD:  Okay.  What I

7   have is the Penguin Arrow arrived July 6th,

8   '05.  Anyway, it's not mentioned in the --

9   I think it was in the original claim, but it

10  was not mentioned in the complaint.

11       MR. DOWDY:  Right.  And I think

12  there was some overlap between when it first

13  happened and the massive information that we

14  originally gave to the company and then

15  everybody and then kind of paired it down as

16  time went as to what's where.

17       MR. CRUTCHFIELD:  Right.

18       Q.  Now, in looking at these -- in

19  looking at these delivery breakdowns and the

20  import stock report, you know, just for the

21  various periods of time that we're provided,

22  it looked like obviously the time frame from

23  the time of discharge to when it ultimately

# FREEDOM COURT REPORTING

Page 88

1   went out varied depending on the vessel.

2   There was no set time; is that correct?

3           MR. DOWDY:  I'm going to object to

4   the form because I didn't understand it

5   completely.

6       Q.   What I'm saying is, from looking

7   at this, it doesn't appear that there is any

8   schedule in the warehouse X day in, out X

9   day.  It went out gradually in bundles and

10  some of -- depending on --

11      A.   I think I know what you're asking,

12  but let me see if I can explain it this

13  way.  Great Southern and Import were in a

14  commodity business.  We deal with supply and

15  demand daily.

16          And so it is possible and it is

17  certainly conceivable that if a vessel

18  discharges, for an example, a thousand packs

19  of wood, that there could be fifty packs

20  left for some period after the thirty days

21  because there again, supply and demand.

22          Now, we try to get it out.  You

23  know, there's other factors.  It gets back

# FREEDOM COURT REPORTING

Page 89

1   to the inland freight issues we talked about

2   earlier.  It gets back to scheduling times

3   with the port.  So I'm still a little --

4       Q.   Well, just -- I mean, just by

5   example.  You don't have to accept these

6   figures.  This is sort of what I've got by

7   example.

8            Looks like, for instance, on the

9   Penguin Arrow, which was -- which I have as

10  discharge or arrival on July the 6th, that

11  as of the day of the hurricane, there was

12  still five hundred and fifty-five bundles

13  there.

14      A.   Yes.  I don't want to speak to the

15  Penguin Arrow per se because I need -- I'm

16  familiar with it.  But that's -- I'm not as

17  familiar with the details as I am these two

18  vessels that we've been speaking of.

19           So, you know, I will give you an

20  example as far as the Kestrel.  The Kestrel,

21  once we got cargo clearance on 8-8, we

22  picked up -- there was four thousand and

23  fifty-six packs discharged on the Kestrel.

# FREEDOM COURT REPORTING

Page 90

1    On 8-29, Hurricane Katrina hit.

2    We had picked up seventy-two percent of that

3    cargo.  And that's basically an average of a

4    hundred and seventy-three packs per day.

5    Based on that average per day of

6    pickup, we would have had that vessel

7    completely moved out and to its final

8    destination, our plants, by 9-1, well within

9    the space agreement we had with the port.

10    Q.    Would that be complete, all the

11    bundles from that ship?

12    A.    Yes, sir.  And on 8-29, we had

13    moved seventy-two percent of cargo.

14    Q.    And I'm not trying to pin you down

15    to any particular time, but in looking at

16    the various cargos that came in, it does

17    appear that there were a number of shipments

18    where lumber stayed in the warehouse up to

19    three months and in some cases four months?

20    A.    And that's true.  You know, I

21    think you can also go back and see where

22    it's the polar opposite as well where

23    everything was picked up well within the

## FREEDOM COURT REPORTING

Page 93

1       A.    Yes.

2       Q.    All right.  And tell me again how

3   you communicated that to them.  Was that an

4   e-mail or a fax?

5       A.    It should be a fax.  And that's

6   our common practice with all ports.

7       Q.    And in terms of the warehouse

8   arrangement that you had, you mentioned a

9   little while ago in response to one of my

10  questions that you were timing-wise within

11  the agreement that you had with the port.

12  What did you mean there?  Within the space

13  agreement or --

14      A.    Yes.  I was speaking of the

15  Kestrel Arrow, that based on she discharged

16  on 8-8.  And on 8-29 when Hurricane Katrina

17  hit, we had picked up seventy-two percent of

18  the cargo, which based on that hundred and

19  seventy-three unit per day pickup average,

20  we would have had all the cargo out well

21  within the forty-five days within the space

22  agreement that we had with the port.

