IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| GREAT SOUTHERN WOOD PRESERVING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.  1:06cv708-CSC (WO) |
| AMERICAN HOME ASSURANCE CO., *et al.*, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In 2005, Hurricane Katrina wreaked havoc in New Orleans and along the Louisiana, Mississippi and Alabama gulf coasts.  This lawsuit is part of Katrina's unwanted legacy.  The plaintiff, Great Southern Wood Preserving, Inc., brings claims of breach of contract and bad faith concerning the denial of insurance coverage for the loss of lumber shipments at the Port of Gulfport, Mississippi during Katrina on August 29, 2005.  The defendants are American Home Assurance Company, AIG, American International Underwriters Corporation, and American International Marine Agency.  The parties have consented to a United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment, pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. L.R. 73.1.

Now pending before the court is the defendants' motion for summary judgment.  (Doc. No. 21.)  The court has carefully considered the motion, the supporting and opposing evidentiary materials and the arguments of counsel heard on August 14, 2007.  The court concludes that the motion for summary judgment is due to be granted.

# I.  THE FACTS

Great Southern Wood Preserving, Inc., ("Great Southern Wood") is in the business of treating lumber which it then markets as "Yella Wood" to customers such as Home Depot and local hardware stores.  (Doc. No. 22-2, Goff's Dep., p. 11.)[1]  Great Southern Wood acquires most of its lumber domestically; however, ten to fifteen percent of its lumber is imported.  (*Id*.)

In June 2005, American Home Assurance Company issued a marine open cargo policy to Great Southern Wood.  (Doc. No. 1, Pl's Ex. 1.)  The policy insured "lawful goods and/or merchandise suitably packed for export, consisting principally of UNFURNISHED LUMBER. . . ."  (*Id*., p. 3.)[2]  The policy included a shore clause, which provided:

> Unless broader terms and conditions have been provided for in Clause 17 or elsewhere herein; where this insurance by its terms covers while on docks, wharves, or elsewhere on shore, and/or during land transportation, it shall include the risks of collision, derailment, overturning or other accident to the conveyance, fire, lightning, sprinkler leakage, cyclones, hurricanes, earthquakes, floods (meaning the rising of navigable waters) and/or collapse or subsidence of docks or wharves, even though the insurance be otherwise Free of Particular Average.

(*Id*., p. 6.)

The policy also included a Warehouse to Warehouse Clause, providing as follows:

> This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the Declaration

---

[1] Marty Goff is an import manager for Great Southern Wood.

[2] Apparently, the term "unfurnished lumber" means wood which has not been prepared, i.e. wood which is untreated.

and/or Certificate for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment, if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse destination named in the policy or until the expiry of 15 days (or 30 days, if the destination to which the goods are insured is outside the limits of port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be agreed in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the ASSURED.

(*Id.*, p. 8.) In addition, a marine extension clause provided that the "insurance attaches from the time the goods leave the Warehouse at the place named in the Policy, Certificate or Declaration for the commencement of transit and continues until the goods are delivered to the final Warehouse at the destination named in the Policy, Certificate or Declaration. . . ." (*Id.*)

During the period of coverage, several ships transported wood purchased by Great Southern Wood from South America to various ports along the Gulf of Mexico. Generally, after the wood was discharged from the vessel, it was placed in a warehouse at a designated port. Trucks owned and operated by Great Southern Wood then hauled the lumber to the company's treating facilities or, on rare occasions, transported the untreated wood directly to a customer from a port warehouse.[3] Generally, all ports along the Gulf of Mexico provide

---

[3] Goff stated that untreated wood is occasionally sold directly to Georgia Pacific. (Goff's Dep., p. (continued...)

3

thirty (30) days of free space to transport shipped products out of port warehouses.  (*Id.*, p. 29.)  However, due to "inland logistics,"  Great Southern Wood was "always under pressure to get the amount of cargo . . . out of . . . [the] small port" of Gulfport, Mississippi.[4]  (*Id.*, p. 30.)  Great Southern Wood discussed this problem with Mississippi Port Authority officials and asked for additional time to move its cargo from the port.  (*Id.*)  After their discussion on August 1, 2005, Great Southern Wood and the Mississippi Port Authority entered into a "Space Assignment Agreement."  (Doc. No. 22-5.)