23      Q.    And that's what I was getting at.

# FREEDOM COURT REPORTING

Page 100

1    (Whereupon, Defendant's Exhibit

2  No. 15 was marked for identification and

3  attached to the original transcript.)

4    Q.   All right.  Let me show you -- it

5  actually has Ken's cover letter on it -- but

6  Exhibit 15 which is the report of Jack

7  Taylor.  Have you read that and are you

8  familiar with it?  You may not have.

9    A.   No, sir.

10    Q.   Okay.  Well, maybe I should just

11  handle it this way.  Obviously in this

12  lawsuit, Great Southern makes contention

13  that there was coverage for this cargo and

14  they make the assertion that it is covered

15  under a clause known as the warehouse to

16  warehouse clause?

17    A.   Yes, sir.

18    Q.   And you may have looked at that

19  language in there and so forth.  Can you

20  tell me what the basis is that that clause,

21  that warehouse to warehouse clause covers

22  this particular cargo?

23    MR. DOWDY:  I'm going to object to

## FREEDOM COURT REPORTING

Page 101

1    the form.  Calls for a legal conclusion.

2    You can answer it to the extent --

3                THE WITNESS:  I'm sorry?

4                MR. DOWDY:  I said you can answer

5    it to the extent you understand.

6        Q.    Let me ask you a better question.

7    See if I can do that.  Do you know what

8    facts support that contention?

9        A.    I can only speak to my perception

10   of that clause.

11       Q.    Okay.

12       A.    And that is our products, one

13   hundred percent of the products that went in

14   port are in our opinion raw products.  Our

15   customers do not consume these products in

16   the form in which we bring them in.

17                So our final destination or place

18   of rest is our plants because that is when

19   we have a finished good that's sold.  And so

20   because it is our plants are in off the port

21   facilities, I concluded it meant thirty days

22   beyond the discharge date.

23       Q.    Your plant facilities, you're

# FREEDOM COURT REPORTING

Page 102

1    talking about the treatment plants we've

2    been talking about?

3        A.   Yes.

4        Q.   I take it from what you're saying,

5    that being an off -- outside the port

6    destination, that you've got either the

7    thirty days or when it reached that

8    destination, whichever first occurred I

9    think is how the policy reads?

10       A.   I personally perceive that it's

11   saying that because it's not a finished

12   good, that I have to move it outside the

13   port gate, outside the port facility, which

14   means that my marine cargo insurance covered

15   me an additional fifty days for a total of

16   thirty days once the cargo had been

17   discharged.

18       Q.   Do you know whether Great Southern

19   ever advised AIG or its broker or anybody

20   else in the insurance end of things that --

21   as to where the destinations were for any

22   particular cargo?

23       A.   William Ray would be able to

# FREEDOM COURT REPORTING

Page 103

1   answer that question.  I don't know.  I did

2   not have any direct dealings with the

3   insurance company or broker.

4        Q.   Do you contend in the lawsuit that

5   -- well, let me ask it this way.  Do you

6   contend that the product had not reached its

7   destination at the time of the loss, its

8   final destination?

9        A.   Yes, sir, that's our contention.

10       Q.   And that being the facilities,

11  your treatment facilities?

12       A.   Yes.

13       Q.   Do you know whether Great Southern

14  procured insurance for the inland transit of

15  that cargo from Gulfport to the treatment

16  plant?

17            MR. DOWDY:  You mean on the

18  trucks?

19            MR. CRUTCHFIELD:  Yes.

20       A.   I don't know.  I'd have to refer

21  that to William Ray.

22       Q.   You mentioned a while ago that

23  your feeling was that the cargo was not --

## FREEDOM COURT REPORTING

Page 104

1    had not reached its ultimate destination.  I

2    think you testified earlier, though, that on

3    some occasions you sell it as a raw material

4    directly from Gulfport?

5         A.    I sell it as a raw material to

6    other treating plants, yes.

7         Q.    And are you -- Do you contend that

8    that product is covered until it reaches

9    those other treatment plants?

10         MR. DOWDY:   Object to the form.

11         A.    Yes.

12         MR. DOWDY:   I'm just objecting.

13    You can answer.

14         Q.    Those destinations you would agree

15    wouldn't be known -- maybe not known to

16    Great Southern, but certainly an unknown to

17    an insurance company until the sale had

18    occurred?