The agreement specified that the Mississippi Port Authority would provide an assigned space which would accommodate the storage of up to 3,000 tons of cargo per month and that, "[i]n consideration of this space, Great Southern Wood Preserving [would] guarantee a three month volume of 3,000 short tons of lumber at a wharfage rate of $1.70 per short ton."  (*Id.*)  In addition, the Mississippi Port Authority agreed to provide "[f]ree time . . . in the amount of forty-five (45) days from the date of receipt of each shipment from vessel."  (*Id.*)  The agreement stated that Great Southern Wood's assigned space would "only be used for the receipt and *short-term storage* of lumber and related products in support of the cargo operations of the Customer at the Port of Gulfport."[5]  (*Id.*) (Emphasis in original.)

----

[3](...continued)
63.)

[4] In other words, the amount of wood transported from the Gulfport warehouse was limited by the nature of the trucking lanes and the number of trucks that are permitted to enter the port each day. (Goff's Dep., p. 30.)

[5] The agreement also included a "Care, Custody, and Control" provision, which stated:

(continued...)

After entering into the space assignment agreement, Great Southern Wood continued receiving shipments of lumber in Gulfport.

The Vessel Kestrel Arrow delivered approximately 3850 bundles or packages of lumber to Gulfport on August 3, 2005, and completed discharge of her cargo on August 6, 2005. (Doc. No. 26, Ex. G; Goff's Dep., p. 85.) The following day, the United States Department of Agriculture ("USDA") approved the release of the lumber. (Goff's Dep., p. 85.) At that time, Great Southern Wood's trucks began picking up the lumber from the warehouse and delivering the wood to its various treating plants. Approximately 73 units of lumber were trucked per day. (*Id.*, p. 93.) (*Id.*)

On August 23, 2005, a tropical storm over the Bahamas was gradually developing into Hurricane Katrina. As Katrina crossed over the State of Florida into the Gulf of Mexico, the Vessel Sanko Stream was sailing across the Gulf toward the Port of Gulfport with another load of Great Southern Wood's lumber. She arrived in Gulfport safely, and delivered approximately 4060 bundles or packages of wood on August 25, 2005. (*Id.*, p. 84, 86.) The ship discharged her cargo on August 27, 2005. (*Id.*) As Hurricane Katrina grew stronger and headed toward the Louisiana and Mississippi coastline, Great Southern Wood awaited

---

[5](...continued)

The sole responsibility for the care, custody, control and protection of customer's cargo shall be the Customer or, as appropriate, the person designated as the Responsible Party. The Mississippi State Port Authority has no responsibility for the care, custody, control or protection fo Customer's cargo. If the party responsible for the care, custody, control and protection of Customer's cargo is someone other than the Customer, then please identify the responsible party for care, custody, and control.

(Doc. No. 22-5.)

clearance from the USDA to begin transport of the Sanko Stream cargo. By August 29, 2005, Great Southern Wood had moved seventy-two percent of the Kestrel Arrow cargo out of the warehouse. On the morning of August 29, 2005, Hurricane Katrina slammed into the coast, destroying the remainder of the cargo from the Kestrel Arrow and all of the cargo from the Sanko Stream. (*Id.*, p. 86.) On October 4, 2005, United States Customs released the USDA's hold on the Sanko Stream cargo. (*Id.*)

On August 31, 2005, Great Southern Wood reported the loss of lumber to American Home Assurance Company. (Doc. No. 22-5, Ho's Affid., p. 1.) The insurance company retained SGS North American/Marine Services, an independent marine surveyor, to investigate the claim. (*Id.*) On May 23, 2006, American Home Assurance Company determined that Great Southern Wood's claim should be denied for the following reasons:

> The losses presented in [this] claim occurred on August 29, 2006, when the Mississippi State Port Authority Warehouse in Gulfport, Mississippi where the lumber products were stored was destroyed by Hurricane Katrina. Given that these losses did not occur during the ocean voyage, but during a period of storage after discharge of the vessels, we direct your attention to the [warehouse to warehouse] provision of the policy. . . .
>
> We note that the Policy is a Marine Open Cargo Policy and does not provide separate warehouse coverage, nor was such coverage ever requested.
>
> The information submitted establishes that Great Southern used the warehouse at the pier as a storage facility for its lumber after vessel discharge, and the lumber was removed by Great Southern from the warehouse as it was needed at Great Southern's various processing facilities. We have also been advised that occasionally the material was sold and shipped to customers directly from the Gulfport warehouse. The

6

spreadsheets we received indicate that it typically takes Great Southern 90 days or longer to remove the lumber delivered by a particular vessel completely from the Gulfport warehouse. The contract between Great Southern and the Mississippi State Port Authority establishes that Great Southern assumed all responsibility for the care, custody, control and protection of the cargo. SSA is the designated stevedore, cargo handler and terminal operator on behalf of Great Southern. In addition, all of the bills of lading show that the place of delivery is the Port of Gulfport, and the space designated for "Place of delivery by on carrier" is blank. The Commercial invoices for each shipment show the "destination" as Gulfport.