19         A.    True.

20         Q.    Okay.  I probably forgot to ask

21    this.  But in terms of those sales to other

22    treatment plants, what were the terms of

23    those sales, in other words, were they FOB

# FREEDOM COURT REPORTING

Page 119

1  a through bill of lading, it would -- this

2  blank would be filled in to show the

3  carrier, meaning the inland carrier, where

4  the ultimate place of delivery was?

5      A.   I mean, I've never had experience

6  with one.  But yes, I can see where that is

7  a place.  I'm not familiar with this.

8      Q.   All right.  This probably is more

9  of a lawyer question than anything, but I

10  need to ask you.  In this lawsuit, Great

11  Southern alleges that AIG or the other

12  defendants in this case denied coverage and

13  acted in bad faith when they did so, which

14  is a legal term.

15      And I'm not asking you to be a

16  lawyer.  Do you know or do you have a

17  position on -- or does Great Southern have a

18  position on what facts support that

19  allegation?

20      A.   Yes.  It's our contention that as

21  described in the marine cargo policy that we

22  talked about earlier, that because the final

23  destination of our product was outside the

## FREEDOM COURT REPORTING

Page 120

1   port facility, that we had fifteen

2   additional days of thirty days of coverage

3   under our contract.  That was our

4   perception.  We also --

5       Q.   Go ahead.

6       A.   We also contest that the Sanko

7   Stream, which was the vessel that discharged

8   on the 25th or began on the 25th, finished

9   on the 27th, we allege that that vessel was

10  covered because we never had customs

11  clearance on that vessel.

12          We never even had a chance to go

13  in and pick up anything.  We finally got

14  customs clearance on October -- I think it

15  was the 4th.  And the only reason we got it

16  then is customs told us that they were

17  cleaning up old documents.

18      Q.   Okay.

19      A.   So we allege that that vessel was

20  never even cleared, but yet it was denied.

21      Q.   You would agree, though, that you

22  still had -- the cargo, you couldn't remove

23  it from the warehouse, but it was still

## FREEDOM COURT REPORTING

Page 121

1   within your custody and control.  Is that a

2   fair statement?

3       A.   And there again, this get into

4   legal conversation.  I can tell you what my

5   opinion is.

6       Q.   All right.

7       A.   My opinion is that the cargo is

8   not in our custody or our control unless

9   there's full clearance given to us via the

10  U.S.D.A. and customs.

11      Q.   As between you and the Mississippi

12  Port Authority, though, you agreed that when

13  that cargo was in their warehouse, it was in

14  your custody, care and control.  Is that a

15  fair statement?

16      A.   Yes.  But I cannot pick it up

17  until I'm given clearance.

18      Q.   I understand that.  But it wasn't

19  in anybody's elses control?

20      A.   Yes.  I agree.

21      Q.   All right.

22      A.   I couldn't pick it up nor could

23  anyone else.

## FREEDOM COURT REPORTING

Page 124

1   the expiration, that occurs first and that's

2   when the policy period begins, coverage

3   ends?

4       A.   No, sir.   We contest that the

5   final destination is our plant.   And it is

6   still in route.   It is still in transit even

7   though it's been discharged and sitting

8   there, there's nothing we can do with that

9   product there.   And so for us, it's still in

10  transit to our facilities.

11      Q.   Let me put it this way.   You're

12  not saying that had it reached what you

13  consider to be its final destination, that

14  you would keep having -- and it made it

15  there in five days -- that you would have

16  more time of coverage under these time

17  limits?

18          In other words, once it reaches

19  the destination, that's when you understand

20  is when the coverage terminates?

21      A.   Once it reaches our destination

22  outside the port facilities.

23      Q.   Right.   Whether you have fifteen

EXHIBIT 6



# ORIGINAL
Exhibit 6



## MISSISSIPPI STATE PORT AUTHORITY AT GULFPORT

### SPACE ASSIGNMENT AGREEMENT

---

This AGREEMENT is made this 1st day of August 2005 by and between the Mississippi State Port Authority (hereinafter referred to as "MSPA"), P.O. Box 40, One Hancock Plaza, Suite 1401, Gulfport, Mississippi 39502, and whose FAX is (228) 865-4320; and

**Great Southern Wood Preserving**
**P.O. Box 610**
**Abbeville, AL 36310**
**334-585-2253**

(hereafter referred to as "Customer").