These facts establish that Great Southern exercised full dominion and control over the lumber once it was discharged from the vessels and placed into the warehouse in Gulfport. Therefore, the ordinary course of transit had ceased, and the lumber had been delivered to its final destination warehouse within the meaning of the Policy.

We conclude there is no coverage for these losses under the Policy because the losses occurred after coverage under the Policy had ceased.

(Doc. No. 22-5, Ex. 4.) On August 9, 2006, Great Southern Wood filed the instant lawsuit against the defendants. (Doc. No. 1.)

## II.  THE STANDARD OF REVIEW

Under FED.R.CIV.P. 56(c) summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[6]  The

---

[6]In *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986), the court stated:

(continued...)

party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324. If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993); *see also* FED.R.CIV.P. 56(e). ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248

---

[6](...continued)
"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue...Rule 56(e)...requires the nonmoving party to go beyond the pleadings and by...affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial...We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves....

*Id.* at 324.

(1986).  A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248 (1986).  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 257.  If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant.  *See Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir.1997); *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995).  However, if there is a conflict in the evidence, the plaintiff's evidence is to be believed and all reasonable inferences must be drawn in his favor."  *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED.R.CIV.P. 56(c).  With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

## III.  DISCUSSION

### A.  Breach of Contract

Under the terms of the Warehouse to Warehouse Clause of the marine open cargo

9

policy, "the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to the final warehouse . . . "  Great Southern Wood contends that American Home Assurance Company's denial of its claim is a  breach of the terms of the policy.

Great Southern Wood maintains that the policy term "final warehouse at the destination named in the policy" is ambiguous because the final warehouse or destination is not listed in the policy, and the term is not defined within the policy.  Great Southern Wood argues that the final destination of its product is at its various manufacturing plants to which the lumber is shipped from the port.  The defendants argue that the policy does not cover the loss because Great Southern Wood took complete custody and control over the lumber when it was moved into the plaintiff's assigned warehouse at the port.  The defendants argue the warehoused lumber had reached its final destination and, therefore, was no longer in transit.  Thus, the fundamental issue in this case focuses on the proper construction of the Warehouse to Warehouse Clause of the Marine Open Cargo Policy and whether the lumber was "in transit" or had reached its "final warehouse . . . destination" within the meaning of the clause.

How the fundamental issue is resolved will be largely determined by the applicable law in this case.  With respect to this court's jurisdiction, the parties are all in the same boat.  The defendants assert, and Great Southern Wood concedes, that this case falls squarely within the admiralty jurisdiction of the federal courts.[7]  (Doc. No. 26-1, p. 7.)  Of course, the

---

[7] In its complaint, Great Southern Wood invokes the diversity jurisdiction of the federal courts pursuant to 28 U.S.C. § 1332(A)(1).  The court notes that the plaintiff has "refrained from asserting admiralty jurisdiction under 28 U.S.C. § 1331(1), apparently in order to obtain a jury trial, which, although not generally available in admiralty, can be had if there is also a basis for diversity jurisdiction."

(continued...)

parties cannot by agreement confer jurisdiction on the court, but in this instance, as we will see, they are right. Great Southern Wood also asserts that state law should be applied to its breach of contract claim because a controlling rule of admiralty law is not implicated in this case. (*Id.*) Unfortunately for Great Southern Wood, that claim doesn't hold water. In *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14 (2004), the Supreme Court considered a case in which there was a train wreck involving a shipment of machinery from Australia to Huntsville, Alabama, pursuant to a bill of lading. The Court found that the bill of lading was a maritime contract, holding that "so long as a bill of lading requires a substantial carriage of goods by sea, its purpose is to effectuate maritime commerce – and thus it is a maritime contract." *Id.*, 458 U.S. at 27. Importantly for present purposes, the Court further held that "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Id.*, 543 U.S. at 22-23. The Court emphasized the importance of uniformity of the general maritime law, specifically noting that "'[i]t certainly could not have been the intention [of Article III's grant of admiralty jurisdiction] to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states.'" *Id.*, 543 U.S. at 28, *quoting American Dredging Co. v. Miller*, 510

---

[7](...continued)
*Harville v. Johns-Manville Products Corp.*, 731 F.2d 775, 779 (11th Cir. 1984) (citing *Fitzgerald v. United States Lines Co.*, 374 U.S. 16 (1963)). There is clearly a basis for diversity jurisdiction in this case.