The parties agree that:

**A.    Space Assignment.** Subject to the terms and conditions set forth herein and the rules and regulations established within the MSPA Port Terminal Tariff No. 4, as amended from time to time, or any successor Tariff, MSPA assigns to Customer certain space at the Port of Gulfport (hereinafter "Assigned Space") for the handling and storage of cargo.

The Assigned Space consists of sufficient covered storage area within the Port of Gulfport to accommodate the receipt and storage of up to 3,000 tons of cargo monthly. In consideration of this space, Great Southern Wood Preserving will guarantee a three month volume of 3,000 short tons of lumber at a wharfage rate of $1.70 per short ton. Great Southern Wood Preserving will pay to the Port $1.70 per ton of any short fall from the three month tonnage guarantee.

The Customer shall pay to MSPA, in accordance with established MSPA accounting and billing procedures. Charges for cargo handling from the assigned space to load out to truck or rail shall be billed separately by the stevedore as designated in Paragraph G of the Agreement.

**B.    Use.** The Assigned Space shall only be used for the receipt and short-term storage of lumber and related products in support of the cargo operations of the Customer at the Port of Gulfport.

**C.    Term.** The assignment shall commence on July 1, 2005 and shall expire on December 31, 2005.

**D.    Free Time.** Free time shall be in the amount of forty-five (45) days from the date of receipt of each shipment from vessel.



DEFENDANT'S
EXHIBIT

*11*

**E.    Demurrage.**   Following free time the Customer shall pay to MSPA demurrage as set forth in MSPA Tariff No. 4, as amended, from time to time, or any successor tariff.

If the party responsible for payment of demurrage is other than the Customer, then the responsible party must be identified and must be acceptable to the Mississippi State Port Authority.  The party responsible for payment of demurrage is:

---

**F.    Care, Custody, and Control.**    The sole responsibility for the care, custody, control and protection of customer's cargo shall be the Customer or, as appropriate, the person designated as the Responsible Party.  The Mississippi State Port Authority has no responsibility for the care, custody, control or protection of Customer's cargo.  If the party responsible for the care, custody, control and protection of Customer's cargo is someone other than the Customer, then please identify the responsible party for care, custody, and control.

**G.    Stevedore.**   Customer shall use a stevedore, cargo handler, and terminal operator that has been, or is granted, a permit by the Mississippi State Port Authority Board of Commissioners for handling cargo at the Port of Gulfport.  The designated Stevedore is:

| | |
|---|---|
| **P & O Ports** | **Stevedoring Services of America** |
| P.O. Box 4241 | P.O. Box 1960 |
| Gulfport, MS 39502 | Gulfport, MS  39502 |
| 228-5663-1009 | 228-863-3922 |

The Stevedore shall be responsible for payment of all license and usage fees directly to the MSPA on behalf of the Customer.  If the Stevedore fails to pay the usage fees, the Customer shall be responsible for payment of all fees assessed in accordance with the Port Terminal Tariff.

**H.    Placement of Cargo.**    Customer's cargo shall only be placed within the Assigned Space.  If cargo is placed outside the assigned space, it shall nevertheless be subject to all of the provisions of this Agreement except Customer shall immediately move its cargo from the non-assigned space to the Assigned Space upon the directions from the Operations Director of the MSPA.  Failure to remove the cargo may result in the MSPA sustaining substantial damages.

**I.    Removal of Cargo.**    Failure to clear all cargo and equipment from the Assigned Space at the expiration of this Agreement will result in the Port assessing a penalty equal to five times (5x) the published wharf demurrage rate.  Further, upon order from the Executive Director of the MSPA, Customer's cargo shall be removed from the Assigned Space and from the property of MSPA.  In this regard, Customer acknowledges that he MSPA has limited space for the storage or placement of cargo and, accordingly, that a failure to move Customer's cargo from the Assigned Space upon expiration of free time period and upon orders of the Executive Director may result in substantial damages due to

the liability of the MSPA to handle scheduled vessel calls at the Port of Gulfport because the Assigned Space is needed for the loading or unloading of other cargo. Therefore, if Customer does not comply with the orders of the Executive Director to move its cargo as required herein, MSPA may, but is not obligated to, move Customer's cargo and such movement may be off MSPA property, all at Customer's cost and expense, in order to mitigate the damages the MSPA may otherwise sustain.