U.S. 443, 451 (1994).

Unquestionably, this suit was properly brought in diversity; however, this case can also be sustained under admiralty jurisdiction by virtue of the maritime contract involved. *See Norfolk Southern Railway Co.*, *supra*. The nature and subject-matter of the marine open cargo insurance policy in this case obviously involves a maritime contract. Assuredly, the dispute is not inherently local; indeed, it involves an international shipment of lumber purchased in South American and shipped to Mississippi. In *Steelmet, Inc. v. Caribe Towing Corp.*, 779 F.2d 1485, 1488 (11th Cir.1986),[8] the Eleventh Circuit explained that in deciding whether to apply state law in an admiralty case, a court must identify the state law involved, determine if an admiralty principle conflicts with that law and if there is not admiralty principle determine if an admiralty rule should be fashioned. If not, then the state rule should be followed. "But, when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." *All Underwriters v. Weisberg*, 222 F.3d 1309, 1312 (11th Cir. 2000) (quoting *Coastal Fuels Mktg., Inc. v. Florida Express Shipping Co., Inc.*, 207 F.3d 1247, 1251 (11th Cir.2000)). The plaintiff argues that the general contract law of Alabama applies, that the applicable terms of the warehouse to warehouse clause are ambiguous and, therefore, summary judgment is impermissible because there is a triable issue of fact. There are several

---

[8]Whether *Weisberg* and *Steelmet's* approach to the question of applying state law *vel non* is valid after *Kirby* is an interesting question but one which the court need not resolve.

problems with this argument.  The parties do not identify any admiralty principle in conflict with state law or suggest to the court that some principle should be developed.  More importantly, the plaintiff has not identified any specific state or local interest at stake relating to the interpretation of the policy.  Thus, even though the court should look to state law in determining marine insurance contract issues, Great Southern Wood's ambiguity argument cannot create an ambiguity in contract language which is well settled in the industry.  As the court will explain, warehouse to warehouse clauses are standard throughout the marine insurance industry.  *See generally* Donald T. Rave & Stacy Tranchina, *Marine Cargo Insurance: An Overview*, 66 TUL. L. REV. 371 (1991).  The court concludes that there is no ambiguity in the contract language sufficient to create a disputed issue of fact for resolution by a trier of fact.

The critical question, therefore, devolves into whether Great Southern Wood exercised dominion and control over the untreated lumber.  The defendants, citing *Lumber & Wood Products, Inc. v. New Hampshire Insurance Co.*, 807 F.2d 916 (11th Cir. 1987), argue that coverage ceased when Great Southern Wood began "exercis[ing] dominion and control over the goods" in the Gulfport warehouse.  In *Lumber & Wood Products*, *supra*, the Court determined that the consignee of lumber destroyed by Hurricane Frederic exercised control over the goods because the consignee, as a practice, sold lumber directly from its dock and had the exclusive right to make all decisions concerning the lumber after off-loading.  807 F.2d at 919-20.

The parties concede that the issues concerning dominion and control, including

13

whether the goods were no longer in transit, are questions of law to be determined by the court.[9]  Thus, this court must determine whether Great Southern Wood exercised control and dominion over the goods at the Gulfport warehouse.

Because warehouse-to-warehouse clauses are standard in open marine cargo policies, and there is a considerable amount of case law interpreting these clauses *see e.g., Pacific Tall Ships Co. v. Kuehne & Nagel Inc.*, 76 F.Supp.2d 886, 893 (N.D. Ill. 1999), this court is not sailing in unchartered waters.  Generally, when an insured has exercised dominion and control over a shipment by accepting delivery, the goods have reached their final destination and coverage under the policy ceases, even if the goods were not delivered into the insured's warehouse.[10]  Rave & Tranchina, *supra* at 379.  A warehouse to warehouse clause establishes that "once the cargo [is] delivered to the [insured] and once it exercises dominion and control over the cargo, treating it as its stock in trade, the final warehouse ha[s] been reached." *Lumber & Wood Products*, 807 F.2d at 919.  The question of whether a loss is covered by a marine open cargo policy turns on whether the insured "'had exercised dominion over the

_____

[9] During oral argument, both parties conceded that the facts in this case are undisputed and that the legal issues concerning the Warehouse to Warehouse Clause are for the court to decide.