**J.    Attorneys Fees.**    Upon a breach of this Agreement by either party, the prevailing party (whether by negotiation settlement or suit) shall be entitled to its reasonable attorneys fees from the non-prevailing party.

**K.    Special Provisions.**    No special provisions shall apply to this Space Assignment:

_____

CUSTOMER:

By:    _____

Title:    _____

Date:    _____

PARTY RESPONSIBLE FOR CARE, CUSTODY AND CONTROL (Paragraph F) if different from Customer:

By:    _____

Title:    _____

Date:    _____

PARTY RESPONSIBLE FOR PAYMENT OF DEMURRAGE (Paragraph E) if different from Customer:

By:    _____

Title:    _____

Date:    _____

MISSISSIPPI STATE PORT AUTHORITY

By: *David McNeil*

Operations Division

Date: *Aug. 9, 2001*


APPROVED:

By: *Donald R. Allen*

Executive Director

Date: *8/9/05*

EXHIBIT 7

Richard Murray & Co., Inc.

**ABI PROCESSING STATUS REPORT - 7501**

Page: 1
MAC

10/05/2006
02:07:13 PM

| File No. | Entry No. | Status | | Employee | Date | Time |
|---|---|---|---|---|---|---|
| 3839-05 | 990-0899774-6 | LINK - 7501 Prepare Messages | Passed And Certified | DEEDEE | 08/25/2005 | 08:46:23 AM |
| | | ABI - 7501 ABI Results | Paperless - Filer Retain Records | DEEDEE | 08/25/2005 | 09:46:38 AM |
| | | | Passed - Cert-Release Certified Via Summary | DEEDEE | 08/25/2005 | 09:46:38 AM |
| | | ABI - Cargo Release Processing Results | Certified | DEEDEE | 08/25/2005 | 09:46:44 AM |
| | | | Entry Documents Required | DEEDEE | 08/25/2005 | 09:46:44 AM |
| | | | Manifest Hold Agriculture | DEEDEE | 08/25/2005 | 09:46:44 AM |
| | | | Entry Documents Required | DEEDEE | 08/26/2005 | 09:44:24 AM |
| | | | Manifest Hold Agriculture | DEEDEE | 08/26/2005 | 09:44:24 AM |
| | | | Conditional Release Specific Document Review | DEEDEE | 08/26/2005 | 11:48:40 AM |
| | | LINK - Stmt Date-Modify | Manifest Hold Agriculture | DEEDEE | 08/26/2005 | 11:48:40 AM |
| | | ABI - Stmt Date-Modify (Auto) | Passed - Filer Order Stmt/Pay: 09/14/2005 | IAN | 08/26/2005 | 11:48:40 AM |
| | | LINK - Stmt Date-Modify (Auto) | Accepted - Stmt/Pay: 09/14/2005 Stmt No: 1905251028 | IAN | 09/08/2005 | 02:29:48 PM |
| | | | Passed - Filer Order Stmt/Pay: 09/26/2005 | IAN | 09/08/2005 | 02:36:14 PM |
| | | ABI - Stmt Date-Modify | Passed - Filer Order Stmt/Pay: 09/23/2005 | IAN | 09/14/2005 | 10:37:21 AM |
| | | LINK - 7501 Prepare Messages | Accepted - Stmt/Pay: 09/23/2005 Stmt No: 1905257009 | DEEDEE | 09/14/2005 | 10:42:39 AM |
| | | | Replace And Passed | MAC | 09/19/2005 | 01:38:36 PM |
| | | ABI - 7501 ABI Results | Paperless - Filer Retain Records | DEEDEE | 09/19/2005 | 01:49:51 PM |
| | | | Replace And Passed | DEEDEE | 09/19/2005 | 02:38:38 PM |
| | | | Paperless - Filer Retain Records | DEEDEE | 09/19/2005 | 02:38:38 PM |
| | | | Passed | DEEDEE | 09/19/2005 | 02:51:40 PM |
| | | ABI - Cargo Release Processing Results | Conditional Release Specific Document Review | DEEDEE | 10/04/2005 | 10:52:26 AM |
| | | | Agriculture Manifest Hold Removed | DEEDEE | 10/04/2005 | 10:52:26 AM |
| | | | Release Date Update - 10/04/2005 | DEEDEE | 10/04/2005 | 10:52:26 AM |
| | | ABI - Liquidation | No Change | DEEDEE | 08/11/2006 | 08:24:04 AM |

GSWP  105