[10] Although Great Southern Wood argues that the contract is ambiguous because the final destination is not named in the policy, it is clear that the central issue is whether the plaintiff exercised dominion and control over the lumber.  Moreover, the court notes that, due to the numerous ports and the variety of manufacturing plants involved in Great Southern Wood's importing business, the parties would face difficulties specifying the final destination of all shipments in an efficient manner.  Additionally, the terms of the insurance policy indicate that Great Southern Wood was required to name its final destination to the insurance company.  Given that the sole issue in this case is whether Great Southern Wood exercised dominion and control over the lumber, this court will forego floundering in a sea of contract terminology with respect to any alleged ambiguities.

goods so that it might be said that delivery had occurred.'" *Id.*, *quoting Budco Associates, Inc. v. Royal Exchange Assurance of America*, 53 A.D.2d 568, 384 N.Y.S.2d 819, 820 (1976).  *See also Jomark Textiles*, *Inc. v. Int'l Fire and Marine Ins. Co., Ltd.*, 771 F.Supp. 577, 580 (S.D.N.Y. 1989)(holding that, because the plaintiff "exercised dominion and control over the goods, they were no longer in-transit as a matter of law, and therefore, were no longer covered by the Marine Cargo policy.").  A warehouse-to-warehouse clause in "a transit policy of insurance should not be stretched or tortured to provide coverage for losses which take place after delivery." *Lumber & Wood Products*, *Inc.*, 807 F.2d at 920.   An insured cannot indefinitely avail itself of coverage by storing lumber conveniently in an area which is not designated in the policy, such as outside a warehouse, and then claim that the cargo is allegedly "in transit." *Id.*  Once the final destination is reached, transit must cease. *Id.*  Consequently, coverage must also cease.  *Id.*

In this case, the undisputed facts demonstrate that Great Southern Wood exercised dominion and control over the lumber after it was unloaded of the ships at the Gulfport warehouse.  In his deposition, Maty Goff, an import manager for Great Southern Wood, testified that he and other members of inventory management determined where to transport the lumber after the cargo was placed in the warehouse.  (Doc. No. 22-2, Goff's Dep., p. 59.) Goff acknowledged that he and other Great Southern Wood employees "ultimately . . . make the final call" with respect to where to transport the lumber from the warehouse, that inventory levels and other "supply and demand" issues were some of the factors he considered when determining which manufacturing plant should receive a certain amount of

wood, and that no one else had control over the cargo.  (Id., at 59, 88, 91.)  Moreover, it is undisputed that Great Southern Wood's subsidiary trucking company would routinely transport the lumber from Gulfport to one of the plaintiff's manufacturing plants[11] selected by Goff or another employee.  The parties also do not dispute that Great Southern Wood occasionally sold its lumber to other manufacturers directly from the Gulfport warehouse. Given that Great Southern Wood held the goods at the port until Great Southern Wood's inventory managers, according to the needs of the company and in their discretion, designated where the wood should be sent and that the company's usual practice was to transport the lumber to more than one manufacturing plant, the court concludes that as a matter of law Great Southern Wood exercised dominion and control over all of the lumber stored in the Gulfport warehouse.

Consequently, when the lumber was discharged overside from the Sanko Stream and the Kestrel Arrow and was placed in the Gulfport warehouse, the lumber was no longer "in transit."  The lumber had arrived at its "final warehouse." Under the undisputed facts of this case, the court concludes that Great Southern Wood should not look to the defendant's marine open cargo policy for recompense for this loss.

Great Southern Wood's argument that it did not have any control over the Sanko Stream cargo because the United States Department of Agriculture had not released the shipment prior to the arrival of Hurricane Katrina lacks merit.  A government hold on goods

---

[11] Great Southern Wood has processing facilities in Mobile, Abbeville, Muscle Shoals, Conyers, Jessup, and Lake Panasofkee.  (Goff's Dep., p. 12.)

in the possession, custody, and control of the insured does not render the goods "in transit" for insurance purposes. *See Fireman's Fund Ins. Co. v. Service Trans. Co.*, 466 F.Supp. 934 (D.C. Md. 1979) (holding that coffee shipment which was temporarily delayed in customs due to the FDA's order was no longer "in the ordinary course of transit" under the meaning of the policy).

Based on the foregoing, the court concludes that the motion for summary judgment with respect to this breach of contract claim is due to be granted.

## B.  Bad Faith

Great Southern Wood asserts that American Home Assurance Company acted in bad faith by "intentionally refus[ing] to pays its claim . . . without any reasonably legitimate, arguable, or debatable reasons for that refusal to pay."  (Doc. No. 1, p. 5.)  This claim is a state law claim and determined by state law.

Under Alabama law, there seemingly are two types of bad faith claims.  An insurance company may be liable for either "normal" bad faith or "abnormal" bad faith.  *State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 306 (Ala. 1999).  In its complaint, Great Southern Wood asserts a claim of "normal" bad faith.[12]  A plaintiff alleging that an insurance company committed "normal" bad faith must demonstrate the following:

---

[12] In its response to the defendants' motion for summary judgment, Great Southern Wood also asserts that it is entitled to recover under the theory of "abnormal" bad faith.  (Doc. No. 26, p. 16.)  Specifically, Great Southern Wood contends that American Home failed to conduct a proper investigation of its insurance claims.  (*Id.*)  Great Southern Wood, however, did not allege facts or list this contention as a claim against the defendants in its complaint.  Consequently, any claim that the defendants acted in bad faith by failing to investigate in an appropriate manner is not before this court.

(a)    Existence of an insurance contract and a breach by the insurer;

(b)    Intentional failure to pay the insured's claim;

(c)    Absence of legitimate or arguable reason for refusal;

(d)    The insurer's actual knowledge of the absence of an arguable reason; and

(e)    If the intentional failure to determine the existence of a lawful basis is the theory relied upon, the insured must prove the insurer's intentional failure to determine whether there was a legitimate or arguable reason to pay the claim.

*Cont. Elec. Co. v. Am. Employers' Ins. Co.*, 518 So. 2d 83, 86 (Ala. 1987). "'Normal' bad faith claims are often referred to as 'directed verdict on the contract' claim[s],' . . . because a plaintiff must show that he is entitled to a directed verdict on the breach of contract claim in order to have his bad faith claim submitted to a jury." *Mut. Serv. Cas. Ins. Co. v. Henderson*, 368 F.3d 1309 (11th Cir. 2004) (citing *Employees' Benefit Assoc. v. Grissett*, 732 So. 2d 968, 976 (Ala. 1995)); *Blackburn v. Fid. & Deposit Co. of Md.*, 667 So. 2d 661, 668 (Ala. 1995); *Nat'l Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982)). As previously discussed, the court finds that Great Southern Wood exercised dominion and control over the lumber and that the cargo had reached its final destination. Thus, Great Southern Wood is not entitled to a directed verdict on the breach of contract claim. Consequently, Great Southern Wood has failed to establish a bad faith claim against American Home Assurance Company.

### C. The Abandoned Claims

In their motion for summary judgment, defendants AIG, American International Underwriters Corporation, and American International Marine Agency argue that they are entitled to summary judgment because "[Great Southern Wood] does not claim any benefits due under any policy with these remaining defendants and therefore does not assert any claim against these defendants." (Doc. No. 22-1, p. 16.) In its response, Great Southern Wood does not list any enumerated claims or brief the issue concerning its failure to assert any claim for benefits due under a policy with the aforementioned defendants. (Doc. No. 26.) Great Southern Wood alleges no facts and makes no argument in response to the defendants' motion for summary judgment with respect to any claims against these defendants. (Doc. No. 26.) In addition, Great Southern Wood does not address the defendants' argument that it has failed to assert a claim against defendants AIG, American International Underwriters Corporation, and American International Marine Agency.

The burden is on the parties to formulate arguments, and a plaintiff's failure to list an enumerated claim and brief an issue in a memorandum of law in opposition to a defendant's motion for summary judgment is deemed an abandonment of that claim. *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274 (11th Cir. 2003); *Thomas v. Alabama Council on Human Relations, Inc.*, 248 F.Supp.2d 1105, 1107 n.1 (M.D. Ala. 2003). *Cf. Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994). Accordingly, the court concludes that Great Southern Wood has abandoned its claims against defendants AIG, American International Underwriters Corporation, and

American International Marine Agency. Consequently, the defendants' motion for summary judgment with respect to the claims against the aforementioned defendants is due to be granted.

The court has earlier entered an order granting summary judgment. A separate final judgment will be entered contemporaneously with this opinion.

Done this 21th day of August, 2007.


　　　　　  /s/Charles S. Coody  　　　　　　　　
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE